UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOM CUMMINS, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>vs.<br><br>VIRTUS INVESTMENT PARTNERS INC., GEORGE R. AYLWARD, MICHAEL A. ANGERTHAL, FRANCIS G. WALTMAN and MARK S. FLYNN,<br><br>       Defendants. | No. 15 Civ. _____<br><br>JURY TRIAL DEMANDED |



## CLASS ACTION COMPLAINT

1. Plaintiff Tom Cummins ("Plaintiff"), by and through his undersigned counsel, brings this action individually and on behalf of all persons and entities who purchased or otherwise acquired publicly traded stock in Virtus Investment Partners Inc. (NASDAQ: VRTS) ("Virtus" or the "Company") between May 28, 2013 and December 22, 2014 (the "Class Period"), and were damaged thereby.

2. Virtus is a financial services company with an office in New York, New York that provides investment products and solutions primarily through its subsidiary investment managers. Virtus offers a wide range of open- and closed-end mutual funds, managed accounts and variable insurance products to retail and institutional investors.

3. On December 31, 2008, Virtus was launched as an independent public company in a spin-off of its predecessor's asset management business. In 2008, due to the global financial crisis, Virtus's asset management business had suffered a loss of $17 billion in assets under

management, and it reported an impairment charge of $529 million, or $91.75 per share, when its share price was trading at $10 per share. Virtus desperately needed to turn around its fortunes.

4.     In the fall of 2009, Virtus began to market and offer funds with an "AlphaSector" strategy through a co-advisory relationship with a newly formed investment advisory firm, F-Squared Investments, Inc. ("F-Squared"). F-Squared developed the AlphaSector strategy, which purported to use proprietary quantitative models that provided signals allowing exchange-traded funds ("ETFs") allocated across various sectors managed by the strategy to re-allocate and realize gains when the index was up, while avoiding losses while the index was down.

5.     Virtus sold and marketed AlphaSector funds under its own name as having attractive risk-adjusted returns back to April 2001, which exceeded performance of the Standard & Poors Index ("S&P Index"). The AlphaSector strategy supposedly had limited investor losses during the stock market crash in fall 2008, because it purportedly moved away from the financial sector before its collapse. The AlphaSector's past returns back to April 2001 were presented as the legitimate results of live management of client assets, and not back-tested results that were hypothetical.

6.     The problem was that F-Squared lied about the AlphaSector's track record – 1) it was actually back-tested and not the result of management of "live" customer assets; and 2) the back-testing was not performed accurately, so the results were grossly inflated.

7.     From as early as October 2009, there were false statements in the sales and marketing materials for the AlphaSector Funds prepared by F-Squared. The Financial Industry Regulatory Authority ("FINRA"), which regulates the sales and distribution of mutual funds, refused to approve advertising materials submitted by F-Squared for the AlphaSector funds. Nevertheless, Virtus adopted the sales and marketing materials as its own, including the past

track record, and incorporated this information into registration statements for its AlphaSector funds.

8. Under the Investment Company Act of 1940 ("ICA"), Virtus had duties to ensure the truthfulness and accuracy of its sales materials and registration statement filings for its AlphaSector funds. Virtus also had due diligence duties under Securities and Exchange Commission ("SEC") Rules to perform due diligence before entering into any sub-advisory agreements.

9. As a result, from the start of its sub-advisory relationship, Virtus made numerous requests of F-Squared about the past track record to fulfill its statutory and due diligence duties. Virtus received multiple contradictory or ambiguous responses from F-Squared, all of which were "red flags" that should have raised suspicions over the legitimacy of the past returns. Virtus further failed to verify F-Squared past track record or to obtain F-Squared's "books and records" documenting its actual past performance (which it was required to keep under SEC Rules). But for Virtus's willful blindness, it would have discovered that neither such verification nor such books and records actually exited.

10. Upon information and belief, Virtus aggressively pushed its salespeople to sell the AlphaSector funds through its distribution network of retail broker-dealers and financial advisors. Virtus held sales meetings and instructed its salespeople to tout the past track record of the AlphaSector strategy as evidence that high returns could be earned at low risk, and that the strategy greatly exceeded the S&P Index. Virtus offered substantial sales incentives to its salespeople to sell the AlphaSector Funds over other products.

11. By at least December 14, 2012, however, Virtus knew—or was reckless in not knowing—that the AlphaSector's past track record was back-tested, and was not, in fact, the

results of live asset management. At a meeting held on this date, F-Squared's President gave a presentation to Virtus's salespeople in which he touted AlphaSector's past returns and track record. On information and belief, after he spoke, Virtus's Head of Product Management advised Virtus's sales personnel to ignore these comments about the past track record because the returns were back-tested and not "live" assets.

12. Later, on or about May 28, 2013, Virtus learned that the AlphaSector's past results were grossly overstated and inflated. On information and belief, at or about this time, Virtus learned from F-Squared's data provider that the AlphaSector past returns could not be replicated, and that they were not, therefore, legitimate.

13. However, despite now knowing that the AlphaSector's marketing of its past track record was false and over-stated, Virtus never disclosed this fact to the public or corrected the false and misleading statements in its sales and marketing materials, registration statements and prospectuses for the AlphaSector funds. Virtus ignored the truth because of the explosive growth in the AlphaSector funds—growth that had saved Virtus from the brink of collapse and was vital to its recent success.

14. Virtus's sales of funds with the AlphaSector strategy were enormously successful from 2010 through 2014, and drove increases in the Company's assets under management, its revenues, its earnings and its stock price. The most growth occurred during 2013. By the end of that year, Virtus had successfully launched five AlphaSector funds, which had grown to $11.4 billion in assets under management from nothing. Overall, Virtus grew its assets under management to $57 billion, with revenues of $389 million. The AlphaSector funds carried the highest management fees of all of Virtus's funds and drove the growth of its revenues and profits.

15. To date, due primarily to success at Virtus, the AlphaSector strategy has become the largest ETF-managed strategy in the marketplace.

16. On May 28, 2013, at the start of Class Period, Virtus's stock was trading at **$235** per share. Virtus's stock price had more than doubled as its business grew over the previous few years. As of this date, Virtus knew for a fact—or was willfully blind to the fact—that its stock price was trading at artificially high prices, and that its growth was based on a fraud.

17. On September 5, 2014, however, Virtus investors began to realize the truth. The *Wall Street Journal* reported that F-Squared had received a *Wells Notice* from the SEC for alleged falsifications about its AlphaSector performance and track record in its sales and marketing materials and required regulatory filings.

18. As a result of this first revelation, over the next few days, Virtus's stock price fell by $37 per share, or 16%, from $223 per share to $186 per share. Virtus was further hurt by huge outflows of investor funds from its funds due to a lack of confidence and concern. Virtus's name and reputation were further damaged. Virtus's stock price continued to decline over the next several months while the potential charges hung over F-Squared.

19. Then, on December 22, 2014, the SEC announced that it had formally charged F-Squared and its President, Howard Present, for fraud and various violations of the Investment Advisors Act of 1940 ("IAA"), and that it had reached a settlement with F-Squared regarding those charges. F-Squared consented to the entry of the order finding that it violated Sections 204, 206(1), 206(2), 206(4), and 207 of the IAA and Rules 204-2(a)(16), 206(4)-1(a)(5), 206(4)-7, and 206(4)-8. The order also found that F-Squared aided and abetted and caused certain mutual funds sub-advised by F-Squared to violate Section 34(b) of the Investment Company Act of 1940 ("ICA"). F-Squared acknowledged that its conduct violated federal securities laws, and

agreed to cease and desist from committing or causing violations of these provisions. F-Squared also agreed to cease and desist from its prior violations, retain an Independent Compliance Consultant, and pay disgorgement of $30 million and a penalty of $5 million. The SEC also charged Present with the same violations.

20. The SEC's announcement, although never mentioning Virtus by name, revealed further details and evidence of F-Squared's fraud which implicated Virtus, and Virtus's stock price dropped accordingly to **$168** per share.

21. Virtus is liable to its shareholders because it knew that its business growth, revenue growth and profits were based upon a fraud. Virtus, through its wholly-owned subsidiaries, controlled the investment company and investment adviser for the AlphaSector funds it offered under its name. By at least May 28, 2013, Virtus had actual knowledge that there were materially false statements in the AlphaSector fund registration statements, prospectuses, sales and marketing materials about its strategy and its past track record, that they false statements had inflated its earnings and growth, and that the Company's stock price was artificially inflated.

22. Finally, even after Virtus knew the truth, it failed to so inform its investors and continued to disseminate false and misleading statements to sell the AlphaSectors funds. Virtus's stock price continues to decline to this day.

23. Plaintiff asserts securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of purchasers of Virtus's stock during the Class Period.