# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

IN RE VIRTUS INVESTMENT
PARTNERS, INC.
SECURITIES LITIGATION

Case No. 15-cv-1249 (WHP)

**JURY TRIAL DEMANDED**

**ECF CASE**

## CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. JURISDICTION AND VENUE ...........................................................................8

III. THE PARTIES ......................................................................................................9

    A. Lead Plaintiff ..............................................................................................9

    B. Defendants ..................................................................................................9

    C. Relevant Non-party ..................................................................................12

IV. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ........13

    A. Virtus's Business Is Struggling as it Seeks a Successful Product .........13

    B. Virtus Partners With F-Squared ............................................................13

    C. Virtus Touts AlphaSector's Historic Track Record .............................18

    D. Virtus Touts Its Ability to Select and Monitor Subadvisers Such as F-Squared, and the Technical Prowess of AlphaSector's Strategy...........21

    E. Virtus's Assets under Management, Revenue, Earnings, and Stock Price Skyrocket Due To The Success Of AlphaSector...................................23

    F. Doubts About the AlphaSector Track Record Are Raised Internally Within Virtus, But Ignored ...........................................................................26

    G. The December 14, 2012 Boca Raton Conference – An Internal Bombshell.........27

    H. After the Wholesaler Conference in Boca Raton, Nothing Changes ...................29

        1. Virtus Continues To Aggressively Market The AlphaSector Funds Based On Knowingly False Information ...................................30

        2. The September 2013 Secondary Offering: VIP Sells More Than $160 Million In Common Stock To Investors...........................................32

    I. "All Hell Breaks Loose": Virtus Learns The SEC Is Investigating F-Squared And Employees Are Directed To Destroy Documents .........................33

    J. Virtus Executives At the Heart of the Fraud Start To Sell Their Stock and Cerutti Abruptly Resigns ...................................................................36

V. THE TRUTH BEGINS TO EMERGE.............................................................38

A.     The Market Begins To Learn The Truth, But Analysts Still Believe Any Regulatory Concerns Stop At F-Squared ............................................................... 38

B.     In Its Settlement with the SEC F-Squared Admits To "Willful Violations" of the Securities Laws And "Aiding And Abetting" Violations By Certain (As Yet) Unnamed Mutual Fund Companies ........................................................ 40

C.     Defendants Continue to Mislead Investors ............................................................. 44

D.     Defendants Are Finally Forced To Reveal The Truth ........................................... 45

VI.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................ 47

A.     False and Misleading Statements and Omissions About AlphaSector's Historic Track Record .............................................................................................. 47

B.     False and Misleading Statements and Omissions Regarding Virtus's Selection And Monitoring of Managers And Sub-advisers ................................... 54

C.     False and Misleading Statements Regarding Virtus's Revenue ............................ 56

D.     False and Misleading Statements about the Technical and Proprietary Aspects of the AlphaSector Model ........................................................................ 58

E.     False and Misleading Statements and Omissions Regarding Legal and Regulatory Matters ................................................................................................. 60

VII.   LOSS CAUSATION ...................................................................................................... 61

VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE .................................................................................................. 61

IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................................................ 62

X.     PRAYER FOR RELIEF .............................................................................................. 69

XI.    JURY TRIAL DEMAND ............................................................................................. 69

Court-appointed Lead Plaintiff the Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff"), by its counsel, brings this federal securities class action on behalf of itself and other entities who purchased or otherwise acquired the publicly traded securities of Virtus Investment Partners, Inc. (defined below as "VIP", and, together with its affiliates and subsidiaries, referred to herein as "Virtus" or the "Company") between January 25, 2013 and May 11, 2015 (the "Class Period"), and were damaged thereby.

## I.    **INTRODUCTION**

1.     This case is about a mutual fund company (Virtus) that falsely marketed its flagship product based on a purported blockbuster performance record that in reality never existed. During and before the Class Period, Virtus and its senior executives told investors that the proprietary trading strategy underlying its AlphaSector funds had an astounding historical track record.

2.     According to Defendants, from April 2001 to September 2008 the AlphaSector strategy had achieved astonishing returns approximately 480% greater than the S&P 500 index. This was false. In reality, as Defendants knew, the strategy underlying the AlphaSector funds did not even exist prior to September 2008, and the funds' purported track record was fabricated using back-tested hypothetical results that were not only falsely presented to investors but were themselves grossly inflated.

3.     Defendants profited enormously from their misrepresentations. Their false statements and omissions led to an influx of billions of dollars from unknowing investors and fueled an astonishing spike in Virtus's revenues and assets. This, in turn, caused a correspondingly sharp rise in the Company's stock price, which soared from $10 per share in January 2009 to more than $247 per share by mid-2013. When the truth finally emerged, Virtus's stock price fell nearly 53%, causing hundreds of millions of dollars in losses to investors. Investors are now entitled to recover from the individuals and entities responsible for their losses.

**Background And Overview**

4.      In January 2009, in the wake of the 2008 financial crisis that took a heavy toll on many financial institutions, Virtus became a publicly traded company through an initial public offering ("IPO"). Virtus's stock began trading at $10 per share and shortly thereafter the Company announced a per share impairment charge of $91.75. The Company needed to turn its fortunes around fast if it was to succeed in the ultra-competitive mutual fund industry.

5.      It appeared that Virtus's fortunes had changed in the fall of 2009 when it began to market a new family of funds called "AlphaSector." Virtus offered the AlphaSector funds through a co-advisory relationship with a recently formed investment advisory firm, F-Squared Investments, Inc. ("F-Squared"). The AlphaSector strategy had been developed by F-Squared in conjunction with a then twenty year old college intern and purported to use a proprietary strategy that for years had far outperformed the S&P 500. For instance, one of the AlphaSector indexes boasted having a loss in 2008 of only -1.13% at the time when the market faced one of the greatest financial crises in history and the S&P 500 fell 37%, wiping out many investors and leading to the collapse of some of the most venerable financial institutions in the world.

6.      Virtus began to aggressively market the AlphaSector funds under its own name emphasizing this purported performance record. In marketing materials and other public statements Virtus highlighted AlphaSector's supposed outsized returns going back to April 2001, and presented them as actual results achieved through managing real client assets from an "inception date [of] April 2001."

7.      This information was critically important to potential investors. As described by a former wholesaler who was employed by Virtus during the Class Period and was personally involved in marketing the AlphaSector funds, this track record was the funds' central selling point,

and "everything was built on the track record." Indeed, this former Virtus employee provided Co-Lead Counsel with a VIP marketing document dated January 31, 2013 that is branded with the VIP logo on the first page and expressly touts AlphaSector's past performance record. *See* Exhibit A (Virtus Investment Partners Prospectus dated January 31, 2013). According to this former Virtus employee, the VIP prospectus attached here as Exhibit A was one of the documents used by Virtus's sales force to market the AlphaSector funds during the Class Period.

8. This former employee also stated that the Virtus salesforce was trained to direct potential investors to the specific pages in the document referencing AlphaSector's performance track record because that information "closed the sale." *See* Exhibit A at 60-61. These pages state that the AlphaSector "inception date is April 1, 2001," and highlight the supposed "performance of AlphaSector . . . as compared with the performance of the S&P 500 Index" for periods prior to October 2008. This same information was so critical to Virtus that it also was incorporated into the registration statements VIP filed with the Securities Exchange Commission ("SEC").

9. To allay any investor concerns about the legitimacy of the AlphaSector track record, VIP assured investors that it had performed extensive due diligence on F-Squared, stating in numerous SEC filings that "the identification and selection of investment managers, both affiliates and subadvisers, is <u>critical to the [Virtus] business</u>."[1] The Company also represented that it engaged in "rigorous monitoring" of its sub-advisors, had a "disciplined approach to performance oversight," and selected only "high-caliber managers." Well aware of the importance of the AlphaSector strategy to its overall success, Virtus even specifically highlighted F-Squared as an example of its supposedly rigorous process for selecting investment managers, claiming

---

[1] All emphasis added unless otherwise noted.

during an investor conference in March 2013 that the Company "identif[ies] high-quality teams" and pointed to its "success with [selecting] subadviser F-Squared."

10. Virtus's public representations had their desired effect. Between the fall of 2009 and 2013, the assets in Virtus's AlphaSector funds grew from zero to $11.4 billion. The growth of these funds – which charged the highest management fees of all of Virtus's funds – drove a huge increase in the Company's revenues and profits. From 2010 to 2013, Virtus's revenues increased from $117 million to $389 million. The impact on Virtus's stock price was even more stark. From its initial offering price of $10 per share on January 2, 2009, Virtus's stock price rose to $247.12 per share on May 17, 2013 – an increase of over 2,350%. Analysts noted that AlphaSector was Virtus's flagship product and "generate[d] the lion's share of the firm's overall mutual fund flows" and revenues.

11. Unfortunately for investors, Virtus's representations regarding the AlphaSector funds and the Company's representations regarding its supposedly "rigorous" process of selecting and overseeing investment managers were false. As detailed below, from the outset of its relationship with F-Squared, Virtus ignored numerous warning signs and red flags regarding F-Squared. If Defendants had actually performed any serious due diligence (as they claimed to have done), they would have learned that the AlphaSector track record was utterly false. Far from outperforming the S&P 500 from 2001 through September 2008, the AlphaSector strategy did not even exist until October 2008, and its purported performance record was a fiction constructed by "back-testing" hypothetical results. Moreover, the back-testing itself was performed inaccurately, so even the back-tested results were grossly inflated.

**The December 14, 2012 Boca Meeting**

12.     There can be no dispute that by the end of 2012, Virtus's senior executives knew that the Company's representations about the AlphaSector funds were false.

13.     On December 14, 2012, Virtus held an internal conference for its wholesalers in Boca Raton, Florida, with Virtus's CEO Defendant George Alyward attending by phone and Virtus's Executive Vice Presidents and Defendants Jeff Cerutti and Frank Waltman attending in person. During that conference, the founder of F-Squared (Howard Present) gave a presentation in which he touted AlphaSector's supposedly live performance track record. Following the presentation, however, Virtus's Vice President of Product Management, Peter Batchelar (the executive who had been responsible for conducting due diligence on F-Squared), stood up and told the room not to heed Present's statements about the performance track record because F-Squared's previous returns were in reality based on the back-testing of hypothetical assets. According to individuals who attended the conference, Virtus's senior management sat "stone faced" following Batchelar's remarks, while other employees in the room were shocked to hear that AlphaSector's primary selling point was false.

14.     Incredibly, Virtus continued to sell its money-making AlphaSector funds using the same marketing material and making the same knowing misrepresentations. On January 25, 2013, Virtus filed a registration statement and accompanying prospectus with the SEC containing the exact same language found in past prospectuses highlighting AlphaSector's pre-October 2008 performance record. The registration statement was signed by Virtus's Chief Executive Officer Alyward, supposedly reviewed in accordance with Company and regulatory due diligence standards by Executive Vice President Waltman, and used to market the AlphaSector funds by Virtus's sales force, which was overseen by Executive Vice President Cerutti.

15.     In the twelve months after December 2012, as Virtus continued to market the AlphaSector funds based on multiple false statements about its track record and the Company's due diligence into F-Squared, the funds' assets under management more than doubled, increasing from approximately $5 billion to more than $11 billion.  Defendants realized enormous profits and revenues from this increase.  Among other things, Defendants leveraged Virtus's growth to conduct a secondary offering of common stock based on the same misrepresentations.  Specifically, on September 13, 2013, Virtus raised more than $160 million from public investors by issuing and selling 1.1 million shares of its common stock at an offering price of $155 per share.

**Virtus Learns That The SEC Is Investigating F-Squared**

16.     In early October 2013, F-Squared's founder Howard Present gave another presentation, this time in Chicago, to a Virtus-only crowd of senior managers and advisors.  During this meeting, Present stated that F-Squared was being investigated by the SEC regarding the truth of its touted 2001 to 2008 performance records.

17.     News of an SEC investigation into F-Squared was not publicly known at the time and caused Virtus to go into full damage control mode.  According to the former Virtus employee referenced above, Defendants Alyward and Cerutti quickly arranged an all hands on deck conference call where employees were told by Cerutti and others to "destroy any materials they had" relating to the supposed track record of the AlphaSector funds.  This former employee stated that what followed was a "scorched earth" approach to destroying documents, including emails, relating to Virtus's marketing of AlphaSector in reliance on its purported past performance track record.  Virtus's management also acted to quietly eliminate references to AlphaSector's track record from publicly-filed documents.  For example, it was deleted from Virtus's October 4, 2013 prospectus without any explanation or mention.

18.     Shockingly, although Virtus claimed that it conducted "rigorous" monitoring of its subadvisers and enforced the highest standards of discipline and quality, Defendants continued to allow F-Squared to manage billions of dollars of Virtus's clients' assets as if nothing was wrong. Virtus did not alert its investors to the critical fact that the Company had falsely marketed its flagship funds for years; Virtus did not take any steps to remove F-Squared from its supposedly "high quality" group of sub-advisors; and Virtus did not even investigate the allegations against F-Squared (which Virtus in fact already knew to be accurate). Virtus management instead chose to ignore the issue, claiming to employees that this was an "F-Squared issue, not a Virtus issue" and "all the mutual funds were started in 2009 and later."

19.     Virtus's senior executives, however, knew that trouble was on the horizon and began to unload their own holdings of Virtus stock. Defendant Cerutti for instance, sold more than 34% of his Virtus stock between June 2013 and March 2014, realizing profits for himself of more than $2.2 million. Likewise, Defendant Waltman, between March 2013 and March 2014, sold 28% of his personal holdings for a personal profit of more than $1.6 million.

**The Truth Emerges**

20.     Investors eventually learned the truth. On September 3, 2014, news agencies reported that F-Squared had received a "Wells Notice" from the SEC regarding its AlphaSector funds. While Virtus continued to deny that the SEC investigation could impact Virtus, this news caused the Company's share price to decline by $37.33, or 16.7%. Then, on December 22, 2014, the SEC announced that it had formally charged F-Squared and its founder for fraud and various related violations of the Investment Advisers Act of 1940 and that F-Squared had reached a simultaneous settlement with the SEC related to those charges. In connection with the settlement, F-Squared "admit[ted]" to "willfully violat[ing]" the federal securities laws and, notably, "aid[ing]

and abett[ing] certain [as yet unnamed] mutual fund companies" to violate federal securities laws. F-Squared agreed to pay $35 million in disgorgement and civil monetary penalties.

21.     Despite Defendants' longstanding knowledge of F-Squared's false representations and their direction to employees to destroy relevant documents, they continued to tell investors that the F-Squared issues would not impact the Company.  For instance, in its 2014 Form 10-K filed March 2, 2015, Virtus claimed "that the outcomes of its legal and regulatory proceedings are not likely, either individually or in the aggregate, to have a material adverse effect on its consolidated financial condition."  This was false and misleading and omitted material information.

22.     In its Form 10-Q filed May 11, 2015, Virtus was finally forced to admit that the SEC was investigating Virtus regarding "whether the Company had violated securities laws or regulations with respect to F-Squared's historical performance information."  In response to this news, Virtus stock plunged 13% in a single trading day.

23.     Virtus has since taken a reserve of $16.5 million in connection with the ongoing SEC investigation into the Company, fired F-Squared, been forced to re-brand its flagship AlphaSector funds under a new name, and seen a reduction of more than 15% in the assets under management in its former AlphaSector funds (with redemptions continuing).  Analysts have estimated that Virtus could pay the SEC tens of millions of dollars in costs, penalties and disgorgement relating to the SEC investigation and Virtus's legal and regulatory troubles remain ongoing.

## II.     JURISDICTION AND VENUE

24.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, § 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

25.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

26.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts and transactions that give rise to the violations of law alleged herein, including the dissemination to the public of materially untrue and misleading mutual fund advertising materials, press releases and filings with the SEC, occurred in this District, where the Company's securities actively traded on the NASDAQ Stock Market.

27.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE PARTIES

### A.     Lead Plaintiff

28.     Plaintiff Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff") is a public pension system that has been providing retirement benefits to Arkansas's public school and education employees since 1937.  ATRS manages approximately $15 billion in assets for the benefit of its members.  As set forth in the certification already on file with the Court, ATRS purchased Virtus common stock during the Class Period and suffered damages as a result of the violations alleged herein.  On June 9, 2015, this Court appointed ATRS as the Lead Plaintiff in this litigation.

### B.     Defendants

29.     Defendant Virtus Investment Partners, Inc. ("VIP") is incorporated under the laws of Delaware, headquartered in Hartford, Connecticut, and transacts business in this district, in part,

through an office at 1540 Broadway, New York, New York. VIP's stock trades publicly on the NASDAQ stock exchange under the symbol "VRTS." VIP also solely owns and controls Virtus Investment Advisors Inc. ("VIA"), an SEC-registered investment adviser with several of the same officers and directors as Virtus and acted as the investment adviser for the Virtus AlphaSector Funds. VIA is also the investment adviser for Defendant Virtus Opportunities Trust (defined below as "VOT"), an SEC-registered investment company controlled by VIP, which filed registration statements, prospectuses for the Virtus AlphaSector Funds, and issued the Virtus AlphaSector mutual fund shares to the public.

30. Defendant George R. Aylward is and at all relevant times was the President, Chief Executive Officer and Director of VIP and certified the truth and accuracy of VIP's public filings throughout the Class Period. He was also the President, Chairman and Director and a control person of VIA and the President and a Trustee of VOT. As President and a Trustee of VOT, Aylward co-signed the sub-advisory agreement between VIA and F-Squared, was required to oversee Virtus's AlphaSector investments, and signed VOT's registration statements and prospectuses throughout the Class Period.

31. Defendant Michael A. Angerthal is and at all relevant times was the Executive Vice President, Chief Financial Officer and Treasurer of VIP. As the CFO of VIP, he certified the truth and accuracy of its public filings throughout the Class Period. He was also the Vice President, Chief Financial Officer, Director and a control person of VIA.

32. Defendant Jeffrey T. Cerutti is the former Executive Vice President and Head of Distribution for VIP and the former President of VP Distributors, LLC, the underwriter for VOT and a 100% wholly owned subsidiary of VIP. Cerutti commenced employment with the Company effective June 1, 2010 and abruptly resigned from his position effective April 1, 2014. The

Company's January 25, 2013 Registration Statement names Cerutti as the President of VP Distributors.

33.     Defendant Francis G. Waltman is and at all relevant times was the Executive Vice President and Head of Product Management of VIP.  Defendant Waltman was also the Executive Vice President, Director and a control person of VIA.  As the Senior Vice President and control person of VOT, Waltman co-signed the subadvisory agreement between VIA and F-Squared.

34.     Defendants George R. Aylward, Michael A. Angerthal, Jeffrey T. Cerutti, and Frank G. Waltman, are collectively referred to as the "Executive Defendants."  The Executive Defendants, because of their positions within VIP and affiliated companies, possessed the power and authority to control the contents of Virtus's filings with the SEC, its press releases, its presentations to securities analysts and institutional investors, and its other public statements.  Each of the Executive Defendants was provided with copies of the Company's reports and other public statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each Executive Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and misleading when made.

35.     Defendant Virtus Opportunities Trust ("VOT") is an open-end management investment company registered with the SEC under the Investment Company Act of 1940. Defendant Aylward is a senior officer and trustee of VOT, and Waltman is a senior officer of VOT.

36.     The Executive Defendants, VIP, and VOT are collectively referred to herein as the "Defendants."

C.    **Relevant Non-party**

37.    During the Class Period, Virtus marketed and sold its flagship AlphaSector funds in connection with a sub-advisory agreement with F-Squared.  F-Squared was founded in 2006 by Howard Present, and is an investment adviser with its headquarters in Wellesley, Massachusetts.  F-Squared, in conjunction with a college student who in 2008 was 20 years old, developed the proprietary trading model underlying the AlphaSector funds marketed and sold by Virtus during the Class Period.

38.    On December 22, 2014, the SEC announced that it had charged F-Squared and Howard Present with a host of violations of federal securities laws related to Virtus's AlphaSector funds, and that F-Squared had simultaneously reached a settlement with the SEC where it admitted intentional wrongdoing, and "violations of the federal securities laws."  F-Squared also admitted that Virtus's AlphaSector funds were intentionally marketed based on a false, materially inflated performance track record.  F-Squared also admitted to violating Sections 204, 206(1), 206(2), 206(4), 206(4)-(8), and 207 of the Investment Advisers Act of 1940 ("Advisers Act"), which prohibit "publish[ing], circulat[ing], or distribut[ing] . . . untrue statement[s] of material fact" in mutual fund filings and advertisements.  F-Squared further admitted to "willfully violat[ing] Section 34(b) of the Investment Company Act of 1940 ("Investment Company Act") because it "willfully aided and abetted . . . certain mutual funds sub-advised by F-Squared" to make "untrue or misleading statement[s] of material fact in [] registration statement[]s" and other documents.

39.    In addition to making the admissions described above and other admissions, F-Squared agreed to pay $35 million to resolve the SEC's charges.  The SEC has announced that its investigation into these matters is continuing and, as described below, the SEC is currently investigating Virtus for its role in marketing the AlphaSector funds and – spurred by the SEC's investigation – Virtus has finally terminated its relationship with F-Squared.

## IV.	FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.  Virtus's Business Is Struggling as it Seeks a Successful Product

40.	In late 2008, the Phoenix Companies, Inc. ("Phoenix"), a life insurance and annuity company, desperately needed to get rid of a problem child – its wholly owned subsidiary Virtus. As investment values dropped and clients fled in the wake of the financial crises, Virtus's assets had declined by 50% in 2008.

41.	On December 31, 2008, Phoenix launched Virtus as an independent public company through an IPO on January 2, 2009.  Virtus's shares began trading on the NASDAQ Global Market under the symbol "VRTS," at $10 dollars per share, giving the Company a market capitalization of approximately $57 million.  A few months later, Virtus reported in its 2008 Form 10-K filed April 10, 2009 that it would be forced to take a $91.75 per share impairment charge which was over 800% of its total market capitalization.

42.	It was plain by this point that Virtus desperately needed to turn around its fortunes if it was going to succeed in the mutual fund industry.  Virtus executives understood better than anyone that the mutual fund business was cut-throat and highly competitive.  Because Virtus was tiny compared to the larger mutual fund companies, and because of its precarious financial position, Virtus had to quickly find products that trounced the competition and which its sales force could market aggressively.  As Virtus's CEO Aylward noted in public statements -- "Of course the primary driver of success in the business is really investment performance, products must have solid performance to attract and retain assets."

### B.  Virtus Partners With F-Squared

43.	In 2006, Howard Present co-founded F-Squared to develop and market a quantitative-based product called "AlphaCycle."  According to the SEC's Complaint against F-Squared dated December 22, 2014 ("SEC Complaint"), F-Squared had failed to turn a profit by

2008. Indeed, as of July 15, 2008, F-Squared had received only $189 of AlphaCycle fees for the calendar year, while suffering a $609,000 net loss. By mid-2008, F-Squared was struggling to meet its payroll.

44. In early June 2008, Present had several discussions with David Morton, a wealth advisor from the Boston area, hoping to interest him in a joint venture using AlphaCycle. Morton was not impressed, AlphaCycle offered nothing promising, but he was interested in pitching a sector rotation strategy which intrigued Present. Morton told Present that he had a 20 year-old college intern, Corey Hoffstein, who was working on various quantitative projects in the development phase, including a momentum-based algorithm that analyzed price trend and volatility data to generate buy/sell signals for investments that would be licensed through a company founded by Morton and Hoffstein called Newfound Research. These discussions eventually led Present and F-Squared to develop a supposedly proprietary strategy called "AlphaSector," and F-Squared entered into a licensing agreement with Newfound Research to implement that strategy.

45. On February 6, 2009, F-Squared contacted Virtus about AlphaSector, claiming that it was a "proprietary analytical engine" that had "consistently outperformed the benchmark S&P 500 since its inception in April, 2001." The purported track record of the AlphaSector strategy was remarkably better than the competition, with F-Squared claiming that it performed better than 99% of its peer group.

46. Soon thereafter, Virtus began to consider entering into a sub-advisory relationship with F-Squared in order to market the AlphaSector funds. Before it could do so, however, Virtus was under a strict obligation to conduct a rigorous diligence process to confirm F-Squared's claims about AlphaSector's performance. Section 15(c) of the Investment Company Act states:

It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.

47.     Virtus was also required by law to hire a sub-adviser pursuant to written contract and to oversee and approve that contract on an ongoing basis.  Section 15(a)(2) of the Investment Company Act states:

It shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract, which contract, whether with such registered company or with an investment adviser of such registered company, has been approved by the vote of a majority of the outstanding voting securities of such registered company, and. . . shall continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company.

48.     SEC Rule 270.34b-1 likewise imposes strict requirements on the presentation of any investment performance or comparison to indexes in advertising and sales materials, so that the advertisement is not "deemed to be misleading."  Other SEC Rules, such as Rule 275.205-1, provides precise instructions for how an "investment record" and "investment performance" can be calculated.  Accordingly, in order to assess the accuracy and legal compliance of any past track record represented by F-Squared, Virtus was required to analyze and understand the source of the AlphaSector strategy's returns from its inception date.

49.     Indeed, recognizing the importance that its own investors placed on the Company's ability to pick quality mangers and sub-advisers and to monitor them diligently, VIP assured investors in its SEC filings and elsewhere that it closely monitored the quality of its subadvisers.  For instance, in its Form 10-K filed April 10, 2009, Virtus stated "[w]e monitor the quality of the managers' products by assessing their performance, style, consistency and the discipline with which they apply their investment process."   Likewise, in the Virtus Q4 2009

conference call on February 5, 2010, Defendant CEO Alyward noted that "[o]ur product management and development capabilities are a core part of the business. . . . We monitor and manage our products continuously and we are willing to make manager changes when appropriate to improve performance."

50.     According to the SEC's complaint, on September 16, 2009, Present told Virtus: "The index is based on a live strategy, with live client assets that was run since inception in 2001." Though the Defendants were required to rigorously review these statements and other background information to assess the validity of F-Squared's investment methodology and assertions regarding AlphaSector's astonishing purported track record, there is no indication that the Defendants did anything to verify this information.

51.     A former Virtus employee who worked in  the group, Performance Operations, and reported directly to Defendant Waltman, noted that, typically, Virtus used an array of methods to conduct due diligence -- from the simple, such as interviewing the investment managers -- to the complex, such as recalculating or reengineering data.  This former employee recalled that ongoing performance diligence was presented to VOT's Board of Trustees each quarter and senior management, including Defendants CEO Alyward and Waltman were in attendance when these quarterly reports were given.

52.     According to this employee, however, Batchelar and Waltman were responsible for conducting the initial due diligence on AlphaSector before it was adopted by Virtus.  Because Waltman prepared the diligence, was Senior Vice President of VOT, and regularly attended VOT quarterly Board meetings discussing fund due diligence, it is very likely Waltman presented the AlphaSector diligence to VOT's Board of Trustees.

53.     After this brief period of so-called "due diligence," Virtus quickly agreed to market and sell the AlphaSector funds under the Virtus imprint.  On September 29, 2009 – just <u>thirteen days</u> after receiving a vague unsupported statement from F-Squared about the past track record of AlphaSector – Virtus entered into a subadvisory agreement with F-Squared signed by Aylward, Waltman, and Present.  The subadvisory agreement states that:

> The Adviser [VIA] . . . hereby employs F-Squared Investments, Inc. to furnish investment advisory services to the Fund [VOT] related to [the] AlphaSector Rotation Strategy. . . .  In providing advisory services to the Designated Series [the Virtus AlphaSector funds], the Subadviser [F-Squared] shall be subject to . . . the supervision and control of the Trustees of the Fund [VOT] and to the instructions from the Adviser [VIA].

54.     To officially launch these funds, on October 5, 2009, Virtus issued a press release titled in bold letters – "Virtus Introduces a Dynamic Approach to Equity Investing:  AlphaSector Rotation Strategy Available in Two Funds."  The press release which was filed in a Form 8-K with the SEC went on to explain the sector rotation strategy and how the AlphaSector indexes influence the Virtus AlphaSector funds:

> The Virtus AlphaSector Rotation Fund will track F-Squared Investments' AlphaSector™ Rotation Index (ASRX), while 75 percent of the Virtus AlphaSector Allocation Fund will track that same index, with the remaining 25 percent allocated to a Virtus enhanced core fixed income strategy.
>
> AlphaSector is an "active index" that is constructed exclusively from the nine Select Sector SPDR exchange-traded funds, which represent the sectors of the S&P 500, plus an ETF that tracks short-term Treasuries. The strategy is designed to make longer-term allocations among the S&P 500 sectors but, in periods of market weakness, to dynamically allocate to the short-term Treasury ETF.

55.     Accordingly, Virtus would ensure that the AlphaSector funds asset allocation and performance would 100% "track" the AlphaSector indexes.   Because the success of the Virtus AlphaSector funds was completely linked to the AlphaSector indexes, the past performance of the indexes was critical to investors deciding whether or not to invest in the funds.  In the press release,

17

Defendant Waltman directly pointed to the AlphaSector track record which had been touted in so many emails by Present but remained un-researched by Virtus, stating "the AlphaSector Index-based funds offer an uncomplicated approach to equity investing that is designed to control risk in down markets, while participating or outperforming in up markets."

### C. Virtus Touts AlphaSector's Historic Track Record

56.     Defendants recognized that the AlphaSector funds were not simply a product, but a story.  The story behind the AlphaSector funds was that they were highly effective in protecting investments in down markets while simultaneously providing a track record of phenomenal returns greatly exceeding the S&P 500 going back to 2001.  Indeed, the funds' supposed past performance record was expressly highlighted in documents filed with the SEC.  For example, in its January 25, 2013 Registration Statement, Virtus presented the following information on AlphaSector:

> The AlphaSector Rotation Index (ASRX) . . . is an equal weighted index comprised of a limited number of sector-based exchange-traded funds ("ETFs"). . . .  The ETFs are selected monthly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility.  The Index is constituted to focus on avoiding losses of its underlying ETFs, and has the ability to move defensively to large "cash" positions in periods of broader market weakness.  The tables below show performance of the AlphaSector Rotation Index as compared with the performance of the S&P 500 Index.

| Annual Returns (calendar year) | AlphaSector Rotation Index | S&P 500 Index |
|---|---|---|
| 2003 | 9.38% | 28.71% |
| 2004 | 13.89% | 10.86% |
| 2005 | 5.65% | 4.93% |
| 2006 | 14.40% | 15.78% |
| 2007 | 14.18% | 5.49% |
| 2008 | -8.54% | -37.00% |
| 2009 | 25.37% | 26.46% |
| 2010 | 15.50% | 15.06% |
| 2011 | 1.35% | 2.11% |
| 2012 | 14.47% | 16.00% |

| Average Annual Total Return | 1 Year | 5 Years | 10 Years | Since Inception of AlphaSector |
|---|---|---|---|---|

| | | | | Rotation Index (4/1/01)[1] |
|---|---|---|---|---|
| AlphaSector Rotation Index | 14.47% | 8.97% | 10.20% | 7.90% |
| S&P 500 Index | 16.00% | 1.66% | 7.10% | 3.78% |

The Premium AlphaSector Index (ASRP) . . . is an equal weighted index comprised of a limited number of sector-based exchange traded funds ("ETFs"). . . . The ETFs are selected weekly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility. The Index is constituted to focus on avoiding losses of its underlying ETFs, and has the ability to move defensively to large "cash" positions in periods of broader market weakness. The tables below show performance of the Premium AlphaSector Index as compared with the performance of the S&P 500 Index.

| Annual Returns (calendar year) | Premium AlphaSector Index | S&P 500 Index |
|---|---|---|
| 2003 | 24.07% | 28.71% |
| 2004 | 14.90% | 10.86% |
| 2005 | 6.83% | 4.93% |
| 2006 | 16.81% | 15.78% |
| 2007 | 14.86% | 5.49% |
| 2008 | -1.13% | -37.00% |
| 2009 | 32.22% | 26.46% |
| 2010 | 17.66% | 15.06% |
| 2011 | 1.68% | 2.11% |
| 2012 | 13.90% | 16.00% |

| Average Annual Total Return | 1 Year | 5 Years | 10 Years | Since Inception of Premium AlphaSector Index (4/1/01) |
|---|---|---|---|---|
| Premium AlphaSector Index | 13.90% | 12.24% | 13.79% | 12.65% |
| S&P 500 Index | 16.00% | 1.66% | 7.10% | 3.78% |

[1] The Index Inception date is April 1, 2001[.]

57.    The information set forth above was critical to investors. It purported to describe the actual "performance" track record of the AlphaSector indexes as compared to the S&P 500 index for a period of nearly a decade. The indexes show an "inception date" of "April 1, 2001."

The average annual total returns for the Premium AlphaSector Index and AlphaSector Rotation Index were purported to be an incredible 12.65% and 7.90% (respectively) since their "inception date" as opposed to only 3.78% for the S&P 500. The Premium AlphaSector Index is shown having a loss in 2008 of only -1.13% at the time when the market faced one of the greatest financial crises in history and the S&P 500 is shown having a loss of -37.00%. Investors reading this information would see that in a time of market turmoil that the AlphaSector indexes were not only a safe-haven but delivered returns that far surpassed the competition, with compounding returns that were 480% higher than the S&P 500.

58.     Similar information was displayed in Virtus's Registration Statements filed with the SEC on January 28, 2010, January 27, 2011, January 27, 2012, Prospectuses filed December 8, 2009, February 6, 2012, and January 31, 2013, and Summary Prospectuses filed with the SEC on February 2, 2010, February 2, 2011, February 2, 2012, January 31, 2013, and June 13, 2013 which incorporated this information by reference.

59.     The importance that Virtus placed on this information is further demonstrated by the fact that Virtus made each of these documents available through VIP's website, where they could easily be accessed by investors or other interested market observers.

60.     Moreover, Virtus's salesforce repeatedly and aggressively used this information to market AlphaSector funds to investors. At the height of Virtus's success, there were over 60 Virtus wholesalers devoted to selling Virtus's products. Hired in 2010 as Executive Vice President and Head of Distribution, Defendant Cerutti was head of the entire Virtus salesforce and one of the top five highest paid executives in the Company.

61.     According to the former Virtus wholesaler referenced above wholesalers were instructed by Cerutti, Batchelar and others to emphasize AlphaSector's 2001 to 2008 performance

data discussed above and to stress to current and potential clients that this track record was live tested, *i.e.* actual money was actively managed during this time period using this strategy and actual trades were made based on this strategy and actual investors benefitted from the strategy.

62.     According to this former employee, the wholesalers were "instructed to show what the funds did in 2001 to 2008" and emphasize that they "dramatically outperformed the S&P 500." When asked how important it was in client pitches to emphasize this information, the employee stated that -- "it closed the sale" and "everything was built on the [2001-2008] track record."

**D. Virtus Touts Its Ability to Select and Monitor Subadvisers Such as F-Squared, and the Technical Prowess of AlphaSector's Strategy**

63.     Virtus knew that investors who purchased VIP's publicly traded securities viewed the Company's ability to pick quality managers and sub-advisers and to effectively monitor them was critical.   For this reason, VIP repeatedly represented in its SEC filings and other public statements that it had stringent selection criteria and exercised rigorous diligence and monitoring of its supposedly "high-quality" sub-advisers.   For example, in its 2012 Form 10-K filed March 1, 2013, the Company stated:

> We monitor the quality of the affiliated managers and unaffiliated subadvisers products by assessing their performance, style, consistency and the discipline with which they apply their investment process.

64.     In a Citigroup U.S. Financial Services Conference dated March 5, 2013, Defendant Alyward stated:

> As a multi-manager, the identification and selection of investment managers, both affiliates and subadvisers, is critical to the business. We have been successful because we identify high-quality teams with the distinctive strategies and carefully consider the cultural fit of the manager. While we start by identifying the capabilities we're looking for and then identify the best manager to provide the strategy, whether it's from an existing affiliated manager, a current subadviser or a new manager. We have been successful developing partnerships by using this focused approach. Our relationship with Vontobel, for example, began with 2 funds in less than $150 million of assets, and we've grown that to over $9 billion. We

had a similar success with another subadviser, F-Squared, which began managing 1 fund for us 3 years ago, and we have sold more than $6 billion in their strategies to date.

65. According to the former employee who worked in the Performance Operations group, discussed above, although the Product Management group, which was headed by Defendant Waltman, primarily performed the due diligence into products prior to their offering by Virtus, they did not typically perform due diligence into their ongoing performance, which was handled by Performance Operations. In the case of the AlphaSector funds, however, the ongoing diligence and the "bottom line assessment" of the quality of the product and its performance was "dictated" by Batchelar and Waltman. This appeared to the former employee as "slightly unusual" because past performance was typically assessed based on a set of quantitative performance analytics that were worked out by Product Management and Performance Operations together, rather than dictated by Batchelar and Waltman. The former employee believed that Performance Operations was the group better equipped to handle ongoing diligence of AlphaSector because Performance Operations was more quantitatively focused.

66. Just as Virtus and its management continuously hyped the selection and continued monitoring of its subadvisors such as F-Squared, it also emphasized the supposed technical proficiency of the model used to generate AlphaSector's track record. Indeed, Virtus's very first press release, dated October 5, 2009, touting AlphaSector noted that the indexes are based on "signals generated by F-Squared's proprietary quantitative model." Virtus's Registration Statement filed with the SEC on January 25, 2013 and its accompanying Prospectus filed January 31, 2013 noted that:

> The AlphaSector[SM] Rotation Index (ASRX) is an active public index published by NASDAQ and designed to outperform the S&P 500[®] Index while also seeking to manage downside risk and lower overall volatility. It is an equal weighted index comprised of a limited number of sector-based exchange-traded funds ("ETFs") and a short-term Treasury bond ETF as a

cash proxy. <u>The ETFs are selected monthly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility.</u>

\* \* \*

The Premium AlphaSector<sup>SM</sup> Index (ASRP) is an active public index published by NASDAQ and designed to outperform the S&P 500® Index while also seeking to manage downside risk and lower overall volatility. It is an equal weighted index comprised of a limited number of sector-based exchange traded funds (ETFs) and a short-term Treasury bond ETF as a cash proxy. <u>The ETFs are selected weekly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility.</u>

Moreover, these statements were incorporated by reference in multiple Summary Prospectuses filed January 31, 2013 and June 13, 2013.

67.     Each of the Summary Prospectuses dated January 31 and June 13, 2013 similarly noted that:

> The [AlphaSector] fund allocates net assets to multiple asset classes including: U.S. Equity, International Equity, Fixed Income, and Alternative. Allocations within each asset class are based on proprietary quantitative models.

68.     As discussed below, this information would later be revealed to be false, because this purportedly dynamic and proprietary analytical model was implemented using simple moving averages, one of the most basic trading tools used by novice, retail investors.

**E.  Virtus's Assets under Management, Revenue, Earnings, and Stock Price Skyrocket Due To The Success Of AlphaSector**

69.     From the outset, Virtus's sales of the AlphaSector funds were enormously successful, driving increases in VIP's assets under management ("AUM"), its revenues, earnings and stock price.  The two original Virtus AlphaSector funds were so successful, that Virtus soon added three more AlphaSector-based funds, launching the Virtus Premium AlphaSector Fund on July 12, 2010 and the Virtus Allocator Premium AlphaSector Fund and Virtus Global Premium

AlphaSector Fund on March 15, 2011.   All of these funds were invested by tracking AlphaSector indexes.

70.     Wall Street analysts acknowledged that AlphaSector was Virtus's flagship product and the source of much of its revenue growth and fund inflow.  For example, on June 25, 2012, Sandler O'Neill Partners initiated coverage on Virtus with a "Buy" rating, noting that:

> We expect retail investors to continue to gravitate toward VRTS's AlphaSector funds . . . designed to provide upside participation and downside protection – particularly assuming the equity markets remain choppy.
>
> ***
>
> Much of VRTS's growth in the last couple of years can be attributed to the mutual fund channel reflecting a step up in sales via the wirehouses, and into newer strategies (i.e. AlphaSector funds).
>
> ***
>
> VRTS's three largest open-end funds (Multi-Sector Short-Term Bond, Emerging Market Opportunities, and Premium AlphaSector) continue to generate the lion's share of the firms overall mutual fund flows (~100% over the last few quarters).

71.     Because Virtus publicly touted a supposed AlphaSector performance record that far exceeded its peers, the Executive Defendants knew that Virtus could charge considerably higher fees than other funds that could not match AlphaSector's seemingly sterling track record.

72.     According to a Jefferies October 9, 2013 analyst report, the 1.50% fees on the Virtus Dynamic AlphaSector fund were not only the highest but 300% higher than the average fees across all product lines.  These fees in turn translated into huge profits.

| Year | Total AUM ($B) | AUM AlphaSector Fund ($B) |
|------|----------------|---------------------------|
| 2008 | $22.6 | 0 |
| 2009 | $25.4 | $.171 |
| 2010 | $29.5 | $.927 |
| 2011 | $34.6 | $3.89 |

| | | |
|---|---|---|
| 2012 | $45.5 | $5.0 |
| 2013 | $57.7 | $11.46 |

73.     As the chart above shows, from 2008 to 2013, Virtus's AUM grew by over 155%, of which the AUM attributable to AlphaSector funds grew from zero to $11.46 billion, or approximately 20% of the total AUM and 33% of the increase in AUM over that period. The growth of Virtus's AlphaSector Funds also contributed to an astonishing growth of revenues and profits disclosed in its annual reports filed in its Forms 10-K, which rose more than 324% in five years.

| Year | Revenue ($ mil.) | Net Income ($mil). |
|---|---|---|
| 2009 | $117 | ($6.5) |
| 2010 | $144 | $5.2 |
| 2011 | $204 | $104 |
| 2012 | $280 | $37 |
| 2013 | $389 | $75 |

74.     The explosive growth in revenue and earnings, in turn, had a tremendous effect on Virtus's stock price. Virtus's market capitalization grew an astounding 2350% from its initial public offering closing price of $10.50 per share on January 2, 2009 to a Class Period and all time high of $247.12 per share on May 17, 2013. Virtus's one time impairment charge of $91.75 per share in its first year of trading looked to be a distant memory.

| Date | Closing Price | Market Capitalization |
|---|---|---|
| January 2, 2009 / First Day of Trading | $10.50 | $60,758,166 |
| January 4, 2010 | $16.64 | $96,287,226 |
| January 3, 2011 | $46.69 | $270,171,311 |
| January 3, 2012 | $77.50 | $448,453,130 |
| January 2, 2013 | $125.68 | $727,246,314 |

| May 17, 2013 / Class Period and All Time High | $247.12 | $1,429,957,903 |

75.     The chart below represents the growth in Virtus's stock price during this period:



76.     Defendants greatly benefited from these gains.  For example, Virtus's Proxy filed April 10, 2009 shows that Defendant CEO Aylward received 26% of his total compensation in salary while 74% was in incentive pay.   As part of the spin off from Phoenix, Aylward received 19,521 Virtus stock options at an exercise price of $31.38.

**F.  Doubts About the AlphaSector Track Record Are Raised Internally Within Virtus, But Ignored**

77.     Despite Virtus's tremendous success, questions were being raised internally about AlphaSector's claimed track record.  While it was not disclosed publicly until recently, according to multiple media reports and confirmed by discussions with former employees of Virtus, certain Virtus wholesalers began to raise questions about the AlphaSector performance record as early as 2011.

78.     For instance, according to a December 22, 2014 article in Fortune magazine titled "The Fund That Was Too Good To Be True," two former Virtus employees say that inside Virtus Howard Present got the nickname "Howie Backtest."  In an attempt to assuage the wholesalers, in December 2011, a conference call was set up led by Present and Virtus's sales leaders Jeff Cerutti and John McCormack.  This call was for the benefit of the Virtus wholesalers and could help give them further direction and instruction into discussing AlphaSector's track record during pitches. According to a February 9, 2015 article published by RIABiz, a publication that specializes in the mutual fund industry, the call unsettled some listeners because Present was combative and seemed to cut the call short.

### G. The December 14, 2012 Boca Raton Conference – An Internal Bombshell

79.     There can be no dispute that by the end of 2012, Virtus's senior executives had actual knowledge that the AlphaSector funds' past performance record – their key selling point – was fabricated.   On December 14, 2012, Virtus held an internal conference for its wholesalers at the Boca Raton Resort and Club.  According to a February 9, 2015 article from RIABIZ, titled "Where Virtus Stands After F-Squared Seemingly Led It Astray, To Mutual Benefit," numerous Virtus sales managers including Executives Jeff Cerutti and Frank Waltman attended the conference in person.    The former VIP employee discussed above personally attended the conference, and confirmed the information in the RIABiz article was correct.  This employee confirmed to Co-Lead Counsel that Defendants Cerutti and Waltman were in attendance.  This employee further stated that Defendant Alyward, because he was injured with a broken leg, could not attend the meeting in person, but attended via telephone.

80.     On the first day of meetings, Howard Present spoke to the Virtus sales force and touted AlphaSector's now-infamous returns and past performance record.  Present's hour-long talk included the statement, "The AlphaSector Premium Index is based on an active strategy with an

inception date of April 1, 2001. Inception date is defined as the date as of which investor assets began tracking the strategy." This is what the wholesalers had been told for years to use as a selling point for Virtus AlphaSector funds and, as such, it was also set forth in Virtus's SEC filings and marketing materials and on its website.

81.     Present spoke for all of his allotted time, and by the time he left the room the conference was running slightly behind schedule. Pete Batchelar, head of product management at Virtus, then stood up to give a recap of the presentation. According to two Virtus employees who were in the room at the time, and as reported by RIABiz, during his recap, Batchelar told the room not to heed the portion of Present's remarks relating to F-Squared's allegedly live track record. F-Squared's incredible returns were, he said, based not on actual client assets but on the backtesting of hypothetical assets.

82.     Members of Virtus's senior management, were "stone-faced" at the announcement, staring straight ahead and showing no surprise whatsoever. In stark contrast, the wholesalers looked around the room in shock. Despite rumors, they had never definitively heard before (and certainly not from management) that the AlphaSector track record was backtested. It was particularly shocking because this track record was the central selling point of the AlphaSector funds – "it closed the sale" – and had been used by the wholesalers time and time again to get investors to purchase Virtus's mutual funds.

83.     Counsel for Plaintiffs spoke to the RIABIZ reporter who published the initial article. The reporter confirmed the accuracy of his original article and further stated that, based on follow-up investigations with his sources (former employees of Virtus), Defendants Waltman and Cerutti were unquestionably in the conference room when Batchelar made these comments.

84.     As noted, RIABiz's reporting of events and sources are further confirmed by the former Virtus wholesaler referenced above.  According to that former employee, after Present's presentation, "there were several statements by [senior managers] John McCormick, Paul Cahill, and Pete Batchelar" which "contradict[ed]" Present's statement concerning the live track record.  This former employee also confirmed that Defendants Waltman and Cerutti were in attendance and that CEO Alyward was participating by phone.

85.     This former Virtus wholesaler further stated that "eyebrows were raised" and others in attendance were "surprised" by the "contradictory statements" between Present and Virtus management about Virtus's flagship product.  After this bombshell, according to the former Virtus employee, those in attendance increasingly questioned AlphaSector's model and its past performance.  But they were instructed (or rather commanded) by sales management, including Defendant Cerutti and others, that "this is how it stands so go out and sell with it.  So we did, vehemently."  This employee said that while employees were concerned by the comments at the Boca Raton meeting, their complaints became a "broken record" and eventually the truth was "swept under the rug."   RIABiz's article confirms this information, citing a former wholesaler's explanation for why they continued to sell AlphaSector after learning that its past formance record was false -- "We were just raising a ton of money."

### H.  After the Wholesaler Conference in Boca Raton, Nothing Changes

86.     After the Boca meeting nothing changed.  Rather than take the necessary prompt action to correct its prior misstatements about the AlphaSector funds and to engage its "disciplined monitoring" and oversight of its supposedly "high-quality" investment managers and subadvisors, Virtus conducted business as usual.  The Company continued to market its AlphaSector Funds based on knowingly false information, and VIP even raised more than $160 million from public investors in a secondary offering of common stock.

### 1. Virtus Continues To Aggressively Market The AlphaSector Funds Based On Knowingly False Information

87.     Despite executives at the highest levels of Virtus knowing full well that AlphaSector's track record was false, Virtus continued to sell the five AlphaSector funds as if everything was aboveboard and the integrity of the funds remained intact.

88.     The Company's January 25, 2013 Registration Statement and accompanying January 31, 2013 Prospectus were both filed with the SEC a month after the Boca meeting but contained the exact same language touting AlphaSector's pre-October 2008 performance record that had been disseminated in the past.  As noted above, these filings state that the AlphaSector Indexes performed at blockbuster rates every year on average since their "inception date" of April 1, 2001, beating the S&P 500 by hundreds of basis points every year.

89.     Defendant George Aylward (CEO of VIP), who participated by phone in the Boca meeting personally signed this Registration Statement.  Frank Waltman (Executive Vice President, Head of Product Management of VIP), who attended the Boca meeting in person, and who supposedly conducted a rigorous due diligence process into the validity of the AlphaSector methodology is listed in this Registration Statement and Prospectus as serving as a Director of VP Distributors, the underwriter of the AlphaSector mutual funds and a 100% wholly-owned subsidiary of VIP, and a Senior Vice President of VOT.  And Jeffrey Cerutti (Former Executive Vice President, Head of Distribution of VIP) is listed in the Registration Statement as the President of VP Distributors.  All of these executives, Alyward, Waltman, and Cerutti signed off on these documents knowing they were false and knowing investors would rely on these falsities to throw billions of dollars into Virtus.

90.     Nonetheless, Virtus's wholesalers continued to use this Registration Statement and Prospectus, and similar materials, when selling the AlphaSector funds, specifically emphasizing

the track record that Defendants indisputably knew to be false. Indeed, as stated by the former Virtus wholesaler discussed above, who was personally involved in marketing AlphaSector funds during the Class Period, Virtus wholesalers were trained to emphasize the 2001-2008 track record of AlphaSector when marketing the funds.

91. Documents that this former Virtus wholesaler provided to Co-Lead Counsel confirm this point. Exhibit A, attached hereto, is a January 31, 2013 prospectus that the former wholesaler stated was used to market the AlphaSector funds during the Class Period. This document is branded on the very first page with the logo of "Virtus Investment Partners," and contains information about Virtus's five AlphaSector funds. The former Virtus wholesaler stated that this was one of the key documents used by the salesforce to market the funds, and that wholesalers were trained to point to the information in the Appendices because it "closed the sale." Specifically, they pointed to pages 60 and 61 of Exhibit A, which discuss the "performance of the AlphaSector [funds] as compared with the performance of the S&P 500 Index" and that the "inception date" of the AlphaSector index was April 1, 2011.

92. Virtus's knowingly false statements had their desired impact, as the profits continued to roll in. Indeed, on the Company's May 1, 2013 first quarter conference call, Defendant Alyward noted the continued success of the Company stating that:

> We continued to deliver a significant top line and bottom line growth, including record sales, net flows and profitability. . . . Total sales of $6.2 billion represented a 78% increase from the first quarter of last year and a sequential increase of 62% from the fourth quarter. We also have record $3.7 billion of positive net flows that nearly doubled the net flows from the year earlier.
>
> The biggest driver for our growth continues to be mutual fund sales and we had our best quarter ever for fund sales.

93. Thus, the Boca meeting changed nothing. Rather than take steps to correct its prior misstatements and get truthful information to investors, Virtus's message internally was to keep

silent, not make waves, and continue to aggressively sell AlphaSector funds based on false representations.

## 2. The September 2013 Secondary Offering: VIP Sells More Than $160 Million In Common Stock To Investors

94. On or around September 13, 2013, Virtus took advantage of its increasing assets and revenues generated from the AlphaSector funds, and VIP's correspondingly soaring stock price, to conduct a secondary offering of common stock. In this offering, VIP sold approximately 1,129,000 shares of common stock at a price of $155.00 per share for total net proceeds of approximately $167 million from investors.

95. The stock was issued pursuant to numerous SEC filings, including a registration statement that was filed with the SEC on June 26, 2013 and a prospectus dated June 26, 2013 and prospectus supplement dated September 12, 2013 (collectively, the "Registration Statement"). The Registration Statement makes several statements touting VIP's ability to monitor the "quality" of its sub-advisers, including F-Squared, stating, for example: "We monitor the quality of our products by assessing the managers' performance, style, consistency and the discipline with which they apply their investment process. . . . Our primary objective is to provide clients with a diverse offering of high-quality investment capabilities from the best managers."

96. The Registration Statement also incorporated by reference numerous SEC filings, such as the 2012 Form 10-K, which praised the Company's ability to "monitor the quality of the affiliated managers and unaffiliated subadvisers products by assessing their performance, style, consistency and the discipline with which they apply their investment process." In a press release dated September 12, 2013, Virtus disclosed that it intended to use the net proceeds of this offering to "expand its seed capital program for new investment strategies and funds; invest in other growth

opportunities; and for general corporate purposes," however two years later, the funds remain unused, sitting on the Company's balance sheet.

## I. "All Hell Breaks Loose": Virtus Learns The SEC Is Investigating F-Squared And Employees Are Directed To Destroy Documents

97. According to the SEC's Complaint against F-Squared and Present, on July 30, 2013, the Commission's examination staff began a routine examination of F-Squared. On July 31, 2013, the examination staff interviewed Present, who said that the performance of AlphaSector prior to October 2008 was based on accounts managed by another investment adviser, but that he could not reveal the name of the other adviser due to a confidentiality agreement. Later that day, the examination staff asked F-Squared to produce additional documents as soon as possible, including:

> Supporting documentation for the investor assets within the Premium AlphaSector Index starting in April 2001 including the investor names and the managers / firms responsible for managing the accounts.

98. On July 31, 2013, while the Commission staff was in F-Squared's office, Present emailed David Morton, "Please call. Left you voicemail. Time sensitive subject." Two hours later, Present left another voicemail for Morton:

> Uh, I have a regulator in my office, and they are looking at the contracts between us. . . . I am going to talk to you about what's being provided and see if we can forestall because I don't want them to walk out of my office and over to yours. Um, that doesn't help either of us.

99. Within one day and minimal digging, the SEC had zeroed in on the problem with AlphaSector's track record and forced Present to start scrambling. In response to the SEC investigation, on September 23, 2013, Present told his staff the news that F-Squared was going to drop pre-October 2008 results from its representations of AlphaSector's historical performance. He explained:

As most of you should know, now that we have crossed over the 5 year mark for our AlphaSector US Equity strategies. . ., we are going to shift our presentation decks to define "live" as 9/08 forward and everything prior as backtested. While when we acquired rights to the AlphaSector strategy from [Newfound Research] they provided us with historical performance of the strategy, now that we have crossed the five year window we feel there is no need to deal with the distractions and confusion of even asserting that the live track record is [sic] in existence prior to the formation of the firm.

100.     With that, F-Squared took down all information relating to AlphaSector's fake track record from its advertising materials and website, but refused to make any public statements.

101.     Days later, in late September or early October 2013, the former Virtus wholesaler referenced above recalled that the Company held a due diligence meeting in Chicago where Howard Present gave a presentation to thirty internal Virtus advisors. While this former employee did not personally attend the meeting, he heard from persons who did attend that Jeff Cerutti, Paul Cahill, and John McCormack, the heads of Virtus's sales department were all in attendance. According to this former employee, Present's presentation was a game changer. During the meeting, Virtus management learned that F-Squared was being investigated by the SEC regarding AlphaSector's 2001 to 2008 performance track record.

102.     After this announcement by F-Squared, according to this former employee, "all hell broke loose" and Virtus went into full damage control mode. Indeed, shortly after the Chicago meeting Virtus management organized an all hands on deck conference call, which included CEO Alyward, as well as Cerutti, Batchelar, Cahill, and McCormick. The former Virtus wholesaler personally attended the conference call. According to this former employee, on this call management told Virtus's employees that they "had to do a scorched earth" and destroy "any materials they had" relating to AlphaSector's prior track record. This employee said that he and others destroyed both hard copy documents and emails because "everything needed to be gone."

103. This former employee recalled that Virtus employees were "shocked" by this order but many, including himself, complied by deleting emails, PDFs, discarding hard copy documents, and advertising materials – anything that reflected the AlphaSector 2001 to 2008 track record. This employee recalled that "[i]f it was internal between product research, sales force, and management – there was quite a bit of that and that all had to go."

104. In its October 4, 2013 Prospectus, Virtus suddenly removed the Appendices which had discussed in detail AlphaSector's 2001 to 2008 track record. In its Form N-1A Registration Statement filed January 27, 2014, signed by Defendants Alyward and VOT Trustees, Virtus once again eliminated AlphaSector's past performance record. Neither in the prospectus, registration statements or any other press releases, or forums did Virtus even mention that this language had been deleted, let alone provide any explanation that it was being done because of an SEC investigation into F-Squared challenging the veracity of these former statements.

105. The former Virtus wholesaler confirmed that Virtus did not even bother to even alert its own clients of this problem, let alone pubic investors, stating that "Virtus posted no information and senior management publicly did not make any statements." After the scramble, Virtus's advertising materials and prospectuses no longer contained the AlphaSector track record. But investors and clients were not informed about the change, why it took place, or that the past track record was false. According to this former employee, the line from management to Virtus's employees was that this was an "F-Squared issue, not a Virtus issue" and that "all the mutual funds were started in 2009 and later."

106. Despite this "stonewall" exterior, the Virtus sales force was in a panic. According to the former Virtus wholesaler, Virtus's wholesalers had weekly sales meeting "almost every Friday for a year" where the "SEC investigation became the number one point of conversation."

Virtus employees knew they had not only been trained to use the AlphaSector performance history but encouraged investors to purchase billions of dollars in Virtus funds based on their false representations, and employees became concerned about potential liability. According to the former Virtus wholesaler, Cerutti, Batchelar and others were on these Friday calls discussing the SEC investigation and attempted to assuage the wholesalers by noting that "it would stop at the prospectus (corporate) level of Virtus" and they personally (the salesforce) should not worry. Even if Virtus was not being formally investigated by the SEC, at this time, Virtus's senior executives knew that it was a problem that involved the highest levels of management and posed a serious risk to the Company.

**J.  Virtus Executives At the Heart of the Fraud Start To Sell Their Stock and Cerutti Abruptly Resigns**

107.    Even though Virtus's executives told the wholesalers not to panic, they could not follow their own advice. Recognizing that the SEC was now investigating F-Squared and that Virtus would be next, the two most senior executives who personally attended the December 2012 Boca Raton meeting, Defendants Jeff Cerutti and Frank Waltman started to unload their personal holdings of Virtus stock.

108.    As shown in the table below, prior to 2013, Cerutti never sold a single share of Virtus common stock during the three years from when he first started working at the Company in June 2010. But just a few months after the Boca retreat, on June 1, 2013, Cerutti sold 3,280 shares at the average price of $231.86, (close to the Class Period and record high of $247.12) for a total of $760,500. On March 14, 2014, a few months after the SEC investigation into F-Squared was revealed to Virtus and materials were ordered by Cerutti to be destroyed, Cerutti unloaded 8,225 shares, at a price of $175.62 per share or $1,444,474.50. Altogether, Cerutti sold 34% of his stock

for total proceeds of over $2.2 million dollars. None of these sales were pursuant to a 10b-5-1 trading plan.

| Insider | Transaction Date | Acquisition ("A") /Disposition ("D") | Shares | Price | Value |
|---|---|---|---|---|---|
| No dispositions in the period between 2009-2012 | | | | | |
| Jeff Cerutti | June 1, 2013 | D | 3,280 | $231.86 | $760,500.80 |
| | March 14, 2013 | D | 8,225 | $175.62 | $1,444,474.50 |
| Total Dispositions | | D | 11,505 | | $2,204,975.30 |

109.    After dropping this significant quantity of shares, Cerutti abruptly resigned effective April 1, 2014. Cerutti left knowing that he would be giving up unvested stock and equity awards worth over $1.6 million. Since Cerutti's base salary was held constant at only $300,000 per year, Cerutti gave up the vast majority of his compensation, which was virtually guaranteed if he stayed.

110.    As shown in the table below, after the Boca Raton meeting in December 2012 but before the fraud was revealed to investors, Defendant Waltman started to unload shares at a rapid pace. According to his Form 4s filed with the SEC, Waltman sold 28% of his holdings between March 2013 and March 2014, pocketing $1,643,721.76. These sales were not pursuant to a 10b-5-1 trading plan, rather Waltman knew that he needed to dump the stock before investors learned what he had known since at least December 2012 – that Virtus's flagship product was built on a lie.

| Insider | Transaction Date | Acquisition ("A") /Disposition ("D") | Shares | Price | Value |
|---|---|---|---|---|---|
| Frank Waltman | March 15, 2013 | D | 2,189 | $186.16 | $407,504.24 |
| | Dec. 16, 2013 | D | 732 | $205.82 | $150,660.24 |
| | Dec. 16, 2013 | D | 751 | $202.67 | $152,205.17 |

| | Dec. 16, 2013 | D | 767 | $203.43 | $156,030.81 |
|---|---|---|---|---|---|
| | Dec. 17, 2013 | D | 308 | $203.99 | $62,828.92 |
| | Dec. 17, 2013 | D | 442 | $202.40 | $89,460.80 |
| | March 14, 2014 | D | 3,559 | $175.62 | $ 625,031.58 |
| Total Dispositions | | D | 8,748 | | $1,643,721.76 |

## V. THE TRUTH BEGINS TO EMERGE

### A. The Market Begins To Learn The Truth, But Analysts Still Believe Any Regulatory Concerns Stop At F-Squared

111. On May 14, 2014, The *Wall Street Journal* reported that F-Squared announced in a letter to clients that it had "clearly overstated" the past performance of its main strategy in marketing materials and misrepresented that its strategy tracked real money. Despite F-Squared's disclosure, Virtus's management refused to comment and did not confirm that the F-Squared issue impacted any Virtus funds. Nor did any of the Virtus Defendants inform the market that they had been aware of the falsity of the F-Squared track record and the SEC investigation into F-Squared for many months. Nonetheless, Virtus shares declined over the next two days by approximately $8.66 per share, or 4.67%.

112. On September 3, 2014, multiple news agencies reported for the first time that F-Squared had received a "Wells Notice" from the SEC. In its September 5, 2014 analyst report, Jefferies noted that the "Wells Notice disclosure by F-Squared is the key piece of new information" for Virtus. Jefferies stated that "VRTS is not subject to the SEC investigation" but noted that "[c]urrently F-Squared sub-advises on 5 VRTS funds, which account for $13B (approx. 20%) of VRTS's roughly $61B in AUM." Influenced by the fact that Virtus had not made any statements or disclosures on the SEC investigation, Jefferies made it clear that "[i]t's important to note the SEC's investigation is focused on F-Squared and not VRTS. Any resulting proceedings, actions or fines that may be undertaken by the SEC would be against F-Squared."

113.    Defendants had deliberately concealed from analysts the material risk that Virtus's business could be negatively impacted by the legal issues related to F-Squared – including by damaging the AlphaSector brand and/or leading to large outflows of assets from those funds when the truth was revealed.  Defendants were also deliberately concealing the material undisclosed risk that, because Virtus's long-standing knowledge that its representations about AlphSector were false, Virtus itself would be subject to regulatory investigations and potential fines and sanctions.

114.    Despite the fact that the full truth was not known to the market, Virtus shares declined in response to this news from $222.34 per share to close on September 5, 2014 at $185.01, a loss of $37.33 per share or 16.7%.

115.    Defendants continued to mislead the market about the true impact of the F-Squared issues.  On October 28, 2014, VIP held a conference call with investors where a Sandler O'Neill & Partners analyst asked Alyward "[j]ust to follow up on F-Squared, any updates on the SEC investigation?  And then from your perspective, do you have any sort of time line as it relates to your relationship with F-Squared?"  In response, Defendant Alyward downplayed the significance of the SEC investigation into F-Squared by saying the AlphaSector funds "fit really well into a portfolio that you're looking at from a risk-managed perspective."  "You've seen what's been in the media related to that.  So I have no updates or anything to provide. . . .  The funds are continuing to do what they're intended to do, and that is really what we consider very important in terms of the financial advisers understanding how to use those products in their portfolio."  While Alyward was unwilling to disclose that Virtus's prior statements concerning risk management and consistent performance were wholly inconsistent with his knowledge that AlphaSector's track record was completely made up, Jefferies noted in its October 29, 2014 analyst report "the SEC investigation of VRTS sub-advisor F-Squared remains the primary factor that keeps us Hold rated

as we continue to evaluate the range and likelihood of different outcomes from the SEC investigation."

116.     On November 14, 2014, news sources reported that Howard Present resigned from F-Squared and as a subadvisor of Virtus.  Dow Jones News Wire reported that "[t]he departure comes amid regulatory scrutiny about how F-Squared advertised certain historical returns." According to Sandler O'Neill & Partners, Present's departure "likely deepen[s] concerns for existing/prospective [Virtus] fund shareholders, thereby further pressuring related sales and redemptions."  In response, Virtus shares closed on November 13, 2014 at $183.00 and proceeded to drop the next four business days, closing on November 19, 2014 at $154.17, a loss of $28.83 per share or 15.7%.

**B.      In Its Settlement with the SEC F-Squared Admits To "Willful Violations" of the Securities Laws And "Aiding And Abetting" Violations By Certain (As Yet) Unnamed Mutual Fund Companies**

117.     On Monday, December 22, 2014, news agencies reported that F-Squared admitted to "willfully" violating securities laws, and settled with the SEC in return for detailed admissions and $35 million in disgorgement and civil monetary penalties.   In the December 22, 2014 settlement, the SEC found and F-Squared admitted to a host of "willful[]" violations of federal securities laws, including that the AlphaSector funds were marketed based on a false, materially inflated performance track record which they advertised as "not backtested."   F-Squared also admitted that its purportedly "dynamic" and "proprietary" algorithmic model that helped generate the 2001 to 2008 track record was in reality based on "simple moving average[s]" that are the generic tool of the most basic trader.

118.     Further, F-Squared admitted to "willfully violat[ing]" Sections 204, 206(1), 206(2), 206(4), and 207 of the Advisers Act and rules promulgated thereunder which prohibit "publish[ing], ciculat[ing], or distribut[ing] . . . untrue statement[s] of material fact" in mutual fund

filings and advertisements. Notably, the SEC also found and F-Squared admitted to "willfully violat[ing]" Section 34(b) of the Investment Company Act because it "willfully aided and abetted . . . certain mutual funds sub-advised by F-Squared" to make "untrue or misleading statement[s] of material fact in [] registration statement[]s" and other documents filed with the Commission under the Investment Company Act.

119.   Since AlphaSector's inception in October 2008, through September 2013, the SEC found and F-Squared admitted that it sold and marketed its funds based on two materially false claims. Specifically, F-Squared admitted that:

> F-Squared made two materially false claims in its AlphaSector advertisements and Forms ADV, namely that
>
> - the in/out ETF signals that formed the basis of the AlphaSector index returns had been used to manage client assets from April 2001 to September 2008l and
>
> - the in/out ETF signals resulted in a track record that significantly outperformed the S&P 500 Index from April 2001 to September 2008.

120.   The SEC specifically identified that the AlphaSector indexes "that are the subject of this matter, include the AlphaSector Premium Index and the AlphaSector Rotation Index." These were the exact indexes in Virtus's registration statements and prospectuses.

121.   In addition, F-Squared admitted that its past returns were grossly overstated. According to the SEC, F-Squared incorrectly applied ETF trend data that dictated whether an ETF was in or out of the AlphaSector portfolio (the "in/out signals"). In creating its backtested track record, F-Squared systematically applied the in/out signals one week before the ETF price changes that caused changes in signals ( *i.e.*, a change from invested in the ETF to out of the ETF or vice-versa). As a result, the advertised historical performance of the AlphaSector strategy from April 2001 to September 2008 was not only based upon a fabricated backtest of hypothetical returns, but

even the back-test was premised on erroneously implementing signals to sell before price drops and to buy before price increases that had occurred a week earlier. F-Squared compiled the historical data to implement a hypothetical trade (that F-Squared advertised as an actual trade) one week before the trade could have occurred.

122.    As a result, the SEC found that AlphaSector's track record was materially over-stated and inflated. For example, if an investor made a hypothetical investment of $100,000 on April 1, 2001, the investment would have been worth approximately $128,000 on August 24, 2008 if invested in the S&P 500 Index. With accurately timed (but still hypothetical and back-tested) signal implementation, the same investment in F-Squared's hypothetical ETF sector rotation strategy would have been worth only $138,000. However, by implementing the hypothetical and back-tested signals one week early (and incorrectly), F-Squared advertised the investment as worth $235,000 - an increase of approximately 350% than if F-Squared had applied the signals accurately. This intentional wrongdoing is further verified by the fact that Virtus's AlphaSector funds actually grossly underperformed the market when the data was implemented on a "live," going forward basis from September 2008 to present.

123.    According to the SEC, F-Squared and Present knew that these statements about the AlphaSector strategy were false and materially misleading. Present knew that the track record had been back-tested, and was not derived from actual live asset management. F-Squared also "admit[ted]" that the AlphaSector track record was based on changes in 41-week and 61-week simple moving averages, and not "algorithmic-based models" which are referenced in numerous marketing materials and prospectuses filed with the SEC and distributed to investors.

124.    Based upon this conduct, the SEC found and F-Squared admitted that it "willfully violated" Sections 206(1) and 206(2) which prohibit any investment adviser from employing any

device, scheme, or artifice to defraud any client or prospective client, and from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

125. The SEC also found and F-Squared "admitted" that it "willfully violated" Section 206(4) of the Advisors Act and Rule 206(4)-1(a)(5) which makes it a fraudulent, deceptive, or manipulative act, practice, or course of business to, among other things, directly or indirectly publish, circulate, or distribute an advertisement which contains any untrue statement of material fact, or which is otherwise false or misleading, and Rule 206(4)-7 which, among other things, makes it a fraudulent, deceptive, or manipulative act, practice, or course of business to fail to adopt and implement such written policies or procedures reasonably designed to prevent violation of the Advisers Act and rules.

126. The SEC also found and F-Squared "admit[ted]" that it "willfully violated" Section 206(4) of the Advisers Act and Rule 206(4)-8, which makes it a fraudulent, deceptive, or manipulative act, practice, or course of business for any investment adviser to a pooled vehicle to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, or to other wise engage in any act, practice, or course of business that is fraudulent, deceptive or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

127. Finally, the SEC found and F-Squared admitted to "willfully aid[ing] and abet[ing] . . . certain mutual funds sub-advised by F-Squared . . . to violate Section 34(b) of the Investment Company Act which, among other things, makes it unlawful for any person to make any untrue or

misleading statement of material fact in any registration statement, application, report, account, record, or other document filed with the Commission under the Investment Company Act."

128.    As a result of these numerous violations, F-Squared agreed to cease and desist from its prior abuses, retain an Independent Compliance Consultant and pay disgorgement of $30 million and a penalty of $5 million.

## C.    Defendants Continue to Mislead Investors

129.    Despite Howard Present's resignation as a sub-advisor for Virtus and F-Squared's admissions of violations of the federal securities laws relating to its 2001-2008 AlphaSector track record, Virtus continued to mislead investors regarding the material risk that these issues posed to Virtus's business and potential exposure to legal and regulatory action.

130.    On January 29, 2015, Virtus held a conference call where Defendant Aylward stated that there were "elevated mutual fund redemptions," but in his prepared remarks refused to acknowledge Howard Present's resignation, a looming SEC investigation, or the plain fact that Virtus had for so many years touted a fake track record for one of its "flagship" products.  Aylward noted:

> While AlphaSector Rotation had modestly positive net flows for the quarter, Premium AlphaSector experienced net outflows of $1.3 billion due primarily to elevated redemptions. Several factors contributed to the outflows including reactions to a large capital gain distribution communicated on November 13, the absolute performance of this downside protection product in an up market and developments at the fund sub-advisor and the related announcements and resulting media coverage.

Incredibly, this was the extent of Alyward's prepared remarks on Present and AlphaSector. When asked by an analyst from Raymond James and Associates to "maybe update us on what is going on there," Alyward responded.

> [W]e're not going to answer any questions related to the sub advisor or any regulatory matter.

131.    Similarly, VIP's 2014 Form 10-K filed March 2, 2015 states:

> The Company believes, based on its current knowledge, that the outcomes
> of its legal and regulatory proceedings are not likely, either individually or
> in the aggregate, to have a material adverse effect on its consolidated
> financial condition.

Thus a year and a half after Virtus's senior management destroyed materials and told its sales force

that the SEC investigation was a significant "corporate" and "prospectus" problem at the highest

levels of Virtus, management continued to deliberately conceal material risks that they knew

Virtus faced.

**D.    Defendants Are Finally Forced To Reveal The Truth**

132.    On May 11, 2015, Virtus filed its Q1 2015 10-Q in which it announced for the first

time that the SEC was investigating the Company in connection with F-Squared.  The 10-Q notes:

> As previously disclosed, in December 2014 the SEC announced a
> settlement with F-Squared Investments ("F-Squared"), an unaffiliated
> former subadviser (see Note 14 of the condensed consolidated financial
> statements) which settled charges that F-Squared had violated the federal
> securities laws as described in Investment Advisers Act Release No. 3988.
> The settlement related to F-Squared's inaccurate performance information
> for the period of April 2001 through September 2008, including indices that
> certain Virtus mutual funds tracked beginning in September 2009 and
> January 2011.  As part of the SEC's non-public, confidential investigation
> of this matter, the SEC staff informed the Company that it was inquiring
> into whether the Company had violated securities laws or regulations with
> respect to F-Squared's historical performance information. Although the
> Company has not received a Wells Notice in connection with the
> investigation, the Company is in active discussions with the SEC staff with
> the objective of promptly resolving this matter.

> Based upon these circumstances, the Company has recorded a loss
> contingency pursuant to *ASC 450* – Contingencies, of approximately \$5.2
> million in the first quarter 2015, in other operating expenses along with a
> related potential income tax benefit as a component of the Company's
> income tax expense.

133.    This disclosure shocked the market.  Indeed, on the accompanying May 11, 2015

conference call Alyward let it slip that the Company was in "turmoil," but then quickly backed

away from the statement saying "[w]ell, in hindsight I don't know why I used the word turmoil." Continuing mixed messages, Alyward announced that Virtus had fired F-Squared, and announced that Virtus renamed its five AlphaSector funds, eliminating the once impressive AlphaSector moniker.   Remarkably, Defendant Alyward stated:

> You know funds have changes in sub-advisors and managers somewhat frequently in the industry. So there is nothing unusual from that perspective.

134.    Despite Defendant Alyward's continued efforts to downplay it, the market reacted sharply to this news, with the price of VIP stock plunging 13% in a single day, falling from $134.00, to $116.27 on May 11, 2015 on extraordinarily high trading volume.

135.    In its May 11, 2015 report, Jefferies noted that the SEC investigation would be an "overhang" for the stock and predicted that "net outflows will likely accelerate."   Although litigation had never before been on Wall Street analysts' radar, Credit Suisse would later note that the number one risk for Virtus would now be "Litigation Issues:  VRTS is currently facing several litigation issues, and an adverse judgment can result in a large payment which could impact their ability to operate and generate profits."

136.    In its June 5, 2015 analyst report, Jefferies noted that even though Virtus's loss contingency was $5.2 million, it estimated that a potential SEC penalty and disgorgement paid by Virtus could rise as high as $60 million, (nearly double F-Squared's payment and without taking into account private litigation risk) assuming Virtus was at "arms-length from the source of the errors."

137.    On July 31, 2015, Virtus announced that it had not resolved the SEC investigation and that its loss contingency had more than tripled to $16.5 million.  The material risks to Virtus's business that had been deliberately concealed have now been revealed to the market as Virtus, among other things:

- Is in the midst of a significant SEC investigation (as Defendants knew was essentially inevitable);

- Has had to fire F-Squared, which was previously highlighted as a Virtus "success" story;

- Has eliminated the branding of its flagship product, changing the name of each of its AlphaSector funds;[2]

- Has seen significant outflows of assets under management in the funds that were formerly know as AlphaSector – with assets declining more than 15% from a high of $11.4 billion to approximately $9.9 billion, with redemptions continuing; and

- Has seen a corresponding decline in revenue as its highest-fee funds lose assets.

138.    The inevitable materialization of these risks, and the damages they would cause to Virtus's business and share price had been foreseeable to Defendants for many years but Defendants deliberately concealed them in order to benefit themselves at the expense of Virtus's investors.

## VI.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

139.    In addition to the materially false and misleading statements and omissions set forth above, Defendants made the following materially false and misleading statements and omissions during the Class Period.

### A.    False and Misleading Statements and Omissions About AlphaSector's Historic Track Record

140.    During the Class Period and for years earlier, Virtus touted the AlphaSector funds' false and misleading track record in numerous public statements, including in documents publicly-filed with the SEC.  These documents include the Company's January 28, 2010, January 27, 2011,

---

[2]The name changes are as follows: (i) AlphaSector Rotation has been rebranded as Virtus Sector Trend Fund, (ii) Premium AlphaSector has been rebranded as Virtus U.S. Equity Trend Fund; (iii) Global Premium AlphaSector has been rebranded as Virtus Global Equity Trend Fund; (iv) Allocator Premium AlphaSector has been rebranded as Virtus Multi-Asset Trend Fund; and (v) Dynamic AlphaSector has been rebranded as Virtus Dynamic Trend Fund.

January 27, 2012, and January 25, 2013 Registration Statements, its Prospectuses filed December 8, 2009, February 6, 2012, and January 31, 2013, and in dozens of Summary Prospectuses filed with the SEC on February 2, 2010, February 2, 2011, February 2, 2012, January 31, 2013, and June 13, 2013 which incorporated this information by reference, as well advertising materials, sales pitches to clients, and on its website.

141.    The Company's January 25, 2013 registration statement, which was signed by Defendant Alyward, and the accompanying prospectus that were publicly filed with the SEC, made express statements about AlphaSector's past track record.    These statements included a direct comparison between AlphaSector's track record and the performance of the S&P 500, as follows:

The AlphaSector Rotation Index (ASRX) . . . is an equal weighted index comprised of a limited number of sector-based exchange-traded funds ("ETFs"). . . .  The ETFs are selected monthly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility.  The Index is constituted to focus on avoiding losses of its underlying ETFs, and has the ability to move defensively to large "cash" positions in periods of broader market weakness.  The tables below show performance of the AlphaSector Rotation Index as compared with the performance of the S&P 500 Index.

| Annual Returns (calendar year) | AlphaSector Rotation Index | S&P 500 Index |
|---|---|---|
| 2003 | 9.38% | 28.71% |
| 2004 | 13.89% | 10.86% |
| 2005 | 5.65% | 4.93% |
| 2006 | 14.40% | 15.78% |
| 2007 | 14.18% | 5.49% |
| 2008 | -8.54% | -37.00% |
| 2009 | 25.37% | 26.46% |
| 2010 | 15.50% | 15.06% |
| 2011 | 1.35% | 2.11% |
| 2012 | 14.47% | 16.00% |

| Average Annual Total Return | 1 Year | 5 Years | 10 Years | Since Inception of AlphaSector Rotation Index (4/1/01) |
|---|---|---|---|---|
| AlphaSector Rotation Index | 14.47% | 8.97% | 10.20% | 7.90% |

| S&P 500 Index | 16.00% | 1.66% | 7.10% | 3.78% |

The Premium AlphaSector Index (ASRP) . . . is an equal weighted index comprised of a limited number of sector-based exchange-traded funds ("ETFs"). . . . The ETFs are selected weekly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility. The Index is constituted to focus on avoiding losses of its underlying ETFs, and has the ability to move defensively to large "cash" positions in periods of broader market weakness. The tables below show performance of the Premium AlphaSector Index as compared with the performance of the S&P 500 Index.

| Annual Returns (calendar year) | Premium AlphaSector Index | S&P 500 Index |
|---|---|---|
| 2003 | 24.07% | 28.71% |
| 2004 | 14.90% | 10.86% |
| 2005 | 6.83% | 4.93% |
| 2006 | 16.81% | 15.78% |
| 2007 | 14.86% | 5.49% |
| 2008 | -1.13% | -37.00% |
| 2009 | 32.22% | 26.46% |
| 2010 | 17.66% | 15.06% |
| 2011 | 1.68% | 2.11% |
| 2012 | 13.90% | 16.00% |

| Average Annual Total Return | 1 Year | 5 Years | 10 Years | Since Inception of Premium AlphaSector Index (4/1/01)[1] |
|---|---|---|---|---|
| Premium AlphaSector Index | 13.90% | 12.24% | 13.79% | 12.65% |
| S&P 500 Index | 16.00% | 1.66% | 7.10% | 3.78% |

[1] The Index Inception date is April 1, 2001[.]

142. Identical information was included in the January 31, 2013 VIP prospectus, which was provided to Co-Lead Counsel by a former Virtus employee and is attached as Exhibit A at pages 60-61, and incorporated by reference into numerous Summary Prospectuses filed January 31, 2013 and June 13, 2013.

143.    The information in these documents was material to investors.  It purported to describe the actual "performance" track record of the AlphaSector indexes as compared to the S&P 500 index for a period of several years.  By showing an "inception date" of "April 1, 2001," investors understood that the returns were the result of a proven historical strategy that actually had been in place since an inception date of April 2001.  The average annual total returns for the Premium AlphaSector Index and AlphaSector Rotation Index were purported to be an incredible 12.65% and 7.9% (respectively) since their "inception date" as opposed to only 3.78% for the S&P 500.  The Premium AlphaSector Index is shown having a loss in 2008 of only -1.13% at the time when the market faced one of the greatest financial crises in history and the S&P 500 is shown having a loss of -37.00%.  Investors reading this information would see that in a time of market turmoil that the AlphaSector indexes were not only a safe-haven but even in good times delivered returns that far surpassed the competition, with compounding returns that were 480% higher than the S&P 500.

144.    The statements set forth above were materially false and misleading.  In connection with the December 22, 2014 settlement between F-Squared and the SEC, F-Squared admitted to "two materially false claims in its AlphaSector advertisements."   These admitted materially false claims were that (1) the AlphaSector strategy had managed client assets from its inception April 2001 to September 2008, and (2) the AlphaSector strategy had significantly outperformed the S&P 500 index from April 2001 to September 2008.

145.    Indeed, in stark contrast to Virtus's statements about AlphaSector's historical performance, the AlphaSector strategy did not even exist prior to October 2008.  As described above, the reported results for periods prior to October 2008 were based not upon actual

management of real client money but instead upon post-hoc "back-testing" of the AlphaSector strategy using hypothetical inputs.

146.    Moreover, the hypothetical back-testing itself was materially false and misleading. As F-Squared has admitted in connection with the SEC settlement:

> F-Squared created the pre-October 2008 "historical track record" incorrectly by implementing all the purchases and sales [for the funds] one week before they should have been implemented.  Because the signals were detecting price momentum, F-Squared's incorrectly implementing the signals one week early meant that AlphaSector's "historical track record" was based on its selling before price drops that had already occurred and buying before price increases that had already occurred.  As described below, virtually all of AlphaSector's claimed outperformance relative to the S&P 500 Index for the pre-October 2008 period is attributable to this erroneous calculation.

147.    As further admitted by F-Squared, this "inaccurate compilation of historical data substantially [and falsely] improved the AlphaSector's strategy's advertised back-tested and hypothetical historical performance for the pre-October 2008 period."  As described in F-Squared's admissions filed in the SEC action, this error meant the following:

> If an investor made a hypothetical investment of $100,000 on April 1, 2001 (assuming a reinvestment of dividends and no further contributions or withdrawals), the investment would have been worth approximately $128,000 on August 24, 2008 if invested in the S&P 500 Index.  With accurately timed (but still hypothetical and back-tested) signal implementation, the same investment in F-Squared's hypothetical and back-tested signals one week early, F-Squared advertised the investment as worth $235,000.

148.    As the SEC described in its December 22, 2014 press release announcing the settlement with F-Squared, this inaccurate calculation grossly inflated AlphaSector's pre-October 2008 returns by 350%.  Defendants knew or should have known about this inflation because Virtus had a direct relationship with Newfound Research – the Company that was founded by Cory Hoffstein, the 20 year old intern who in 2009 licensed his algorithm to F-Squared, and David Morton.

149.    On October 4, 2012, Virtus announced that it was teaming up with Newfound Research to establish Newfound Investments.  According to the press release:

> Newfound Investments is a new investment manager that will expand Virtus' offerings of innovative investment solutions by adding disciplined, rules-based strategies to manage a variety of asset classes. . . .  Using Newfound Research's proprietary tactical models, the first strategies managed by Newfound Investments will be three open-ended mutual funds called the Virtus Disciplined funds. Virtus has filed registrations with the SEC for the Virtus Disciplined Equity Style Fund, Virtus Disciplined Select Country Fund and Virtus Disciplined Select Bond Fund. Corey Hoffstein, co-founder and chief investment officer of Newfound Research, will serve as portfolio manager for the new funds.

150.    Through this relationship, Virtus knew or should have known that the intern responsible for the algorithm underlying AlphaSector had been just thirteen years old in 2001, at the time that the AlphaSector strategy had supposedly gone live, and had not even graduated from college until 2009.  Moreover, if Defendants had any questions or wanted to seek more information on the background of AlphaSector, including the history of the algorithm and building blocks of the model, they could easily have reached out to Hoffstein, or Morton, since they were now direct business partners and there was no buffer (such as Howard Present) between them.

151.    Unfortunately for investors, however, there is no indication that Defendants used the opportunity to do any follow-up due diligence on AlphaSector.  Further, according to the SEC complaint against F-Squared, in May 2013 Virtus asked Newfound Research why its substantially similar funds had substantially underperformed AlphaSector in 2008.  This question prompted an employee to run a backtest on F-Squared and he identified a large performance difference between the performance he calculated for AlphaSector in 2008 as compared to the performance of the same fund advertised by F-Squared and Virtus.

152.    According to the SEC complaint, this employee – in just a few days of work – "discovered the calculation error that had substantially inflated AlphSector's purported pre-September 2008 track record."

153.    In addition to these materially false and misleading affirmative statements during the Class Period, Defendants made a number of materially false and misleading omissions regarding AlphaSector's historic track record.  As discussed, Defendants quietly eliminated the above-referenced information from Registration Statements and Prospectuses filed after October 2013, and from other public statements made after October 2013.

154.    For example, the Registration Statement and Prospectuses for AlphaSector funds issued on October 4, 2013, January 27, 2014, September 12, 2014, and November 12, 2014 do not have any discussion of the 2001 to 2008 track record, eliminate references to "inception date," and do not make comparisons between AlphaSector's purported pre-October 2008 performance and the pre-October 2008 performance of the S&P 500 Index.  Nowhere in those documents do Defendants state that this information had been removed because it was now known to be materially false, nor do they reference the critical facts, each of which they were personally aware, that (i) F-Squared was being investigated by the SEC, (ii) prior statements in Virtus's publicly disseminated materials regarding the AlphaSector funds were materially false and misleading because the pre-October 2008 performance track record was actually backtested only and the AlphaSector strategy did not even exist prior to October 2008, (iii) even the backtested hypothetical results were inaccurate and grossly inflated, and that (iv) Virtus was aware that F-Squared had made materially false and misleading statements regarding the AlphaSector funds. This information would have been material to reasonable investors and the omission of this information rendered Virtus's public statements materially false and misleading.

**B.    False and Misleading Statements and Omissions Regarding Virtus's Selection And Monitoring of Managers And Sub-advisers**

155.    Throughout the Class Period, in multiple public filings with the SEC and other public statements, Virtus and the Defendants touted the disciplined way in which it selected its sub-advisers, such as F-Squared and Howard Present.  For example, in a Citigroup U.S. Financial Services Conference, dated March 5, 2013, Defendant Aylward cheer-leaded Virtus's selection and oversight of advisers.  Aylward stated:

> We're disciplined in our selection of high-caliber managers, our product oversight and development of new products . . .
>
> As a multi-manager, the identification and selection of investment managers, both affiliates and subadvisers, is critical to the business. We have been successful because we identify high-quality teams with the distinctive strategies and carefully consider the cultural fit of the manager. While we start by identifying the capabilities we're looking for and then identify the best manager to provide the strategy, whether it's from an existing affiliated manager, a current subadviser or a new manager. We have been successful developing partnerships by using this focused approach. Our relationship with Vontobel, for example, began with 2 funds in less than $150 million of assets, and we've grown that to over $9 billion. We had a similar success with another subadviser, F-Squared, which began managing 1 fund for us 3 years ago, and we have sold more than $6 billion in their strategies to date.

156.    In a June 11, 2014 Morgan Stanley conference, Aylward again noted that "We are disciplined in our selection of high-caliber managers."

157.    Throughout the Class Period, Virtus also represented to its shareholders in each of its Forms 10-K that it was careful and rigorous in the way that it monitored its funds and managers. For example, Virtus's Form 10-K filed March 1, 2013 states:

> We monitor the quality of the affiliated managers and unaffiliated subadvisers products by assessing their performance, style, consistency and the discipline with which they apply their investment process.

158.    Similarly, VIP's Forms 10-K filed February 24, 2014 and March 2, 2015 state "We monitor the quality of our managers' services by assessing their performance, style, consistency

and the discipline with which they apply their investment process." On March 5, 2013, Defendant Alyward attended a Citigroup U.S. Financial Services Conference, where he stated:

> We also have a disciplined approach to performance oversight to maintain the quality of our investment strategies and a selective product development process that focuses on introducing distinctive new strategies to ensure a product portfolio that is relevant to the current needs of clients.

159. In his powerpoint presentation which accompanied his statements at the Citigroup conference Alyward noted that Virtus offered a:

- "Disciplined product oversight and development."

- "Focused approach to identifying distinctive, high-quality teams"

- "Disciplined approach to managing performance"

- "Rigorous monitoring of strategies' quality, consistency with investment style."

160. In Virtus's presentation accompanying Alyward's interview at the Citigroup conference and in a Morgan Stanley Financial Conference dated June 12, 2013, the Company listed several important points regarding its monitoring of its subadvisers and their strategies:

- "Manager selection, performance oversight and product development are key elements of our approach"

- "Focused approach to identifying distinctive, high-quality teams"

- "Rigorous monitoring of strategies quality, consistency with investment style"

161. In Virtus's prospectus filed September 12, 2013 in conjunction with its secondary offering of common stock, the Company stated:

> We monitor the quality of our products by assessing the managers' performance, style, consistency and the discipline with which they apply their investment process. . . . Our primary objective is to provide clients with a diverse offering of high-quality investment capabilities from the best managers.

162.    In Virtus's presentation for the Morgan Stanley Financials Conference dated June 11, 2014, the Company stated that it offered a "Disciplined product oversight and development."

163.    These statement were materially false and misleading for the reasons discussed above.  At no points was Virtus "rigorous" or "disciplined" in monitoring Present or F-Squared, who were in no way "high quality."  Indeed, as early as December 2012, Virtus management <u>knew</u> that the most important selling point of the AlphaSector funds was fabricated but told their sales force to ignore the problem and commanded that the truth be "swept under the rug."

164.    Nonetheless, Virtus did not inform regulators or its clients, did not suspend or fire F-Squared and did not even conduct an investigation into F-Squared.  In October 2013, Virtus was again alerted, but this time by Howard Present himself, that the SEC was investigating F-Squared and that the AlphaSector track record could not be used in future materials.  Once again, Virtus and Defendants refused to inform its investors, investigate the matter further, or fire or suspend Howard Present and F-Squared.  Ultimately, and directly contrary to Defendants' public statements, Virtus never monitored F-Squared and Howard Present for as long as they were employed as a subadviser with the Company.

### C.    False and Misleading Statements Regarding Virtus's Revenue

165.    During the Class Period, Defendants made a number of materially false and misleading statements or omissions relating to the cause of its steadily rising revenues.  For example, in Virtus's January 30, 2013 conference call, Alyward stated:

> <u>Our portfolio managers continued to deliver strong relative investment performance, and this performance has been a key driver of our high level of sales and net flows</u>. At year end, 95% of our Morningstar-rated assets were in 3-, 4-, and 5-star funds. 10 of those funds, with 73% of our assets, were rated as 5-star funds.

166.    This statement was materially false and misleading because the real "driver" of sales and net flows was Virtus's intentionally false marketing campaign focused on a fabricated

historical performance record that was designed to mislead investors into purchasing its flagship AlphaSector product. Indeed, the actual live investment performance of Virtus's AlphaSector funds, from September 2008 to present, performed considerably worse than the S&P 500 index over the same period.

167. Additionally in Virtus's 2012 Form 10-K filed March 1, 2013 and signed by Defendants Alyward and Angerthal, the Company stated:

> In 2012, total revenue increased 36.9% to $280.1 million from $204.7 million in 2011. Revenues increased in 2012 as compared with 2011 <u>primarily as a result of an increase in average assets and an increase in average management fee rates</u>. Average assets under management, which corresponds to the Company's fee-earning asset levels, was $39.6 billion for the year ended December 31, 2012, an increase of 20.1% from $33.0 billion for the year ended December 31, 2011. Operating income increased by 334.8% from $13.9 million in 2011 to $60.4 million in 2012, primarily due to increased revenues driven by higher levels of average assets under management.

168. Additionally, on the July 31, 2013 conference call, Alyward stated:

> First, we reported our highest levels of revenues and operating earnings and an increase in our operating margin. <u>The growth in revenues reflect the cumulative benefit of our growing asset levels from continued strong net flows</u>.

169. These statements were materially false and misleading, because Virtus's management refused to explain that Virtus's assets under management and performance fees were increasing due to the falsified track record of its flagship product, and not by any legitimate means.

170. Furthermore, throughout the Class Period Defendants made false and/or misleading statements in their annual filings with the SEC regarding AlphaSector's ability to make material and sustained contributions to Virtus's revenue. In its Forms 10-K throughout the Class Period, Virtus displayed in a table the assets under management and advisory fees of each of the five Virtus AlphaSector funds. For example in its 2012 Form 10-K filed on March 1, 2013, Virtus

noted that Virtus's Premium AlphaSector fund had assets of $3.574 billion and took advisory fees on those assets of 1.10%. Virtus also displayed in each of its Forms 10-K through the Class Period that its Virtus Premium AlphaSector Fund made a material contribution to the Company's overall revenue. For example, in its 2014 Form 10-K filed March 2, 2015, the Company noted that Virtus Premium AlphaSector Fund's "[i]nvestment management, administration and transfer fees" equaled $61.56 million which accounted for 14% of Virtus's "total revenues." Even without considering the other four funds, this one AlphaSector fund was an incredible driver of Virtus's overall revenue generation.

171. These metrics were materially false and misleading when made because Virtus failed to disclose that it (1) engaged in unlawful practices to artificially increase its AlphaSector fee revenue which made up a material amount of Virtus' overall revenue; (2) presented a misleading picture of the success, quality, marketability, and sustainability of its flagship product; (3) that it was withholding information regarding deficiencies in its flagship products and the investment advisor which oversaw and managed these products all of which was critical to maintaining the revenue and fund inflows; and (4) materially inflated its reported financial results. These false and misleading statements concealed the Company's true profitability and sustainability of Virtus' reported revenues, and concealed known risks that the Company's fraudulent performance record and use of a deficient advisor that was poorly monitored exposed the Company to regulatory action, government and private lawsuits, adverse publicity, and the loss of current and future clients and fund outflows.

**D.    False and Misleading Statements about the Technical and Proprietary Aspects of the AlphaSector Model**

172. One of the central selling points of Virtus's AlphaSector funds was the model that purportedly generated AlphaSector's tremendous performance. Throughout the Class Period and

years prior, Virtus claimed that the model used to generate AlphaSector's 2001 to 2008 track record was "dynamic" and "analytical" and "proprietary" such that it could not be replicated and investors were buying a truly unique product. In its first press release touting the adoption of AlphaSector, Virtus called it a "dynamic approach to equity investing." This was why Virtus could charge the highest fees for AlphaSector funds out of the over 50 products that it offered. For example, Virtus's Registration Statement filed with the SEC on January 25, 2013 and its accompanying Prospectus filed January 31, 2013 stated that:

> The AlphaSector[SM] Rotation Index (ASRX) is an active public index published by NASDAQ and designed to outperform the S&P 500® Index while also seeking to manage downside risk and lower overall volatility. It is an equal weighted index comprised of a limited number of sector-based exchange-traded funds ("ETFs") and a short-term Treasury bond ETF as a cash proxy. The ETFs are selected monthly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility.

> * * *

> The Premium AlphaSector[SM] Index (ASRP) is an active public index published by NASDAQ and designed to outperform the S&P 500® Index while also seeking to manage downside risk and lower overall volatility. It is an equal weighted index comprised of a limited number of sector-based exchange traded funds (ETFs) and a short-term Treasury bond ETF as a cash proxy. The ETFs are selected weekly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility.

Moreover, these statements were incorporated by reference in multiple Summary Prospectuses filed January 31, 2013 and June 13, 2013.

173. Additionally, each of the Summary Prospectuses dated January 31, 2013 and June 13, 2013 stated:

> The [AlphaSector] fund allocates net assets to multiple asset classes including: U.S. Equity, International Equity, Fixed Income, and Alternative. Allocations within each asset class are based on proprietary quantitative models.

174.     These statements were materially false and misleading.  In the December 22, 2014

Cease and Desist Order, F-Squared admitted that as part of its "willful violations" of securities

laws its "advertisements emphasized algorithmic-based models that purportedly supported both

the hypothetical and actual track record beginning . . . but in reality the AlphaSector track record

for the period April 2001 to June 2008 was based only on changes in 41-week and 61-week simple

moving averages."  In other words, the complicated, proprietary, and dynamic model that made

investors believe that they were investing in something special was in actuality a common,

everyday trader's tool.  Since a simple moving average is formed by computing the average price

of a security over a specific number of periods, it cannot be a proprietary analytical or quantitative

model.

**E.     False and Misleading Statements and Omissions Regarding Legal and Regulatory Matters**

175.     In its Forms 10-K filed February 24, 2014, February 26, 2014, October 27, 2014,

and March 2, 2015 and Forms 10-Q filed November 4, 2013, May 7, 2014, July 29, 2014,

November 7, 2014, singed by Defendants Angerthal and Alyward,  Virtus stated that the:

> [O]utcomes of its legal or regulatory matters are not likely, either
> individually or in the aggregate, to have a material adverse effect on its
> consolidated financial condition.

176.     These and other similar statements were materially false and misleading and

Defendants made a number of material omissions during the Class Period designed to conceal the

risks that the F-Squared issues posed to the Company.  As discussed above, Defendants also

deliberately downplayed any risk to Virtus related to the issues surrounding F-Squared.

Defendants did so despite knowing that they had made materially false and misleading statements

about AlphaSector and that the F-Squared issues were almost certainly going to have negative

consequences for the Company's flagship product, its assets under management, and its revenues, as well as negative legal and regulatory consequences.

## VII.   LOSS CAUSATION

177.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial losses.  As set forth above, the price of Virtus's common stock significantly declined (causing investors' losses) when Virtus and Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed materialized.   Specifically, Virtus and the Defendants' false and misleading statements misrepresented the performance history of some of its flagship products, and investors suffered losses as the price of Virtus stock declined when those statements were corrected and the risks concealed by them materialized, including on the dates that the Company's statements claiming there was no risk of legal or regulatory action were revealed to be false.   Accordingly, as a result of their purchases of Virtus's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

178.   At all relevant times, the market for Virtus's securities was efficient for the following reasons, among others:

   a.   The Company's securities were actively traded on the NASDAQ, a highly efficient market;

   b.   Virtus common stock traded at a significant daily trading volume;

   c.   As a regulated issuer, the Company filed periodic public reports with the SEC;

   d.   Virtus was followed by numerous securities analysts, who issued a significant number of reports on Virtus during the Class Period;

     e.   Virtus was eligible to register securities and did using Form S-3; and

     f.   Virtus communicated with investors via established market communication mechanisms, including the regular issuance of press releases and conference calls with analysts and investors.

179.    As a result, the market for Virtus's securities promptly digested current information with respect to Virtus from all publicly available sources and reflected such information in the price of those securities. Accordingly, purchasers of Virtus's publicly traded securities during the Class Period suffered similar injury through their purchases of such securities at artificially inflated prices, and a presumption of reliance applies.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

180.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded herein. None of the statements at issue were "forward-looking" when made, and even to the extent that any such statements might be construed as forward-looking, they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Alternatively, to the extent that the statutory safe harbor may apply to any such statements, Defendants remain liable because at the time they were made the speaker actually knew the statement was false or misleading or the statement was authorized and/or approved by an executive officer of Virtus who actually knew that it was false or misleading when made.

**EXCHANGE ACT COUNTS**

**COUNT ONE**

**Violation of § 10(B) of the Exchange Act and Rule 10b-5**
**Against Virtus and the Executive Defendants**

181.    Plaintiffs reallege every allegation set forth above as if fully set forth herein.

182.    During the Class Period, Virtus and the Executive Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other members of the Class to purchase Virtus common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

183.    Virtus and the Executive Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Virtus common stock in violation of §10(b) and Rule 10b-5.

184.    Virtus and the Executive Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in a continuous course of conduct to conceal adverse material information about AlphaSector's falsely inflated performance track record and the oversight of its sub-adviser F-Squared, as specified herein.  These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in

that they failed to ascertain and to disclose such facts, even though such facts were available to them.

185.    As a direct and proximate result of Virtus and the Executive Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of Virtus common stock during the Class Period.

## COUNT TWO

### Violation of § 20(a) of the Exchange Act
### Against the Executive Defendants

186.    Plaintiffs reallege every allegation set forth above as if fully set forth herein.

187.    The Executive Defendants were controlling persons of VIP and its affiliated and wholly owned companies during the Class Period due (among other reasons alleged herein) to their executive positions within VIP, VOT, and VIA; their direct involvement in the day-to-day business and operations of these entities, including the preparation of financial statements and public filings, speaking to investors and analysts on quarterly and year-end conference calls and investor presentations and press releases; their oversight of the distribution of prospectuses and marketing materials regarding Virtus's flagship product, the AlphaSector funds, to investors; their participation in board meetings concerning overseeing diligence, monitoring and approval of the AlphaSector funds and the appropriateness of F-Squared as a subdadvisor; and/or their participation in the preparation, approval, and dissemination of the false and misleading registration statements, prospectuses, summary prospectuses, and other marketing materials touting the falsified track record of the AlphaSector funds.

188.    Defendant Alyward was a control person of VIP by, among other things, virtue of his position with Virtus and its affiliated companies, his ownership of stock, his regular participation in Virtus conference calls where he spoke on behalf of the Company to investors and

analysts, and his signing of Virtus's public filings. Aylward is and at all relevant times was the President, Chief Executive Officer and Director of Virtus, and certified the truth and accuracy of Virtus's public filings throughout the Class Period. He was also the President, Chairman and Director of VIA and the President and Trustee of VOT. As President and a Trustee of VOT, Aylward was also required to oversee and co-signed the sub-advisory agreement between VIA and F-Squared, was required to oversee Virtus's AlphaSector investments, and signed VOT's registration statements and prospectuses throughout the Class Period. Aylward regularly attended the quarterly due diligence meetings of VOT signing off on the appropriateness of the AlphaSector investments and F-Squared as a subadvisor. Aylward owned a substantial block of Virtus stock, approximately 164,000 shares or 1.8% of the Company. Aylward certified the truth and accuracy of Virtus's Forms 10-K and 10-Q throughout the class period (which discussed the purported rigorous monitoring of subadvisors such as F-Squared) for their truth and accuracy as well as VOT's registration statements touting AlphaSector's falsified track record.

189.    Defendant Angerthal was a control person of VIP by, among other things, virtue of his position within VIP and its affiliated companies, his ownership of stock, his regular participation in Virtus conference calls where he spoke on behalf of the Company to investors and analysts discussing the purported explosive and sustainable revenue attributable to the AlphaSector funds, and his signing and certification of the truth and accuracy of Virtus's public filings. Angerthal is and at all relevant times was the Executive Vice President, Chief Financial Officer and Treasurer of Virtus and according to Virtus's public filings, was one of "the most highly compensated executive officers" of the Company. As the CFO of Virtus, he certified the truth and accuracy of Virtus's public filings throughout the Class Period. He was also the Vice President, Chief Financial Officer, Director and a control person of VIA. During the Class Period, Angerthal

owned approximately 45,000 shares of Virtus common stock or close to 1% of the shares outstanding.

190.    Defendant Cerutti was a control person of VIP by, among other things, virtue of his position within VIP and its affiliated companies, his ownership of stock, and his overall ability to direct the dissemination of fraudulent information concerning Virtus and its products to investors. As the Executive Vice President and Head of Distribution for Virtus, according to Virtus's public filings, Cerutti was one of the "most highly compensated executive officers" in the Company. He was also the former President of VP Distributors, LLC, the underwriter for VOT. Prior to his unloading of 34% of his holdings in Virtus just before the fraud started to be revealed, Cerutti owned a significant amount of stock, approximately 34,000 shares. In the December 14, 2012 Boca Meeting, while Alyward was on the call, Cerutti, directed Virtus's salesforce that they needed to ignore the "contradict[ions]" between what Present was saying that the AlphaSector track record was live-tested and Batchelar's comment that it was backtested only and to go out and sell the product anyway. Similarly in the all hands on deck conference call in October 2013, Cerutti told numerous employees, while Alyward was on the call, that they had to "destroy" documents evidencing AlphaSector's fraudulent track record, including emails. Given that on numerous occasions Cerutti told dozens of Virtus employees to lie about one of the most important products of the Company directly in front of the CEO (who was unwilling or unable to stop him), there can be no question that Cerutti was a control person of Virtus.

191.    Defendant Waltman was a control person of VIP by, among other things, virtue of his position within VIP and its affiliated companies, his ownership of stock, his position as a spokesman of the Company, his position as the person in charge of the initial and ongoing diligence of Virtus's products, including AlphaSector funds, and the dissemination of this diligence for the

products' approval by Virtus's trustees, and his participation in board meetings to help approve and monitor Virtus products, including the AlphaSector funds. As the Executive Vice President and Head of Product Management of Virtus, Waltman was one of the "most highly compensated executive officers" of the Company. Defendant Waltman was also the Executive Vice President, Director and a control person of VIA. As the Senior Vice President and control person of VOT, Waltman co-signed the subadvisory agreement between VIA and F-Squared. In conjunction with this position, Waltman oversaw the initial and ongoing diligence of the AlphaSector funds, presented them to the trustees of Virtus for the continued sign-off of the AlphaSector products and Howard Present as their subadvisor, and regularly attended quarterly meetings of Virtus trustees to present due diligence on the AlphaSector funds and ensure that the products were approved.

192.    Prior to his unloading of 28% of his holdings in Virtus just before the fraud started to be revealed, Waltman owned a significant amount of stock, approximately 38,000 shares. Waltman was authorized to speak on behalf of the Company and from the very beginning of Virtus's adoption of AlphaSector was quoted in press releases concerning the quality of the funds and F-Squared. When Virtus announced its adoption of AlphaSector and its partnership with F-Squared on October 5, 2009, Waltman stated "AlphaSector Index-based funds offer an uncomplicated approach to equity investing that is designed to control risk in down markets, while participating or outperforming in up markets." When Virtus launched the Virtus Premium AlphaSector fund on July 12, 2010, in a press release for the Company, Waltman noted "Financial advisers recognize that our AlphaSector strategies provide clients what they are looking for in a post-2008 investment era – the flexibility to allocate to cash in downward trending markets while remaining invested in upward trending markets." And in a May 11, 2015 press release, Waltman discussed the replacement of F-Squared as a sub-advisor with Dorsey Wright & Associates, noting

that "[w]ith their experience in price momentum strategies, Dorsey Wright is an ideal partner for Virtus and they share our commitment to producing quality outcomes for clients." Because Waltman was the key spokesman for the Company concerning the flagship product of Virtus, along with his formal position and other responsibilities and oversight of the due diligence of AlphaSector, there can be no question that he was a control person of Virtus.

193. As a direct and proximate cause of Virtus's and the Executive Defendants wrongful conduct as set forth in this Count, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Virtus securities during the Class Period.

## COUNT THREE

### Violation of § 10(b) of the Exchange Act
### Against VOT

194. Plaintiffs reallege every allegation set forth above as if fully set forth herein.

195. During the Class Period, VOT carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other members of the Class to purchase Virtus common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, this defendant took the actions set forth herein.

196. VOT: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Virtus common stock in violation of §10(b) and Rule 10b-5.

197.     VOT individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in a continuous course of conduct to conceal adverse material information about AlphaSector's falsely inflated performance track record and the oversight of its sub-adviser F-Squared, as specified herein.  This Defendant had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that it failed to ascertain and to disclose such facts, even though such facts were available to it.

198.     As a direct and proximate result of VOT's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of Virtus common stock during the Class Period.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a)  Declaring this action to be a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)  Declaring and determining that Defendants violated the federal securities laws as charged above;

c)  Awarding Plaintiffs and the Class compensatory damages;

d)  Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

e)  Awarding such other relief as this Court may deem just and proper.

## XI.     JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  August 21, 2015

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER &**
   **GROSSMANN LLP**

By:     /s/ John C. Browne         

John C. Browne
David J. Schwartz
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
Email: johnb@blbglaw.com
        david.schwartz@blbglaw.com

**LABATON SUCHAROW LLP**
Eric J. Belfi
Michael H. Rogers
140 Broadway
New York, New York 10005
Tel:    (212) 907-0700
Fax:    (212) 818-0477
Email: ebelfi@labaton.com
        mrogers@labaton.com

*Co-Lead Counsel and Attorneys for Lead Plaintiff the Arkansas Teacher Retirement System*

## EXHIBIT A

**SENT TO CO-LEAD COUNSEL FOR LEAD PLAINTIFF BY FORMER WHOLESALER EMPLOYEE OF DEFENDANT VIRTUS INVESTMENT PARTNERS**



# PROSPECTUS

| FUND | TICKER SYMBOL BY CLASS | | | |
|------|------|------|------|------|
|  | A | B | C | I |
| Virtus Allocator Premium AlphaSector<sup>SM</sup> Fund | VAAAX |  | VAACX | VAISX |
| Virtus AlphaSector<sup>SM</sup> Rotation Fund | PWBAX |  | PWBCX | VARIX |
| Virtus Dynamic AlphaSector<sup>SM</sup> Fund | EMNAX | EMNBX | EMNCX | VIMNX |
| Virtus Global Premium AlphaSector<sup>SM</sup> Fund | VGPAX |  | VGPCX | VGPIX |
| Virtus Premium AlphaSector<sup>SM</sup> Fund | VAPAX |  | VAPCX | VAPIX |

TRUST NAME:
VIRTUS OPPORTUNITIES TRUST

January 31, 2013

*Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense. This prospectus contains important information that you should know before investing in Virtus mutual funds. Please read it carefully and retain it for future reference.*

**Not FDIC Insured**
**No Bank Guarantee**
**May Lose Value**

**Table of Contents**

**FUND SUMMARIES**
Virtus Allocator Premium AlphaSector[SM] Fund ................................... 1
Virtus AlphaSector[SM] Rotation Fund ......................................... 6
Virtus Dynamic AlphaSector[SM] Fund .......................................... 11
Virtus Global Premium AlphaSector[SM] Fund ................................... 16
Virtus Premium AlphaSector[SM] Fund .......................................... 21
**MORE INFORMATION ABOUT FUND EXPENSES** ........................... 25
**MORE INFORMATION ABOUT INVESTMENT OBJECTIVES AND PRINCIPAL INVESTMENT STRATEGIES** ................................................. 25
Virtus Allocator Premium AlphaSector[SM] Fund ................................. 26
Virtus AlphaSector[SM] Rotation Fund ......................................... 27
Virtus Dynamic AlphaSector[SM] Fund .......................................... 28
Virtus Global Premium AlphaSector[SM] Fund ................................... 29
Virtus Premium AlphaSector[SM] Fund .......................................... 30
**MORE INFORMATION ABOUT RISKS RELATED TO PRINCIPAL INVESTMENT STRATEGIES** ..................................................... 31
**MANAGEMENT OF THE FUNDS** ...................................... 36
**ADDITIONAL INVESTMENT TECHNIQUES** ............................. 41
**PRICING OF FUND SHARES** ........................................ 41
**SALES CHARGES** ................................................. 42
**YOUR ACCOUNT** ................................................. 46
**HOW TO BUY SHARES** ............................................ 48
**HOW TO SELL SHARES** ........................................... 48
**THINGS YOU SHOULD KNOW WHEN SELLING SHARES** ................. 49
**ACCOUNT POLICIES** .............................................. 50
**INVESTOR SERVICES AND OTHER INFORMATION** .................... 53
**TAX STATUS OF DISTRIBUTIONS** .................................. 53
**FINANCIAL HIGHLIGHTS** ......................................... 54
**Appendix A — Additional Information About The AlphaSector[SM] Rotation Index** .......... 60
**Appendix B — Additional Information About The Premium AlphaSector[SM] Index** .......... 61

# Virtus Allocator Premium AlphaSector<sup>SM</sup> Fund

## Investment Objective

The fund has an investment objective of capital appreciation. In pursuing this objective, the fund maintains an emphasis on preservation of capital.

## Fees and Expenses

The tables below illustrate all fees and expenses that you may pay if you buy and hold shares of the fund. You may qualify for sales charge discounts if you and your family invest, or agree to invest in the future, at least $50,000 in Virtus Mutual Funds. More information about these and other discounts, as well as eligibility requirements for each share class, is available from your financial advisor and under "Sales Charges" on page 42 of the fund's prospectus and "Alternative Purchase Arrangements" on page 57 of the fund's statement of additional information.

| Shareholder Fees *(fees paid directly from your investment)* | Class A | Class C | Class I |
|---|---|---|---|
| Maximum Sales Charge (load) Imposed on Purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum Deferred Sales Charge (load) (as a percentage of the lesser of purchase price or redemption proceeds) | 1.00%(a) | 1.00%(b) | None |

| Annual Fund Operating Expenses *(expenses that you pay each year as a percentage of the value of your investment)* | Class A | Class C | Class I |
|---|---|---|---|
| Management Fees | 1.10% | 1.10% | 1.10% |
| Distribution and Shareholder Servicing (12b-1) Fees | 0.25% | 1.00%(e) | None |
| Other Expenses(d) | 0.35% | 0.35% | 0.35% |
| Acquired Fund Fees and Expenses(c) | 0.29% | 0.29% | 0.29% |
| Recapture of Previously Waived Expenses | 0.03% | 0.03% | 0.03% |
| Total Annual Fund Operating Expenses(d) | 2.02% | 2.77% | 1.77% |
| Less: Fee Waiver | — | (0.02%)(e) | — |
| Total Annual Fund Operating Expenses After Fee Waiver(d) | 2.02% | 2.75% | 1.77% |

(a) Generally, Class A Shares are not subject to any charges by the Fund when redeemed; however, a contingent deferred sales charge may be imposed on certain redemptions within 18 months on exchanges from a Virtus non-money market fund into a Virtus money market fund and purchases on which a finder's fee has been paid. The 18-month period begins on the last day of the month preceding the month in which the purchase was made.

(b) The deferred sales charge is imposed on Class C Shares redeemed during the first year only.

(c) The Total Annual Fund Operating Expenses do not correlate to the ratio of expense to average net assets appearing in the Financial Highlights tables, which tables reflect only the operating expenses of the fund and do not include acquired fund fees and expenses.

(d) Restated to reflect current expenses.

(e) The fund's distributor has contractually agreed to waive its 12b-1 fees applicable to Class C Shares to the extent that the fund's investments in underlying ETFs with their own 12b-1 fees would otherwise cause the total 12b-1 fees paid directly or indirectly by the fund to exceed the limits set forth in applicable law or regulation.

## Example

This example is intended to help you compare the cost of investing in the fund with the cost of investing in other mutual funds. The example assumes that you invest $10,000 in the fund for the time periods indicated and then redeem all of your shares at the end of those periods. The example also assumes that your investment has a 5% return each year and that the fund's operating expenses remain the same and that the expense reimbursement arrangement remains in place only for the period indicated. Although your actual costs may be higher or lower, based on these assumptions your costs would be:

| | Share Status | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|---|
| Class A | Sold or Held | $768 | $1,172 | $1,600 | $2,788 |
| Class C | Sold | $378 | $853 | $1,454 | $3,080 |
| | Held | $278 | $853 | $1,454 | $3,080 |
| Class I | Sold or Held | $180 | $557 | $959 | $2,084 |

## Portfolio Turnover

The fund pays transaction costs, such as commissions, when it buys and sells shares of exchange-traded funds ("ETFs") or securities (or "turns over" its portfolio). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when fund shares are held in a taxable account. These costs, which are not reflected in annual fund operating expenses or in the example, affect the fund's performance. During the most recent fiscal year, the fund's portfolio turnover rate was 211% of the average value of its portfolio.

## Investments, Risks and Performance

### Principal Investment Strategies

The fund allocates net assets to multiple asset classes including: U.S. Equity, International Equity, Fixed Income, and Alternative. Allocations within each asset class are based on proprietary quantitative models.

The U.S. Equity allocation may be invested in ETFs and/or securities representing the primary sectors of the S&P 500® Index. The primary sectors of the S&P 500® Index are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities. The International Equity allocation may be invested in ETFs and/or securities representing both developed markets (EAFE) and emerging markets. The Fixed Income allocation may be invested in ETFs and/or securities representing fixed income sectors including: high yield, investment grade corporate, mortgages, intermediate treasuries and inflation-protected treasuries (TIPS). The Alternative allocation may be invested in ETFs and/or securities representing gold, real estate and broad-based equity securities. The fund may also invest in stocks (without restriction as to market capitalization), bonds (without restriction as to credit quality) and short-term securities. The fund may invest in a basket of securities to represent a sector if it determines that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. The fund may also deviate from a model allocation if it is determined that tracking the model allocation is likely to violate applicable legal or regulatory restrictions or otherwise result in adverse consequences for the fund. In times of market weakness, the fund has the ability to move partially or fully to short-term cash equivalents.

### Principal Risks

The fund may not achieve its objective, and it is not intended to be a complete investment program. The value of the fund's investments that supports your share value may decrease. If between the time you purchase shares and the time you sell shares the value of the fund's investments decreases, you will lose money. Investment values can decrease for a number of reasons. Conditions affecting the overall economy, specific industries or companies in which the fund invests can be worse than expected, and investments may fail to perform as the adviser expects. As a result, the value of your shares may decrease. In addition, you will also be subject to the risks associated with the principal investment strategies of any ETFs in which the fund invests. The principal risks of investing in the fund are:

> *Commodity Risk.* The risk that investments in commodities, such as gold, or commodity-linked notes will subject the fund's portfolio to greater volatility than investments in traditional securities, or that commodity-linked instruments will experience returns different from the commodities they attempt to track.

> *Credit Risk.* The risk that the issuer of a security will fail to pay interest or principal in a timely manner, or that negative perceptions of the issuer's ability to make such payments will cause the price of the security to decline.

> *Emerging Market Investing Risk.* The risk that prices of emerging markets securities will be more volatile, or will be more greatly affected by negative conditions, than those of their counterparts in more established foreign markets.

> *Equity Securities Risk.* The risk that events negatively affecting issuers, industries or financial markets in which the fund invests, will impact the value of the stocks held by the fund and thus, the value of the fund's shares over short or extended periods. Investments in smaller companies may be more volatile than investments in larger companies.

> *Exchange-Traded Funds (ETFs) Risk.* The risk that the value of an ETF will be more volatile than the underlying portfolio of securities the ETF is designed to track, or that the costs to the fund of owning shares of the ETF will exceed those the fund would incur by investing in such securities directly.

> *Foreign Investing Risk.* The risk that the prices of foreign securities in the fund's portfolio will be more volatile than those of domestic securities, or will be negatively affected by economic, political or other developments.

> *High Yield-High Risk Fixed Income Securities Risk.* The risk that the issuers of high yield-high risk securities in the fund's portfolio will default, that the prices of such securities will be volatile, and that the securities will not be liquid.

> *Interest Rate Risk.* The risk that when interest rates rise, the values of the fund's debt securities, especially those with longer maturities, will fall.

> *Market Volatility Risk.* The risk that the value of the securities in which the fund invests may go up or down in response to the prospects of individual companies and/or general economic conditions. Price changes may be temporary or may last for extended periods.

> *Model Portfolio Risk.* The risk that investments selected using quantitative models may perform differently from the market as a whole or from their expected performance. There can be no assurance that use of a quantitative model will enable the fund to achieve positive returns or outperform the market.

> *Portfolio Turnover Risk.* The risk that the fund's principal investment strategies will result in a consistently high portfolio turnover rate. See the "Portfolio Turnover" section above for more information about the impact that portfolio turnover can have on fund performance.

> *Real Estate Investment Risk.* The risk that the value of the fund's shares will be negatively affected by factors specific to the real estate market, including interest rate risk, leverage risk, property risk and management risk.

> *Sector Focused Investing Risk.* The risk that events negatively affecting a particular industry or market sector in which the fund focuses its investments will cause the value of the fund's shares to decrease, perhaps significantly. To the extent that the fund invests a significant portion of its portfolio in ETFs representing one or more of the primary sectors of the S&P 500® Index (such as consumer discretionary, energy, healthcare) or in an ETF representing U.S. Treasuries, the fund is more vulnerable to conditions that negatively affect such sectors as compared to a fund that is not significantly invested in such sectors.

> *U.S. Government Securities Risk.* The risk that U.S. Government securities in the fund's portfolio will be subject to price fluctuations, or that an agency or instrumentality will default on an obligation not backed by the full faith and credit of the United States.

## Performance Information

The bar chart and table below provide some indication of the potential risks of investing in the fund. The fund's past performance, before and after taxes, is not necessarily an indication of how the fund will perform in the future.

The bar chart shows changes in the fund's performance for its first full year of operations. The table shows how the fund's average annual returns compare to those of a broad-based securities market index and a composite benchmark. Updated performance information is available at *virtus.com* or by calling 800-243-1574.

**Calendar year total returns for Class A Shares**

Returns do not reflect sales charges and would be lower if they did.



| Best Quarter: Q1/2012: 4.87% | Worst Quarter: Q2/2012: -0.55% |

## Average Annual Total Returns (for the periods ended 12/31/12)

Returns reflect deduction of maximum sales charges and full redemption at end of periods shown.

| | 1 Year | Since Inception (3/15/11) |
|---|---|---|
| Class A | | |
| Return Before Taxes | 2.51% | 0.85% |
| Return After Taxes on Distributions | 1.61% | 0.32% |
| Return After Taxes on Distributions and Sale of Fund Shares | 1.05% | 0.30% |
| Class C | | |
| Return Before Taxes | 7.99% | 3.52% |
| Class I | | |
| Return Before Taxes | 8.97% | 4.49% |
| S&P 500® Index (reflects no deduction for fees, expenses or taxes) | 16.00% | 8.45% |
| Dow Jones Global Moderate Portfolio Index | 11.24% | 5.99% |

The S&P 500® Index is a free-float market capitalization-weighted index of 500 of the largest U.S. companies. The Dow Jones Global Moderate Portfolio Index is a benchmark that takes 60% of the risk of the global securities market. It is a total returns index that is a time-varying weighted average of stocks, bonds, and cash. The Index is the efficient allocation of stocks, bonds, and cash in a portfolio with 60% of the risk of the Dow Jones Aggressive Portfolio Index. The indexes are calculated on a total return basis with dividends reinvested. The indexes are unmanaged and not available for direct investment.

After-tax returns are calculated using the historical highest individual federal marginal income tax rates and do not reflect the impact of state and local taxes. After-tax returns are shown only for Class A Shares; after-tax returns for other classes will vary. Actual after-tax returns depend on the investor's tax situation and may differ from those shown. After-tax returns are not relevant to investors who hold fund shares in tax-deferred accounts or to shares held by non-taxable entities. In certain cases, the Return After Taxes on Distributions and Sale of Fund Shares for a period may be higher than other return figures for the same period. This will occur when a capital loss is realized upon the sale of fund shares and provides an assumed tax benefit that increases the return.

## Management

The fund's investment adviser is Virtus Investment Advisers, Inc. ("VIA").

The fund's subadvisers are Euclid Advisors LLC ("Euclid"), an affiliate of VIA, and F-Squared Institutional Advisors, LLC ("F-Squared Institutional").

### Portfolio Management

> *Howard Present,* Co-founder, President and CEO of F-Squared Institutional, is a manager of the fund. Mr. Present has served as a Portfolio Manager of the fund since inception in March 2011.

> *Amy Robinson,* Managing Director at Euclid, is a manager of the fund. Ms. Robinson has served as a Portfolio Manager of the fund since inception in March 2011.

## Purchase and Sale of Fund Shares

| Purchase Minimums *(except Class I Shares)* | |
|---|---|
| Minimum Initial Purchase | $2,500 |
| Individual Retirement Accounts (IRAs), systematic purchase or systematic exchange accounts | $100 |
| Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |
| Minimum Additional Purchase | $100 |
| Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |

For Class I Shares, the minimum initial purchase is $100,000; there is no minimum for additional purchases.

In general, you may buy or sell shares of the fund by mail or telephone on any business day. You also may buy and sell shares through a financial advisor.

**Taxes**

The fund's distributions are taxable to you either as ordinary income or capital gains, except when your investment is through a tax-deferred arrangement, such as a 401(k) plan or an individual retirement account. Such tax-deferred arrangements may be taxed later upon withdrawal of monies from those arrangements.

**Payments to Broker-Dealers and Other Financial Intermediaries**

If you purchase the fund through a broker-dealer or other financial intermediary (such as a bank), the fund and its related companies may pay the intermediary for the sale of fund shares and related services. These payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your financial advisor to recommend the fund over another investment. Ask your financial advisor or visit your financial intermediary's Web site for more information.

# Virtus AlphaSector<sup>SM</sup> Rotation Fund

## Investment Objective

The fund has an investment objective of long-term capital appreciation.

## Fees and Expenses

The tables below illustrate all fees and expenses that you may pay if you buy and hold shares of the fund. You may qualify for sales charge discounts if you and your family invest, or agree to invest in the future, at least $50,000 in Virtus Mutual Funds. More information about these and other discounts, as well as eligibility requirements for each share class, is available from your financial advisor and under "Sales Charges" on page 42 of the fund's prospectus and "Alternative Purchase Arrangements" on page 57 of the fund's statement of additional information.

| Shareholder Fees *(fees paid directly from your investment)* | Class A | Class C | Class I |
|---|---|---|---|
| Maximum Sales Charge (load) Imposed on Purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum Deferred Sales Charge (load) (as a percentage of the lesser of purchase price or redemption proceeds) | 0.50%[(a)] | 1.00%[(b)] | None |

| Annual Fund Operating Expenses *(expenses that you pay each year as a percentage of the value of your investment)* | Class A | Class C | Class I |
|---|---|---|---|
| Management Fees | 0.45% | 0.45% | 0.45% |
| Distribution and Shareholder Servicing (12b-1) Fees | 0.25% | 1.00%[(d)] | None |
| Other Expenses[(e)] | 0.32% | 0.32% | 0.32% |
| Acquired Fund Fees and Expenses[(c)] | 0.11% | 0.11% | 0.11% |
| Total Annual Fund Operating Expenses[(e)] | 1.13% | 1.88% | 0.88% |
| Less: Fee Waiver | — | (0.02)%[(d)] | — |
| Total Annual Fund Operating Expenses After Fee Waiver[(e)] | 1.13% | 1.86% | 0.88% |

(a)    Generally, Class A Shares are not subject to any charges by the Fund when redeemed; however, a contingent deferred sales charge may be imposed on certain redemptions within 18 months on exchanges from a Virtus non-money market fund into a Virtus money market fund and purchases on which a finder's fee has been paid. The 18-month period begins on the last day of the month preceding the month in which the purchase was made.

(b)    The deferred sales charge is imposed on Class C Shares redeemed during the first year only.

(c)    The Total Annual Fund Operating Expenses do not correlate to the ratio of expense to average net assets appearing in the Financial Highlights tables, which tables reflect only the operating expenses of the fund and do not include acquired fund fees and expenses.

(d)    The fund's distributor has contractually agreed to waive its 12b-1 fees applicable to Class C Shares to the extent that the fund's investments in underlying ETFs with their own 12b-1 fees would otherwise cause the total 12b-1 fees paid directly or indirectly by the fund to exceed the limits set forth in applicable law or regulation.

(e)    Restated to reflect current expenses.

## Example

This example is intended to help you compare the cost of investing in the fund with the cost of investing in other mutual funds. The example assumes that you invest $10,000 in the fund for the time periods indicated and then redeem all of your shares at the end of those periods. The example also assumes that your investment has a 5% return each year, that the fund's operating expenses remain the same and that the Class C fee waiver remains in place for the period indicated. Although your actual costs may be higher or lower, based on these assumptions your costs would be:

|  | Share Status | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|---|
| Class A | Sold or Held | $684 | $913 | $1,161 | $1,871 |
| Class C | Sold | $289 | $585 | $1,006 | $2,180 |
|  | Held | $189 | $585 | $1,006 | $2,180 |
| Class I | Sold or Held | $90 | $281 | $488 | $1,084 |

## Portfolio Turnover

The Fund pays transaction costs, such as commissions, when it buys and sells shares of exchange-traded funds ("ETFs") or securities (or "turns over" its portfolio). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when fund shares are held in a taxable account. These costs, which are not reflected in annual fund operating expenses or in the example, affect the fund's performance. During the most recent fiscal year, the fund's portfolio turnover rate was 190% of the value of its portfolio.

## Investments, Risks and Performance

### Principal Investment Strategies

The fund seeks to track the AlphaSector<sup>SM</sup> Rotation Index (ASRX), a public index published by NASDAQ. The fund may be invested in ETFs and/or securities representing the primary sectors of the S&P 500® Index and in high-quality short-term securities. The primary sectors of the S&P 500® Index represented by the ETFs are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities.

Allocations are based on a proprietary quantitative model that seeks to evaluate "true" underlying trends within each sector by adjusting for unwarranted price distortions and changing levels of volatility in the market. The fund has the flexibility to be invested in any combination of the sector ETFs and/or securities, a combination of sector ETFs and/or securities and high-quality short-term securities, or 100% in high-quality short-term securities. The fund may invest in a basket of securities to represent a sector if it is determined that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. The fund may also deviate from tracking the AlphaSector<sup>SM</sup> Rotation Index and/or the model allocation if it is determined that tracking the Index and/or the model allocation is likely to violate applicable legal or regulatory restrictions or is otherwise result in adverse consequences for the fund.

### Principal Risks

The fund may not achieve its objective, and it is not intended to be a complete investment program. The value of the fund's investments that supports your share value may decrease. If between the time you purchase shares and the time you sell shares the value of the fund's investments decreases, you will lose money. Investment values can decrease for a number of reasons. Conditions affecting the overall economy, specific industries or companies in which the fund invests can be worse than expected, and investments may fail to perform as the adviser expects. As a result, the value of your shares may decrease. In addition, you will also be subject to the risks associated with the principal investment strategies of any ETFs in which the fund invests. The principal risks of investing in the fund are:

> *Correlation to Index Risk.* The risk that the performance of the fund and its index may vary somewhat due to factors such as fund flows, transaction costs, sample selection, and timing differences associated with additions to and deletions from its index.

> *Equity Securities Risk.* The risk that events negatively affecting issuers, industries or financial markets in which the fund invests, will impact the value of the stocks held by the fund and thus, the value of the fund's shares over short or extended periods.

> *Exchange-Traded Funds (ETFs) Risk.* The risk that the value of an ETF will be more volatile than the underlying portfolio of securities the ETF is designed to track, or that the costs to the fund of owning shares of the ETF will exceed those the fund would incur by investing in such securities directly.

> *Fund of Funds Risk.* The risk that the underlying funds in which the fund invests will expose the fund to negative performance and additional expenses associated with investment in such funds, and increased volatility.

> *Market Volatility Risk.* The risk that the value of the securities in which the fund invests may go up or down in response to the prospects of individual companies and/or general economic conditions. Price changes may be temporary or may last for extended periods.

> *Model Portfolio Risk.* The risk that investments selected using quantitative models may perform differently from the market as a whole or from their expected performance. There can be no assurance that use of a quantitative model will enable the fund to achieve positive returns or outperform the market.

> *Portfolio Turnover Risk.* The risk that the fund's principal investment strategies will result in a consistently high portfolio turnover rate. See the "Portfolio Turnover" section above for more information about the impact that portfolio turnover can have on fund performance.

## Portfolio Turnover

The Fund pays transaction costs, such as commissions, when it buys and sells shares of exchange-traded funds ("ETFs") or securities (or "turns over" its portfolio). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when fund shares are held in a taxable account. These costs, which are not reflected in annual fund operating expenses or in the example, affect the fund's performance. During the most recent fiscal year, the fund's portfolio turnover rate was 190% of the value of its portfolio.

## Investments, Risks and Performance

### Principal Investment Strategies

The fund seeks to track the AlphaSector$^{SM}$ Rotation Index (ASRX), a public index published by NASDAQ. The fund may be invested in ETFs and/or securities representing the primary sectors of the S&P 500® Index and in high-quality short-term securities. The primary sectors of the S&P 500® Index represented by the ETFs are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities.

Allocations are based on a proprietary quantitative model that seeks to evaluate "true" underlying trends within each sector by adjusting for unwarranted price distortions and changing levels of volatility in the market. The fund has the flexibility to be invested in any combination of the sector ETFs and/or securities, a combination of sector ETFs and/or securities and high-quality short-term securities, or 100% in high-quality short-term securities. The fund may invest in a basket of securities to represent a sector if it is determined that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. The fund may also deviate from tracking the AlphaSector$^{SM}$ Rotation Index and/or the model allocation if it is determined that tracking the Index and/or the model allocation is likely to violate applicable legal or regulatory restrictions or is otherwise result in adverse consequences for the fund.

### Principal Risks

The fund may not achieve its objective, and it is not intended to be a complete investment program. The value of the fund's investments that supports your share value may decrease. If between the time you purchase shares and the time you sell shares the value of the fund's investments decreases, you will lose money. Investment values can decrease for a number of reasons. Conditions affecting the overall economy, specific industries or companies in which the fund invests can be worse than expected, and investments may fail to perform as the adviser expects. As a result, the value of your shares may decrease. In addition, you will also be subject to the risks associated with the principal investment strategies of any ETFs in which the fund invests. The principal risks of investing in the fund are:

> *Correlation to Index Risk.* The risk that the performance of the fund and its index may vary somewhat due to factors such as fund flows, transaction costs, sample selection, and timing differences associated with additions to and deletions from its index.

> *Equity Securities Risk.* The risk that events negatively affecting issuers, industries or financial markets in which the fund invests, will impact the value of the stocks held by the fund and thus, the value of the fund's shares over short or extended periods.

> *Exchange-Traded Funds (ETFs) Risk.* The risk that the value of an ETF will be more volatile than the underlying portfolio of securities the ETF is designed to track, or that the costs to the fund of owning shares of the ETF will exceed those the fund would incur by investing in such securities directly.

> *Fund of Funds Risk.* The risk that the underlying funds in which the fund invests will expose the fund to negative performance and additional expenses associated with investment in such funds, and increased volatility.

> *Market Volatility Risk.* The risk that the value of the securities in which the fund invests may go up or down in response to the prospects of individual companies and/or general economic conditions. Price changes may be temporary or may last for extended periods.

> *Model Portfolio Risk.* The risk that investments selected using quantitative models may perform differently from the market as a whole or from their expected performance. There can be no assurance that use of a quantitative model will enable the fund to achieve positive returns or outperform the market.

> *Portfolio Turnover Risk.* The risk that the fund's principal investment strategies will result in a consistently high portfolio turnover rate. See the "Portfolio Turnover" section above for more information about the impact that portfolio turnover can have on fund performance.

> *Sector Focused Investing Risk.* The risk that events negatively affecting an industry or market sector in which the fund focuses its investments will cause the value of the fund's shares to decrease, perhaps significantly. To the extent that the fund invests a significant portion of its portfolio in ETFs representing one or more of the primary sectors of the S&P 500® Index (such as consumer discretionary, energy, healthcare) or in an ETF representing U.S. Treasuries, the fund is more vulnerable to conditions that negatively affect such sectors as compared to a fund that is not significantly invested in such sectors.

> *U.S. Government Securities Risk.* The risk that U.S. Government securities in the fund's portfolio will be subject to price fluctuations, or that an agency or instrumentality will default on an obligation not backed by the full faith and credit of the United States.

## Performance Information

The bar chart and table below provide some indication of the potential risks of investing in the fund. The fund's past performance, before and after taxes, is not necessarily an indication of how the fund will perform in the future.

The bar chart shows changes in the fund's performance from year to year over the life of the fund. The table shows how the fund's average annual returns compare to those of a broad-based securities market index and a composite benchmark. Updated performance information is available at *virtus.com* or by calling 800-243-1574.

**Calendar year total returns for Class A Shares** (includes returns of a predecessor fund)

Returns do not reflect sales charges and would be lower if they did.



| Best Quarter: Q2/2009: 14.28% | Worst Quarter: Q4/2008: -17.03% |

**Average Annual Total Returns** (for the periods ended 12/31/12; includes returns of a predecessor fund)

Returns reflect deduction of maximum sales charges and full redemption at end of periods shown.

| | 1 Year | 5 Years | Class A and Class C Since Inception (8/1/03) | Class I Since Inception (10/1/09) |
|---|---|---|---|---|
| Class A | | | | |
|   Return Before Taxes | 5.57% | 0.48% | 4.82% | — |
|   Return After Taxes on Distributions | 0.72% | -0.72% | 3.65% | — |
|   Return After Taxes on Distributions and Sale of Fund Shares | 0.47% | -0.44% | 3.52% | — |
| Class C | | | | |
|   Return Before Taxes | 11.18% | 0.94% | 4.71% | — |
| Class I | | | | |
|   Return Before Taxes | 12.31% | — | — | 11.27% |
| S&P 500® Index (reflects no deduction for fees, expenses or taxes) | 16.00% | 1.66% | 6.21% | 12.89% |
| AlphaSector™ Rotation Linked Benchmark (reflects no deduction for fees, expenses or taxes) | 16.00% | 3.49% | 6.63% | 12.89% |

## Supplemental Performance Information

On September 29, 2009, F-Squared Investments, Inc. ("F-Squared"), an affiliate of F-Squared Institutional Advisors, LLC ("F-Squared Institutional"), became the fund's subadviser and the fund's principal strategies were changed to those described in the fund's prospectus. (On January 1, 2013, F-Squared Institutional became the fund's subadviser; however, the fund's strategies were unaffected.) The bar chart and table below show performance only since F-Squared began as subadviser to the fund.

### Calendar year total returns for Class A Shares

Returns do not reflect sales charges and would be lower if they did.



| Best Quarter: Q3/2010: 13.11% | Worst Quarter: Q2/2010: -12.53% |
| --- | --- |

### Average Annual Total Returns (for the periods ended 12/31/12)

Returns reflect deduction of maximum sales charges and full redemption at end of periods shown.

| | 1 Year | Since 9/29/2009* | Since 10/1/2009 |
| --- | --- | --- | --- |
| Class A Shares | | | |
|   Return Before Taxes | 5.57% | 7.88% | — |
|   Return After Taxes on Distributions | 4.35% | 7.28% | — |
|   Return After Taxes on Distributions and Sale of Fund Shares | 4.08% | 6.59% | — |
| Class C Shares | | | |
|   Return Before Taxes | 11.18% | 9.08% | — |
| Class I Shares | | | |
|   Return Before Taxes | 12.31% | — | 11.27% |
| S&P 500® Index (reflects no deduction for fees, expenses or taxes) | 16.00% | 11.86% | 12.89% |

* F-Squared began managing the fund on September 29, 2009.

The S&P 500® Index is a free-float adjusted market capitalization-weighted index of 500 of the largest U.S. companies. The index is calculated on a total-return basis with dividends reinvested. The AlphaSector™ Rotation Linked Benchmark consists of the S&P 500® Index since September 29, 2009. Prior to September 29, 2009, its performance represents an allocation consisting of 80% S&P 500® Index and 20% Barclays Capital U.S. Aggregate Bond Index. The Barclays Capital U.S. Aggregate Bond Index measures the U.S. investment grade fixed rate bond market. The indexes are unmanaged and not available for direct investment.

After-tax returns are calculated using the historical highest individual federal marginal income tax rates and do not reflect the impact of state and local taxes. After-tax returns are shown only for Class A Shares; after-tax returns for other classes will vary. Actual after-tax returns depend on the investor's tax situation and may differ from those shown. After-tax returns are not relevant to investors who hold fund shares in tax-deferred accounts or to shares held by non-taxable entities. In certain cases, the Return After Taxes on Distributions and Sale of Fund Shares for a period may be higher than other return figures for the same period. This will occur when a capital loss is realized upon the sale of fund shares and provides an assumed tax benefit that increases the return.

## Management

The fund's investment adviser is Virtus Investment Advisers, Inc. ("VIA").

The fund's subadvisers are Euclid Advisors LLC ("Euclid") (since September 2011), an affiliate of VIA, and F-Squared Institutional (since January 2013).

### Portfolio Management

> *Howard Present,* Co-founder, President and CEO of F-Squared Institutional, is a manager of the fund. Mr. Present has served as a Portfolio Manager of the fund since 2009.

> *Amy Robinson,* Managing Director at Euclid, is a manager of the fund. Ms. Robinson has served as a Portfolio Manager of the fund since 2009.

## Purchase and Sale of Fund Shares

| Purchase Minimums *(except Class I Shares)* | |
|---|---|
| Minimum Initial Purchase | $2,500 |
|    Individual Retirement Accounts (IRAs), systematic purchase or systematic exchange accounts | $100 |
|    Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |
| Minimum Additional Purchase | $100 |
|    Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |

For Class I Shares, the minimum initial purchase is $100,000; there is no minimum for additional purchases.

In general, you may buy or sell shares of the fund by mail or telephone on any business day. You also may buy and sell shares through a financial advisor.

### Taxes

The fund's distributions are taxable to you either as ordinary income or capital gains, except when your investment is through a tax-deferred arrangement, such as a 401(k) plan or an individual retirement account. Such tax-deferred arrangements may be taxed later upon withdrawal of monies from those arrangements.

### Payments to Broker-Dealers and Other Financial Intermediaries

If you purchase the fund through a broker-dealer or other financial intermediary (such as a bank), the fund and its related companies may pay the intermediary for the sale of fund shares and related services. These payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your financial advisor to recommend the fund over another investment. Ask your financial advisor or visit your financial intermediary's Web site for more information.

## Investment Objective

The Fund's investment objective is to seek long-term capital appreciation.

## Fees and Expenses

The tables below illustrate all fees and expenses that you may pay if you buy and hold shares of the fund. You may qualify for sales charge discounts if you and your family invest, or agree to invest in the future, at least $50,000 in Virtus Mutual Funds. More information about these and other discounts, as well as eligibility requirements for each share class, is available from your financial advisor and under "Sales Charges" on page 42 of the fund's prospectus and "Alternative Purchase Arrangements" on page 57 of the fund's statement of additional information.

| Shareholder Fees (fees paid directly from your investment) | Class A | Class B | Class C | Class I |
|---|---|---|---|---|
| Maximum Sales Charge (load) Imposed on Purchases (as a percentage of offering price) | 5.75% | None | None | None |
| Maximum Deferred Sales Charge (load) (as a percentage of the lesser of purchase price or redemption proceeds) | 1.00%(a) | 5.00%(b) | 1.25%(b) | None |

| Annual Fund Operating Expenses (expenses that you pay each year as a percentage of the value of your investment) | Class A Shares | Class B Shares | Class C Shares | Class I Shares |
|---|---|---|---|---|
| Management Fees | 1.89%(c)(d) | 1.89%(c)(d) | 1.89%(c)(d) | 1.89%(c)(d) |
| Distribution and Shareholder Servicing (12b-1) Fees | 0.25% | 1.00% | 1.00% | None |
| Other Expenses(d): | | | | |
| Dividends on Short Sales and Interest Expense | 0.64% | 0.64% | 0.64% | 0.64% |
| Remainder of Other Expenses | 0.42% | 0.42% | 0.42% | 0.42% |
| Total Other Expenses | 1.06% | 1.06% | 1.06% | 1.06% |
| Acquired Fund Fees and Expenses(e) | 0.20% | 0.20% | 0.20% | 0.20% |
| Total Annual Fund Operating Expenses(d) | 3.40% | 4.15% | 4.15% | 3.15% |

(a) Generally, Class A Shares are not subject to any charges by the Fund when redeemed; however, a contingent deferred sales charge may be imposed on certain redemptions within 18 months on exchanges from a Virtus non-money market fund into a Virtus money market fund and purchases on which a finder's fee has been paid. The 18-month period begins on the last day of the month preceding the month in which the purchase was made.

(b) The maximum deferred sales charge is imposed on Class B Shares redeemed during the first year; thereafter, it decreases 1% annually to 3% during the third and fourth years and to 0% after the sixth year. The deferred sales charge is imposed on Class C Shares redeemed during the first year only.

(c) Management Fees exceed the contractual percentage rate because the Advisory Agreement, as amended, calculates fees based on Managed Assets rather than based on net assets although the table shows the percentage rate as applied to net assets. Managed Assets means the total assets of the fund, including any assets attributable to borrowings, minus the fund's accrued liabilities other than such borrowings. In the future, performance fee adjustments may increase or decrease the management fee by up to +/- 1.00% of the average net assets of the fund during a rolling 36-month period (or cumulative period since the implementation of the principal investment management changes).

(d) Restated to reflect current fees and expenses.

(e) The Total Annual Fund Operating Expenses do not correlate to the ratio of expense to average net assets appearing in the Financial Highlights tables, which tables reflect only the operating expenses of the fund and do not include acquired fund fees and expenses.

## Example

This example is intended to help you compare the cost of investing in the fund with the cost of investing in other mutual funds. The example assumes that you invest $10,000 in the fund for the time periods indicated. It shows your costs if you sold your shares at the end of the period or continued to hold them. In the case of Class B Shares, it assumes that

your shares are converted to Class A Shares after seven years. The example also assumes that your investment has a 5% return each year and that the fund's operating expenses remain the same. Although your actual costs may be higher or lower, based on these assumptions your costs would be:

| | Share Status | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|---|
| Class A | Sold or Held | $898 | $1,560 | $2,243 | $4,048 |
| Class B | Sold | $817 | $1,461 | $2,120 | $4,174 |
| | Held | $417 | $1,261 | $2,120 | $4,174 |
| Class C | Sold | $517 | $1,261 | $2,120 | $4,331 |
| | Held | $417 | $1,261 | $2,120 | $4,331 |
| Class I | Sold or Held | $318 | $971 | $1,649 | $3,457 |

## Portfolio Turnover

The fund pays transaction costs, such as commissions, when it buys and sells shares of exchange-traded funds ("ETFs") or securities (or "turns over" its portfolio). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when fund shares are held in a taxable account. These costs, which are not reflected in annual fund operating expenses or in the example, affect the fund's performance. During the most recent fiscal year, the fund's portfolio turnover rate was 165% of the average value of its portfolio.

## Investments, Risks and Performance

### Principal Investment Strategies

The fund seeks to achieve its investment objective by taking long and short positions in ETFs and/or stocks representing the nine primary sectors of the S&P® 500 Index. The primary sectors of the S&P 500® Index are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities. Allocations are based on a proprietary, quantitative model that seeks to evaluate trends within each sector by adjusting for changing levels of volatility in the market.

The fund intends to employ leverage in the form of borrowing on its long positions in circumstances where the fund has determined to take long positions representing four or more sectors. The fund intends to take short positions in sectors projected to have negative absolute performance, up to approximately 5.5% of the fund's net assets, for each such sector. In the event that all nine sectors are projected to have negative absolute performance, the fund may take short positions worth up to 50% of the fund's net assets, with the remainder of the fund's assets remaining in cash and cash equivalents.

### Principal Risks

The fund may not achieve its objective, and it is not intended to be a complete investment program. The value of the fund's investments that supports your share value may decrease. If between the time you purchase shares and the time you sell shares the value of the fund's investments decreases, you will lose money. Investment values can decrease for a number of reasons. Conditions affecting the overall economy, specific industries or companies in which the fund invests can be worse than expected, and investments may fail to perform as the adviser expects. As a result, the value of your shares may decrease. In addition, you will also be subject to the risks associated with the principal investment strategies of any ETFs in which the fund invests. The principal risks of investing in the fund are:

> *Equity Securities Risk.* The risk that events negatively affecting issuers, industries or financial markets in which the fund invests will impact the value of the stocks held by the fund and thus, the value of the fund's shares over short or extended periods.

> *Exchange-Traded Funds (ETFs) Risk.* The risk that the value of an ETF will be more volatile than the underlying portfolio of securities the ETF is designed to track, or that the costs to the fund of owning shares of the ETF will exceed those the fund would incur by investing in such securities directly.

> *Leverage Risk.* The risk that the value of the fund's shares will be more volatile or that the fund will incur a loss greater than the fund's investment in a given security when leverage is used.

> *Market Volatility Risk.* The risk that the value of the securities in which the fund invests may go up or down in response to the prospects of individual companies and/or general economic conditions. Price changes may be temporary or may last for extended periods.

> *Model Portfolio Risk.* The risk that investments selected using quantitative models may perform differently from the market as a whole or from their expected performance. There can be no assurance that use of a quantitative model will enable the fund to achieve positive returns or outperform the market.

> *Portfolio Turnover Risk.* The risk that the fund's principal investment strategies will result in a consistently high portfolio turnover rate. See the "Portfolio Turnover" section above for more information about the impact that portfolio turnover can have on fund performance.

> *Sector Focused Investing Risk.* The risk events negatively affecting a particular industry or market sector in which the fund focuses its investments will cause the value of the fund's shares to decrease, perhaps significantly. To the extent the fund invests a significant portion of its portfolio in ETF representing one or more of the primary sectors of the S&P 500® Index (such as consumer discretionary, energy, healthcare) or in an ETF representing U.S. Treasuries, the fund is more vulnerable to conditions that negatively affect such sectors as compared to a fund that is not significantly invested in such sectors.

> *Short Sales Risk.* The risk that a fund may experience a loss if the price of a borrowed security increases between the date of a short sale and the date on which the fund replaces the security.

> *U.S. Government Securities Risk.* The risk that the U.S. Government securities in the fund's portfolio will be subject to price fluctuations, or that an agency or instrumentality will default on an obligation not backed by the full faith and credit of the United States.

## Performance Information

The bar chart and table below provide some indication of the potential risks of investing in the fund. The fund's past performance, before and after taxes, is not necessarily an indication of how the fund will perform in the future.

The bar chart shows changes in the fund's performance from year to year over a 10-year period. The table shows how the fund's average annual returns compare to those of a broad-based securities market index and a more narrowly-based benchmark. Updated performance information is available at *virtus.com* or by calling 800-243-1574.

**Calendar year total returns for Class A Shares** (includes returns of a predecessor fund)

Returns do not reflect sales charges and would be lower if they did.



| Best Quarter: Q1/2009: 5.86% | Worst Quarter: Q3/2011: -6.00% |

**Average Annual Total Returns** (for the periods ended 12/31/12; includes returns of a predecessor fund)

Returns reflect deduction of maximum sales charges and full redemption at end of periods shown.

| | 1 Year | 5 Years | 10 Years | Class I Since Inception (10/1/09) |
|---|---|---|---|---|
| **Class A** | | | | |
| Return Before Taxes | 0.56% | -1.96% | -1.35% | — |
| Return After Taxes on Distributions | 0.07% | -2.13% | -1.52% | — |
| Return After Taxes on Distributions and Sale of Fund Shares | 0.04% | -1.73% | -1.20% | — |
| **Class B** | | | | |
| Return Before Taxes | 1.88% | -1.78% | -1.52% | — |
| **Class C** | | | | |
| Return Before Taxes | 5.94% | -1.55% | -1.50% | — |
| **Class I** | | | | |
| Return Before Taxes | 7.20% | — | — | -1.34% |
| S&P 500® Index (reflects no deduction for fees, expenses or taxes) | 16.00% | 1.66% | 7.10% | 12.89% |
| Citigroup 90-Day Treasury Bill Index (reflects no deduction for fees, expenses or taxes) | 8.30% | 2.05% | 2.50% | 2.56% |

The S&P 500® Index is a free-float market capitalization-weighted index of 500 of the largest U.S. companies. The index is calculated on a total-return basis with dividends reinvested. The Citigroup 90-Day Treasury Bill Index measures monthly return equivalents of yield averages that are not marked to market. The 90-Day Treasury Bill Index is an average of the last three three-month Treasury bill issues. The indexes are unmanaged and not available for direct investment.

After-tax returns are calculated using the historical highest individual federal marginal income tax rates and do not reflect the impact of state and local taxes. After-tax returns are shown only for Class A Shares; after-tax returns for other classes will vary. Actual after-tax returns depend on the investor's tax situation and may differ from those shown. After-tax returns are not relevant to investors who hold fund shares in tax-deferred accounts or to shares held by non-taxable entities. In certain cases, the Return After Taxes on Distributions and Sale of Fund Shares for a period may be higher than other return figures for the same period. This will occur when a capital loss is realized upon the sale of fund shares and provides an assumed tax benefit that increases the return.

## Management

The fund's investment adviser is Virtus Investment Advisers, Inc. ("VIA").

The fund's subadvisers are Euclid Advisors LLC ("Euclid"), an affiliate of VIA, and F-Squared Alternative Investments, LLC ("F-Squared Alternative").

### Portfolio Management

> *Howard Present,* Co-founder, President and CEO of F-Squared Alternative, is a manager of the fund. Mr. Present has served as a Portfolio Manager of the fund since February 2012.

> *Amy Robinson,* Managing Director at Euclid, is a manager of the fund. Ms. Robinson has served as a Portfolio Manager of the fund since February 2012.

## Purchase and Sale of Fund Shares

| Purchase Minimums *(except Class I Shares)* | |
|---|---|
| Minimum Initial Purchase | $2,500 |
| Individual Retirement Accounts (IRAs), systematic purchase or systematic exchange accounts | $100 |
| Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |
| Minimum Additional Purchase | $100 |
| Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |

For Class I Shares, the minimum initial purchase is $100,000; there is no minimum for additional purchases.

In general, you may buy or sell shares of the fund by mail or telephone on any business day. You also may buy and sell shares through a financial advisor.

NOTE: Class B Shares are no longer available for purchase, except through reinvestment of dividends/capital gain distributions by existing shareholders and exchange of Class B shares of a fund for Class B shares of other Virtus Mutual Funds, as permitted by the existing exchange privileges (as set forth in the fund's prospectus).

## Taxes

The fund's distributions are taxable to you either as ordinary income or capital gains, except when your investment is through a tax-deferred arrangement, such as a 401(k) plan or an individual retirement account. Such tax-deferred arrangements may be taxed later upon withdrawal of monies from those arrangements.

## Payments to Broker-Dealers and Other Financial Intermediaries

If you purchase the fund through a broker-dealer or other financial intermediary (such as a bank), the fund and its related companies may pay the intermediary for the sale of fund shares and related services. These payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your financial advisor to recommend the fund over another investment. Ask your financial advisor or visit your financial intermediary's Web site for more information.

# Virtus Global Premium AlphaSector[SM] Fund

## Investment Objective

The fund has an investment objective of capital appreciation. In pursuing this objective, the fund maintains an emphasis on preservation of capital.

## Fees and Expenses

The tables below illustrate all fees and expenses that you may pay if you buy and hold shares of the fund. You may qualify for sales charge discounts if you and your family invest, or agree to invest in the future, at least $50,000 in Virtus Mutual Funds. More information about these and other discounts, as well as eligibility requirements for each share class, is available from your financial advisor and under "Sales Charges" on page 42 of the fund's prospectus and "Alternative Purchase Arrangements" on page 57 of the fund's statement of additional information.

| Shareholder Fees *(fees paid directly from your investment)* | Class A | Class C | Class I |
|---|---|---|---|
| Maximum Sales Charge (load) Imposed on Purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum Deferred Sales Charge (load) (as a percentage of the lesser of purchase price or redemption proceeds) | 1.00%[(a)] | 1.00%[(b)] | None |

| Annual Fund Operating Expenses *(expenses that you pay each year as a percentage of the value of your investment)* | Class A | Class C | Class I |
|---|---|---|---|
| Management Fees | 1.10% | 1.10% | 1.10% |
| Distribution and Shareholder Servicing (12b-1) Fees | 0.25% | 1.00%[(d)] | None |
| Other Expenses[(d)] | 0.42% | 0.42% | 0.42% |
| Acquired Fund Fees and Expenses[(c)] | 0.28% | 0.28% | 0.28% |
| Total Annual Fund Operating Expenses[(d)] | 2.05% | 2.80% | 1.80% |
| Less: Fee Waiver | — | (0.03)%[(e)] | — |
| Total Annual Fund Operating Expenses After Fee Waiver[(d)] | 2.05% | 2.77% | 1.80% |

(a) Generally, Class A Shares are not subject to any charges by the fund when redeemed; however, a contingent deferred sales charge may be imposed on certain redemptions within 18 months on exchanges from a Virtus non-money market fund into a Virtus money market fund and purchases on which a finder's fee has been paid. The 18-month period begins on the last day of the month preceding the month in which the purchase was made.

(b) The deferred sales charge is imposed on Class C Shares redeemed during the first year only.

(c) The Total Annual Fund Operating Expenses do not correlate to the ratio of expense to average net assets appearing in the Financial Highlights tables, which tables reflect only the operating expenses of the fund and do not include acquired fund fees and expenses.

(d) Restated to reflect current expenses.

(e) The fund's distributor has contractually agreed to waive its 12b-1 fees applicable to Class C Shares to the extent that the fund's investments in underlying ETFs with their own 12b-1 fees would otherwise cause the total 12b-1 fees paid directly or indirectly by the fund to exceed the limits set forth in applicable law or regulation.

## Example

This example is intended to help you compare the cost of investing in the fund with the cost of investing in other mutual funds. The example assumes that you invest $10,000 in the fund for the time periods indicated and then redeem all of your shares at the end of those periods. The example also assumes that your investment has a 5% return each year and that the fund's operating expenses remain the same and that the expense reimbursement arrangement remains in place only for the period indicated. Although your actual costs may be higher or lower, based on these assumptions your costs would be:

| | Share Status | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|---|
| Class A | Sold or Held | $771 | $1,181 | $1,615 | $2,817 |
| Class C | Sold | $380 | $859 | $1,464 | $3,099 |
| | Held | $280 | $859 | $1,464 | $3,099 |
| Class I | Sold or Held | $183 | $566 | $975 | $2,116 |

## Portfolio Turnover

The Fund pays transaction costs, such as commissions, when it buys and sells shares of the exchange-traded funds ("ETFs") or securities (or "turns over" its portfolio). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when fund shares are held in a taxable account. These costs, which are not reflected in annual fund operating expenses or in the example, affect the fund's performance. During the most recent fiscal year, the fund's portfolio turnover rate was 258% of the average value of its portfolio.

## Investments, Risks and Performance

### Principal Investment Strategies

The fund allocates net assets to U.S. Equity and International Equity. Allocations within each asset class are based on proprietary quantitative models.

The U.S. Equity allocation may be invested in ETFs and/or securities representing the primary sectors of the S&P 500® Index. The primary sectors of the S&P 500® Index represented are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities. The International Equity allocation may be invested in ETFs and/or securities representing both developed markets (EAFE) and emerging markets. The fund may also invest in stocks (without restriction as to market capitalization) and short-term securities. The fund may invest in a basket of securities to represent a sector if it determines that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. The fund may also deviate from a model allocation if it is determined that tracking the model allocation is likely to violate applicable legal or regulatory restrictions or otherwise result in adverse consequences for the fund. In times of market weakness, the fund has the ability to move partially or fully to short-term cash equivalents.

Under normal circumstances, the fund intends to allocate at least 40% of its assets to ETFs and/or securities representative of non-U.S. markets. Through its investment in these ETFs and/or securities, the fund's exposure to non-U.S. markets will be diversified among countries and will have represented the business activities of a number of different countries.

### Principal Risks

The fund may not achieve its objective, and it is not intended to be a complete investment program. The value of the fund's investments that supports your share value may decrease. If between the time you purchase shares and the time you sell shares the value of the fund's investments decreases, you will lose money. Investment values can decrease for a number of reasons. Conditions affecting the overall economy, specific industries or companies in which the fund invests can be worse than expected, and investments may fail to perform as the adviser expects. As a result, the value of your shares may decrease. In addition, you will also be subject to the risks associated with the principal investment strategies of any ETFs in which the fund invests. The principal risks of investing in the fund are:

> *Emerging Market Investing Risk.* The risk that prices of emerging markets securities will be more volatile, or will be more greatly affected by negative conditions, than those of their counterparts in more established foreign markets.

> *Equity Securities Risk.* The risk that events negatively affecting issuers, industries or financial markets in which the fund invests, will impact the value of the stocks held by the fund and thus, the value of the fund's shares over short or extended periods. Investments in smaller companies may be more volatile than investments in larger companies.

> *Exchange-Traded Funds (ETFs) Risk.* The risk that the value of an ETF will be more volatile than the underlying portfolio of securities the ETF is designed to track, or that the costs to the fund of owning shares of the ETF will exceed those the fund would incur by investing in such securities directly.

> *Fund of Funds Risk.* The risk that the underlying funds in which the fund invests will expose the fund to negative performance and additional expenses associated with investment in such funds, and increased volatility.

> *Foreign Investing Risk.* The risk that the prices of foreign securities in the fund's portfolio will be more volatile than those of domestic securities, or will be negatively affected by economic, political or other developments.

> *Market Volatility Risk.* The risk that the value of the securities in which the fund invests may go up or down in response to the prospects of individual companies and/or general economic conditions. Price changes may be temporary or may last for extended periods.

> *Model Portfolio Risk.* The risk that investments selected using quantitative models may perform differently from the market as a whole or from their expected performance. There can be no assurance that use of a quantitative model will enable the fund to achieve positive returns or outperform the market.

> *Portfolio Turnover Risk.* The risk that the fund's principal investment strategies will result in a consistently high portfolio turnover rate. See the "Portfolio Turnover" section above for more information about the impact that portfolio turnover can have on fund performance.

> *Sector Focused Investing Risk.* The risk that events negatively affecting a particular industry or market sector in which the fund focuses its investments will cause the value of the fund's shares to decrease, perhaps significantly. To the extent that the fund invests a significant portion of its portfolio in ETFs representing one or more of the primary sectors of the S&P 500® Index (such as consumer discretionary, energy, healthcare) or in an ETF representing U.S. Treasuries, the fund is more vulnerable to conditions that negatively affect such sectors as compared to a fund that is not significantly invested in such sectors.

> *U.S. Government Securities Risk.* The risk that U.S. Government securities in the fund's portfolio will be subject to price fluctuations, or that an agency or instrumentality will default on an obligation not backed by the full faith and credit of the United States.

## Performance Information

The bar chart and table below provide some indication of the potential risks of investing in the fund. The fund's past performance, before and after taxes, is not necessarily an indication of how the fund will perform in the future.

The bar chart shows changes in the fund's performance for its first full year of operations. The table shows how the fund's average annual returns compare to those of a broad-based securities market index and a more narrowly-based benchmark that reflects the market sectors in which the fund invests. Updated performance information is available at *virtus.com* or by calling 800-243-1574.

### Calendar year total returns for Class A Shares

Returns do not reflect sales charges and would be lower if they did.



| Best Quarter: | Q1/2012: | 6.76% | Worst Quarter: | Q2/2012: | -1.94% |

## Average Annual Total Returns (for the periods ended 12/31/12)

Returns reflect deduction of maximum sales charges and full redemption at end of periods shown.

|  | 1 Year | Since Inception (3/15/11) |
|---|---|---|
| Class A | | |
|   Return Before Taxes | 4.86% | 0.80% |
|   Return After Taxes on Distributions | 3.75% | 0.16% |
|   Return After Taxes on Distributions and Sale of Fund Shares | 2.44% | 0.17% |
| Class C | | |
|   Return Before Taxes | 10.35% | 3.38% |
| Class I | | |
|   Return Before Taxes | 11.47% | 4.39% |
| S&P 500® Index (reflects no deduction for fees, expenses or taxes) | 16.00% | 8.45% |
| MSCI World Index (net) | 15.83% | 5.30% |

The S&P 500® Index is a free-float market capitalization-weighted index of 500 of the largest U.S. companies. The index is calculated on a total return basis with dividends reinvested. The MSCI World Index (net) is a free float-adjusted market capitalization-weighted index that measures developed global market equity performance. The index is calculated on a total return basis with net dividends reinvested. The indexes are unmanaged and not available for direct investment.

After-tax returns are calculated using the historical highest individual federal marginal income tax rates and do not reflect the impact of state and local taxes. After-tax returns are shown only for Class A Shares; after-tax returns for other classes will vary. Actual after-tax returns depend on the investor's tax situation and may differ from those shown. After-tax returns are not relevant to investors who hold fund shares in tax-deferred accounts or to shares held by non-taxable entities. In certain cases, the Return After Taxes on Distributions and Sale of Fund Shares for a period may be higher than other return figures for the same period. This will occur when a capital loss is realized upon the sale of fund shares and provides an assumed tax benefit that increases the return.

## Management

The fund's investment adviser is Virtus Investment Advisers, Inc. ("VIA").

The fund's subadvisers are Euclid Advisors LLC ("Euclid"), an affiliate of VIA, and F-Squared Institutional Advisors, LLC ("F-Squared Institutional").

### Portfolio Management

> *Howard Present,* Co-founder, President and CEO of F-Squared Institutional, is a manager of the fund. Mr. Present has served as a Portfolio Manager of the fund since inception in March 2011.

> *Amy Robinson,* Managing Director at Euclid, is a manager of the fund. Ms. Robinson has served as a Portfolio Manager of the fund since inception in March 2011.

## Purchase and Sale of Fund Shares

| Purchase Minimums *(except Class I Shares)* | |
|---|---|
| Minimum Initial Purchase | $2,500 |
|   Individual Retirement Accounts (IRAs), systematic purchase or systematic exchange accounts | $100 |
|   Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |
| Minimum Additional Purchase | $100 |
|   Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |

For Class I Shares, the minimum initial purchase is $100,000; there is no minimum for additional purchases.

In general, you may buy or sell shares of the fund by mail or telephone on any business day. You also may buy and sell shares through a financial advisor.

### Taxes

The fund's distributions are taxable to you either as ordinary income or capital gains, except when your investment is through a tax-deferred arrangement, such as a 401(k) plan or an individual retirement account. Such tax-deferred arrangements may be taxed later upon withdrawal of monies from those arrangements.

### Payments to Broker-Dealers and Other Financial Intermediaries

If you purchase the fund through a broker-dealer or other financial intermediary (such as a bank), the fund and its related companies may pay the intermediary for the sale of fund shares and related services. These payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your financial advisor to recommend the fund over another investment. Ask your financial advisor or visit your financial intermediary's Web site for more information.

## Investment Objective

The fund has an investment objective of long-term capital appreciation.

## Fees and Expenses

The tables below illustrate all fees and expenses that you may pay if you buy and hold shares of the fund. You may qualify for sales charge discounts if you and your family invest, or agree to invest in the future, at least $50,000 in Virtus Mutual Funds. More information about these and other discounts, as well as eligibility requirements for each share class, is available from your financial advisor and under "Sales Charges" on page 42 of the fund's prospectus and "Alternative Purchase Arrangements" on page 57 of the fund's statement of additional information.

| Shareholder Fees *(fees paid directly from your investment)* | Class A | Class C | Class I |
|---|---|---|---|
| Maximum Sales Charge (load) Imposed on Purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum Deferred Sales Charge (load) (as a percentage of the lesser of purchase price or redemption proceeds) | 1.00%(a) | 1.00%(b) | None |

| Annual Fund Operating Expenses *(expenses that you pay each year as a percentage of the value of your investment)* | Class A | Class C | Class I |
|---|---|---|---|
| Management Fees | 1.10% | 1.10% | 1.10% |
| Distribution and Shareholder Servicing (12b-1) Fees | 0.25% | 1.00% | None |
| Other Expenses(c) | 0.28% | 0.28% | 0.28% |
| Total Annual Fund Operating Expenses After Fee Waiver(c) | 1.63% | 2.38% | 1.38% |

(a)   Generally, Class A Shares are not subject to any charges by the Fund when redeemed; however, a contingent deferred sales charge may be imposed on certain redemptions within 18 months on exchanges from a Virtus non-money market fund into a Virtus money market fund and purchases on which a finder's fee has been paid. The 18-month period begins on the last day of the month preceding the month in which the purchase was made.

(b)   The deferred sales charge is imposed on Class C Shares redeemed during the first year only.

(c)   Restated to reflect current expenses.

## Example

This example is intended to help you compare the cost of investing in the fund with the cost of investing in other mutual funds. The example assumes that you invest $10,000 in the fund for the time periods indicated and then redeem all of your shares at the end of those periods. The example also assumes that your investment has a 5% return each year and that the fund's operating expenses remain the same. Although your actual costs may be higher or lower, based on these assumptions your costs would be:

| | Share Status | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|---|
| Class A | Sold or Held | $731 | $1,060 | $1,411 | $2,397 |
| Class C | Sold | $341 | $742 | $1,270 | $2,716 |
| | Held | $241 | $742 | $1,270 | $2,716 |
| Class I | Sold or Held | $140 | $437 | $755 | $1,657 |

## Portfolio Turnover

The Fund pays transaction costs, such as commissions, when it buys and sells shares of exchange-traded funds ("ETFs") or securities (or "turns over" its portfolio). A higher portfolio turnover rate may indicate higher transaction costs and may result in higher taxes when fund shares are held in a taxable account. These costs, which are not reflected in annual fund operating expenses or in the example, affect the fund's performance. During the most recent fiscal year, the fund's portfolio turnover rate was 297% of the average value of its portfolio.

# Investments, Risks and Performance

## Principal Investment Strategies

The fund seeks to track the Premium AlphaSector[SM] Index (ASRP), a public index published by NASDAQ. The fund may be invested in ETFs and/or securities representing the primary sectors of the S&P 500® Index and high-quality short-term securities. The primary sectors of the S&P 500® Index represented are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities. Allocations are based on a proprietary quantitative model that seeks to evaluate "true" underlying trends within each sector by adjusting for unwarranted price distortions and changing levels of volatility in the market. The fund has the flexibility to be invested in any combination of the sector ETFs and/or securities, a combination of sector ETFs and/or securities and high-quality short-term securities, or 100% in high-quality short-term securities. The fund may invest in a basket of securities to represent a sector if it determines that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. The fund may also deviate from tracking the Premium AlphaSector Index and/or the model allocation if it is determined that tracking the Index and/or the model allocation is likely to violate applicable legal or regulatory restrictions or otherwise result in adverse consequences for the fund.

## Principal Risks

The fund may not achieve its objective, and it is not intended to be a complete investment program. The value of the fund's investments that supports your share value may decrease. If between the time you purchase shares and the time you sell shares the value of the fund's investments decreases, you will lose money. Investment values can decrease for a number of reasons. Conditions affecting the overall economy, specific industries or companies in which the fund invests can be worse than expected, and investments may fail to perform as the adviser expects. As a result, the value of your shares may decrease. In addition, you will also be subject to the risks associated with the principal investment strategies of the exchange-traded funds in which the fund invests. The principal risks of investing in the fund are:

> *Correlation to Index Risk.* The risk that the performance of the fund and its index may vary somewhat due to factors such as fund flows, transaction costs, sample selection, and timing differences associated with additions to and deletions from its index.

> *Equity Securities Risk.* The risk that events negatively affecting issuers, industries or financial markets in which the fund invests, will impact the value of the stocks held by the fund and thus, the value of the fund's shares over short or extended periods.

> *Exchange-Traded Funds (ETFs) Risk.* The risk that the value of an ETF will be more volatile than the underlying portfolio of securities the ETF is designed to track, or that the costs to the fund of owning shares of the ETF will exceed those the fund would incur by investing in such securities directly.

> *Fund of Funds Risk.* The risk that the underlying funds in which the fund invests will expose the fund to negative performance and additional expenses associated with investment in such funds, and increased volatility.

> *Market Volatility Risk.* The risk that the value of the securities in which the fund invests may go up or down in response to the prospects of individual companies and/or general economic conditions. Price changes may be temporary or may last for extended periods.

> *Model Portfolio Risk.* The risk that investments selected using quantitative models may perform differently from the market as a whole or from their expected performance. There can be no assurance that use of a quantitative model will enable the fund to achieve positive returns or outperform the market.

> *Portfolio Turnover Risk.* The risk that the fund's principal investment strategies will result in a consistently high portfolio turnover rate. See the "Portfolio Turnover" section above for more information about the impact that portfolio turnover can have on fund performance.

> *Sector Focused Investing Risk.* The risk that events negatively affecting a particular industry or market sector in which the fund focuses its investments will cause the value of the fund's shares to decrease, perhaps significantly. To the extent that the fund invests a significant portion of its portfolio in ETFs representing one or more of the primary sectors of the S&P 500® Index (such as consumer discretionary, energy, healthcare) or in an ETF representing U.S. Treasuries, the fund is more vulnerable to conditions that negatively affect such sectors as compared to a fund that is not significantly invested in such sectors.

> *U.S. Government Securities Risk.* The risk that U.S. Government securities in the fund's portfolio will be subject to price fluctuations, or that an agency or instrumentality will default on an obligation not backed by the full faith and credit of the United States.

## Performance Information

The bar chart and table below provide some indication of the potential risks of investing in the fund. The fund's past performance, before and after taxes, is not necessarily an indication of how the fund will perform in the future.

The bar chart shows the fund's performance from year to year over the life of the fund. The table shows how the fund's average annual returns compare to those of a broad-based securities market index. Updated performance information is available at *virtus.com* or by calling 800-243-1574.

### Calendar year total returns for Class A Shares

Returns do not reflect sales charges and would be lower if they did.



| Best Quarter: Q1/2012: 7.84% | Worst Quarter: Q3/2011: -9.45% |
|---|---|

### Average Annual Total Returns (for the periods ended 12/31/12)

Returns reflect deduction of maximum sales charges and full redemption at end of periods shown.

|  | 1 Year | Since Inception 7/1/10 |
|---|---|---|
| Class A Shares |  |  |
| Return Before Taxes | 3.73% | 10.04% |
| Return After Taxes on Distributions | 2.81% | 9.58% |
| Return After Taxes on Distributions and Sale of Fund Shares | 1.83% | 8.28% |
| Class C Shares |  |  |
| Return Before Taxes | 9.24% | 11.83% |
| Class I Shares |  |  |
| Return Before Taxes | 10.31% | 12.93% |
| S&P 500® Index (reflects no deduction for fees, expenses or taxes) | 16.00% | 16.47% |

The S&P 500® Index is a free-float adjusted market capitalization-weighted index of 500 of the largest U.S. companies. The index is calculated on a total return basis with dividends reinvested. The index is unmanaged and not available for direct investment.

After-tax returns are calculated using the historical highest individual federal marginal income tax rates and do not reflect the impact of state and local taxes. After-tax returns are shown only for Class A Shares; after-tax returns for other classes will vary. Actual after-tax returns depend on the investor's tax situation and may differ from those shown. After-tax returns are not relevant to investors who hold fund shares in tax-deferred accounts or to shares held by non-taxable entities. In certain cases, the Return After Taxes on Distributions and Sale of Fund Shares for a period may be higher than other return figures for the same period. This will occur when a capital loss is realized upon the sale of fund shares and provides an assumed tax benefit that increases the return.

## Management

The fund's investment adviser is Virtus Investment Advisers, Inc. ("VIA").

The fund's subadvisers are Euclid Advisors LLC ("Euclid"), an affiliate of VIA, and F-Squared Institutional Advisors, LLC ("F-Squared Institutional").

### Portfolio Management

> *Howard Present,* Co-founder, President and CEO of F-Squared Institutional, is a manager of the fund. Mr. Present has served as a Portfolio Manager of the fund since inception in July 2010.

> *Amy Robinson,* Managing Director at Euclid, is a manager of the fund. Ms. Robinson has served as a Portfolio Manager of the fund since inception in July 2010.

## Purchase and Sale of Fund Shares

| Purchase Minimums *(except Class I Shares)* | |
| --- | --- |
| Minimum Initial Purchase | $2,500 |
| Individual Retirement Accounts (IRAs), systematic purchase or systematic exchange accounts | $100 |
| Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |
| Minimum Additional Purchase | $100 |
| Defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans | No minimum |

For Class I Shares, the minimum initial purchase is $100,000; there is no minimum for additional purchases.

In general, you may buy or sell shares of the fund by mail or telephone on any business day. You also may buy and sell shares through a financial advisor.

### Taxes

The fund's distributions are taxable to you either as ordinary income or capital gains, except when your investment is through a tax-deferred arrangement, such as a 401(k) plan or an individual retirement account. Such tax-deferred arrangements may be taxed later upon withdrawal of monies from those arrangements.

### Payments to Broker-Dealers and Other Financial Intermediaries

If you purchase the fund through a broker-dealer or other financial intermediary (such as a bank), the fund and its related companies may pay the intermediary for the sale of fund shares and related services. These payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your financial advisor to recommend the fund over another investment. Ask your financial advisor or visit your financial intermediary's Web site for more information.

# More Information About Fund Expenses

Virtus Investment Advisers, Inc. ("VIA") has voluntarily agreed to limit the total operating expenses (excluding interest, taxes, extraordinary expenses and acquired fund fees and expenses, if any) of certain of the funds so that such expenses do not exceed, on an annualized basis, the amounts indicated in the following table.

| | Class A Shares | Class C Shares | Class I Shares |
|---|---|---|---|
| Virtus Allocator Premium AlphaSector Fund | 1.75% | 2.50% | 1.50% |
| Virtus Global Premium AlphaSector Fund | 1.75% | 2.50% | 1.50% |
| Virtus Premium AlphaSector Fund | 1.70% | 2.45% | 1.45% |

In addition to the expense limitations listed above, VIA has agreed to voluntarily limit Other Expenses of Virtus Dynamic AlphaSector Fund to 0.15% (excluding taxes, interest, prime brokerage interest expense, dividends on short sales, acquired fund fees and expenses, and extraordinary expenses).

VIA may discontinue these arrangements at any time, and under certain conditions may recapture fees waived and expenses reimbursed to the fund under this limitation for a period of three years from the end of the fiscal year in which such waivers and/or reimbursements occurred.

For those funds operating under an expense reimbursement arrangement or fee waiver during the prior fiscal year, total (net) fund operating expenses, including acquired fund fees and expenses, if any, after effect of any expense reimbursement and/or fee waivers were:

| | Class A Shares | Class B Shares | Class C Shares | Class I Shares | Class T Shares |
|---|---|---|---|---|---|
| Virtus Allocator Premium AlphaSector Fund[1][3] | 2.02% | N/A | 2.74% | 1.78% | N/A |
| Virtus Dynamic AlphaSector Fund[2] | 2.98% | 4.43% | 3.81% | 2.98% | N/A |
| Virtus Global Premium AlphaSector Fund | 2.03% | N/A | 2.78% | 1.78% | N/A |
| Virtus Premium AlphaSector Fund[3] | 1.64% | N/A | 2.39% | 1.39% | N/A |

(1) Includes recoupment of fees waived and/or expenses reimbursed by the Adviser.
(2) Total net operating expenses, including acquired fund fees and excluding dividends on short sales and interest expense, were 2.35% for Class A Shares, 3.80% for Class B Shares, 3.18% for Class C Shares and 2.35% for Class I Shares.
(3) Fund expenses currently below capped level.

# More Information About Investment Objectives and Principal Investment Strategies

The investment objectives and principal strategies of each fund are described in this section. Each of the following funds has either a fundamental or a non-fundamental investment objective as noted below. A fundamental investment objective may only be changed with shareholder approval. A non-fundamental investment objective may be changed by the Board of Trustees of that fund without shareholder approval. If a fund's investment objective is changed, the prospectus will be supplemented to reflect the new investment objective and shareholders will be provided with at least 60 days advance notice of such change. There is no guarantee that a fund will achieve its objective(s).

Please see the statement of additional information ("SAI") for additional information about the securities and investment strategies described in this prospectus and about additional securities and investment strategies that may be used by the funds.

# Virtus Allocator Premium AlphaSector<sup>SM</sup> Fund

**Non-Fundamental Investment Objective:**

The fund has an investment objective of capital appreciation.

**Principal Investment Strategies:**

The fund allocates net assets to multiple asset classes including: U.S. Equity, International Equity, Fixed Income, and Alternative. Allocations within each asset class are based on proprietary quantitative models.

The U.S. Equity allocation may be invested in exchange-traded funds ("ETFs") and/or securities representing the primary sectors of the S&P 500® Index. The primary sectors of the S&P 500® Index represented are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities. The International Equity allocation may be invested in ETFs and/or securities representing both developed markets (EAFE) and emerging markets. The Fixed Income allocation may be invested in ETFs and/or securities representing fixed income sectors including: high yield, investment grade corporate, mortgages, intermediate treasuries and inflation-protected treasuries (TIPS). The Alternative allocation may be invested in ETFs and/or securities representing gold, real estate and broad-based equity securities. The fund may also invest in stocks (without restriction as to market capitalization), bonds (without restriction as to credit quality) and short-term securities. The fund may invest in a basket of securities to represent a sector if it is determined that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. In times of market weakness, the fund has the ability to move partially or fully to short-term cash equivalents.

Euclid Advisors LLC ("Euclid") and F-Squared Institutional Advisors, LLC ("F-Squared Institutional") are subadvisers to the fund. F-Squared Institutional provides Euclid with a model portfolio weekly. Euclid is responsible for final portfolio allocation decisions and for placing all transactions. Euclid monitors the fund's allocations to the underlying securities and is responsible for rebalancing assets to maintain target allocations among the underlying ETFs and/or securities, while taking into account any other factors it may deem relevant, such as cash flow and/or timing considerations. The fund may deviate from the model portfolio if it is determined that investing in the model portfolio is likely to violate applicable legal or regulatory restrictions or otherwise result in adverse consequences for the fund.

To the extent the fund invests primarily in ETFs it will be considered a "fund of funds." The term "fund of funds" is typically used to describe mutual funds, such as the fund, whose primary investment strategy involves investing in other investment companies, such as ETFs and other mutual funds. Investments in securities of other investment companies, including ETFs, are subject to statutory limitations prescribed in the Investment Company Act of 1940 (the "1940 Act"). Absent an available exemption, a fund may not: (i) acquire more than 3% of the voting securities of any other investment company, (ii) invest more that 5% of its total assets in securities of any one investment company, or (iii) invest more than 10% of its assets in securities of all investment companies. The fund has obtained exemptive relief from the Securities and Exchange Commission ("SEC") to permit it to invest in affiliated and unaffiliated funds, including ETFs, beyond these statutory limitations, subject to certain conditions. Many ETFs also have obtained exemptive relief from the SEC to permit unaffiliated funds to invest in the ETF's shares beyond these statutory limitations, subject to certain conditions. The fund may rely on the various exemptive orders to invest in ETFs.

*Please see "More Information About Risks Related to Principal Investment Strategies" for information about the risks of investing in the fund. Please refer to "Additional Investment Techniques" for other investment techniques of the fund.*

# Virtus AlphaSector[SM] Rotation Fund

## Fundamental Investment Objective:

The fund has an investment objective of long-term capital appreciation.

## Principal Investment Strategies:

The fund seeks to track the AlphaSector Rotation Index (ASRX), a public index published by NASDAQ. The fund may be invested in ETFs and/or securities representing the primary sectors of the S&P 500® Index and high-quality short-term securities. Compilation of the Index is based on a proprietary quantitative model that seeks to evaluate "true" underlying trends within each sector by adjusting for unwarranted price distortions and changing levels of volatility in the market. The model allocates to the sectors using a model that results in sectors either being included in the portfolio or entirely excluded. The analytical model does not attempt to determine relative weights versus the S&P 500® Index weights or relative to other sector weights; it simply seeks to determine whether or not each sector is positioned to produce positive absolute returns. Sectors that are included are equally weighted, with a maximum allocation per sector of 25% at time of rebalancing. When three or fewer sectors are represented, the remainder is allocated to high-quality short-term securities, up to 100%. The fund may invest in a basket of securities to represent a sector if it determines that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. In times of extreme market weakness, the fund has the ability to move partially or fully to high-quality short-term securities.

Euclid and F-Squared Institutional are subadvisers to the fund. F-Squared Institutional provides Euclid with a model portfolio monthly. Euclid is responsible for final portfolio allocation decisions and for placing all transactions. Euclid monitors the fund's allocations to the underlying securities and is responsible for rebalancing assets to maintain the target allocations among the underlying securities, while taking into account any other factors it may deem relevant, such as cash flow and/or timing considerations. The fund may deviate from tracking the AlphaSector Rotation Index and/or the model allocation if it is determined that tracking the Index and/or the model allocation is likely to violate applicable legal or regulatory restrictions or otherwise result in adverse consequences for the fund.

To the extent the fund invests primarily in ETFs, it will be considered a "fund of funds." The term "fund of funds" is typically used to describe mutual funds, such as the fund, whose primary investment strategy involves investing in other investment companies, such as ETFs and other mutual funds. Investments in securities of other investment companies, including ETFs, are subject to statutory limitations prescribed in the 1940 Act. Absent an available exemption, a fund may not: (i) acquire more than 3% of the voting securities of any other investment company, (ii) invest more that 5% of its total assets in securities of any one investment company, or (iii) invest more than 10% of its assets in securities of all investment companies. The fund has obtained exemptive relief from the SEC to permit it to invest in affiliated and unaffiliated funds, including ETFs, beyond these statutory limitations, subject to certain conditions. Many ETFs also have obtained exemptive relief from the SEC to permit unaffiliated funds to invest in the ETF's shares beyond these statutory limitations, subject to certain conditions. The fund may rely on the various exemptive orders to invest in ETFs.

*Please see "More Information About Risks Related to Principal Investment Strategies" for information about the risks of investing in the fund. Please refer to "Additional Investment Techniques" for other investment techniques of the fund.*

# Virtus Dynamic AlphaSector<sup>SM</sup> Fund

**Non-Fundamental Investment Objective:**

The Fund's investment objective is to seek long-term capital appreciation.

**Principal Investment Strategies:**

The fund seeks to achieve its investment objective by taking long and short positions in ETFs and/or stocks representing the nine primary sectors of the S&P 500® Index. ETFs are funds that are traded on securities exchanges that generally hold a portfolio of common stocks or bonds designed to track the performance of a securities index or sector of an index. The primary sectors of the S&P 500® Index are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities.

The fund uses a proprietary, quantitative model that seeks to evaluate trends within each sector by adjusting for changing levels of volatility in the market. The fund uses this model to determine, on a weekly basis, whether a sector is projected to have positive or negative absolute performance. If positive returns are projected for a particular sector, then the fund takes a long position in one or more ETFs and/or baskets of securities representing that sector. Each sector in which the fund takes a long position will have approximately equal weighting. If a sector is projected to have negative returns, the fund takes a short position in one or more ETFs and/or baskets of securities representing that sector.

The fund intends to employ leverage in the form of borrowing on its long positions in circumstances where the fund has determined to take long positions representing four or more sectors. The aggregate amount of leverage being used by the fund at any time will depend on the number of sectors in which the fund takes a long position, with the maximum amount of leverage being used where the fund takes long positions in all nine sectors. In that event, the amount of leverage will not exceed 30% of the fund's net assets, including borrowings.

The fund intends to take short positions in sectors projected to have negative absolute performance, up to approximately 5.5% of the fund's net assets, for each such sector. In the event that all nine sectors are projected to have negative absolute performance, the fund may take short positions worth up to 50% of the fund's net assets, with the remainder of the fund's assets remaining in cash and cash equivalents.

To the extent the fund invests primarily in ETFs, the fund will be considered a "fund of funds." The term "fund of funds" is typically used to describe mutual funds, such as the fund, whose primary investment strategy involves investing in other investment companies, such as ETFs and other mutual funds. Investments in securities of other investment companies, including ETFs, are subject to statutory limitations prescribed in the 1940 Act. Absent an available exemption, a fund may not: (i) acquire more than 3% of the voting securities of any other investment company, (ii) invest more that 5% of its total assets in securities of any one investment company, or (iii) invest more than 10% of its assets in securities of all investment companies. The fund has obtained exemptive relief from the SEC to permit it to invest in affiliated and unaffiliated funds, including ETFs, beyond these statutory limitations, subject to certain conditions. Many ETFs also have obtained exemptive relief from the SEC to permit unaffiliated funds to invest in the ETF's shares beyond these statutory limitations, subject to certain conditions. The fund may rely on the various exemptive orders to invest in ETFs.

*Please see "More Information About Risks Related to Principal Investment Strategies" for information about the risks of investing in the fund. Please refer to "Additional Investment Techniques" for other investment techniques of the fund.*

**Non-Fundamental Investment Objective:**

The fund has an investment objective of long-term capital appreciation. In pursuing this objective, the fund maintains an emphasis on preservation of capital.

**Principal Investment Strategies:**

The fund allocates net assets to U.S. Equity and International Equity. Allocations within each asset class are based on proprietary quantitative models.

The U.S. Equity allocation may be invested in ETFs and/or securities representing the primary sectors of the S&P 500® Index. The primary sectors of the S&P 500® Index represented are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities. The International Equity allocation may be invested in ETFs and/or securities representing both developed markets (EAFE) and emerging markets. The fund may also invest in stocks (without restriction as to market capitalization) and short-term securities. The fund may invest in a basket of securities to represent a sector if it determines that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. In times of market weakness, the fund has the ability to move partially or fully to short-term cash equivalents.

Under normal circumstances, the fund intends to allocate at least 40% of its assets to ETFs and/or securities representative of non-U.S. markets. Through its investment in these ETFs and/or securities, the fund's exposure to non-U.S. markets will be diversified among countries and will have represented the business activities of a number of different countries.

Euclid and F-Squared Institutional are subadvisers to the fund. F-Squared Institutional provides Euclid with a model portfolio weekly. Euclid is responsible for final portfolio allocation decisions and for placing all transactions. Euclid monitors the fund's allocations to the underlying securities and is responsible for rebalancing assets to maintain target allocations among the underlying ETFs, while taking into account any other factors it may deem relevant, such as cash flow and/or timing considerations. The fund may deviate from the model portfolio if it is determined that tracking the model portfolio is likely to violate applicable legal or regulatory restrictions or otherwise result in adverse consequences for the fund.

To the extent the fund invests primarily in ETFs, it will be considered a "fund of funds." The term "fund of funds" is typically used to describe mutual funds, such as the fund, whose primary investment strategy involves investing in other investment companies, such as ETFs and other mutual funds. Investments in securities of other investment companies, including ETFs, are subject to statutory limitations prescribed in the 1940 Act. Absent an available exemption, a fund may not: (i) acquire more than 3% of the voting securities of any other investment company, (ii) invest more than 5% of its total assets in securities of any one investment company, or (iii) invest more than 10% of its assets in securities of all investment companies. The fund has obtained exemptive relief from the SEC to permit it to invest in affiliated and unaffiliated funds including ETFs, beyond these statutory limitations, subject to certain conditions. Many ETFs also have obtained exemptive relief from the SEC to permit unaffiliated funds to invest in the ETF's shares beyond these statutory limitations, subject to certain conditions. The fund may rely on the various exemptive orders to invest in ETFs.

*Please see "More Information About Risks Related to Principal Investment Strategies" for information about the risks of investing in the fund. Please refer to "Additional Investment Techniques" for other investment techniques of the fund.*

# Virtus Premium AlphaSector[SM] Fund

### Non-Fundamental Investment Objective:

The fund has an investment objective of long-term capital appreciation.

### Principal Investment Strategies:

The fund seeks to track the Premium AlphaSector[SM] Index (ASRP), a public index published by NASDAQ. The fund may invest in ETFs and/or securities representing the primary sectors of the S&P 500® Index and high-quality short-term securities. ETFs are funds that are traded on securities exchanges that generally hold a portfolio of common stocks or bonds designed to track the performance of a securities index or sector of an index. The primary sectors of the S&P 500® Index represented are: consumer discretionary, consumer staples, energy, financials, healthcare, industrials, materials, technology, and utilities. Allocations are based on a proprietary quantitative model that seeks to evaluate "true" underlying trends within each sector by adjusting for unwarranted price distortions and changing levels of volatility in the market. The model allocates to the sectors using a model that results in sectors either being included in the portfolio or entirely excluded. The analytical model does not attempt to determine relative weights versus the S&P 500® Index weights or relative to other sector weights; it simply seeks to determine whether or not each sector is positioned to produce positive absolute returns. Sectors that are included are equally weighted, with a maximum allocation per sector of 25% at time of rebalancing. When three or fewer sectors are represented, the remainder is allocated to high-quality short-term securities, up to 100%. The fund may invest in a basket of securities to represent a sector if it determines that investment in the ETF for that sector is not feasible or otherwise not in the best interest of the fund. In times of extreme market weakness, the fund has the ability to move partially or fully to high-quality short-term securities.

The subadviser provides the adviser with a model portfolio weekly. The adviser is responsible for final portfolio allocation decisions and for placing all transactions. The adviser monitors the fund's allocations to the underlying securities and is responsible for rebalancing assets to maintain the target allocations among the underlying ETFs and/or securities, while taking into account any other factors the adviser may deem relevant, such as cash flow and/or timing considerations. The fund may deviate from tracking the Premium AlphaSector Index and/or the model allocation if it is determined that tracking the Index and/or model allocation is likely to violate applicable legal or regulatory restrictions or otherwise result in adverse consequences for the fund.

To the extent the fund invests primarily in ETFs, it will be considered a "fund of funds." The term "fund of funds" is typically used to describe mutual funds, such as the fund, whose primary investment strategy involves investing in other investment companies, such as ETFs and other mutual funds. Investments in securities of other investment companies, including ETFs, are subject to statutory limitations prescribed in the 1940 Act. Absent an available exemption, a fund may not: (i) acquire more than 3% of the voting securities of any other investment company, (ii) invest more that 5% of its total assets in securities of any one investment company, or (iii) invest more than 10% of its assets in securities of all investment companies. The fund has obtained exemptive relief from the SEC to permit it to invest in affiliated and unaffiliated funds, including ETFs, beyond these statutory limitations, subject to certain conditions. Many ETFs also have obtained exemptive relief from the SEC to permit unaffiliated funds to invest in the ETF's shares beyond these statutory limitations, subject to certain conditions. The fund may rely on the various exemptive orders to invest in ETFs.

*Please see "More Information About Risks Related to Principal Investment Strategies" for information about the risks of investing in the fund. Please refer to "Additional Investment Techniques" for other investment techniques of the fund.*

Each of the funds may not achieve its objectives, and each is not intended to be a complete investment program.

Generally, the value of a fund's investments that supports your share value may decrease. If between the time you purchase shares and the time you sell shares the value of such fund's investments decreases, you will lose money.

Investment values can decrease for a number of reasons. Conditions affecting the overall economy, specific industries or companies in which the fund invests can be worse than expected and investments may fail to perform as the adviser or subadviser expects. As a result, the value of your shares may decrease.

Specific risks of investing in the funds are identified in the below table and described in detail following the table. For certain funds, the indicated risks may apply indirectly through the fund's investments in other investment companies.

| Risks | Virtus Allocator Premium AlphaSector Fund | Virtus AlphaSector Rotation Fund | Virtus Dynamic AlphaSector Fund | Virtus Global Premium AlphaSector Fund | Virtus Premium AlphaSector Fund |
|---|---|---|---|---|---|
| Commodity and Commodity-Linked Instruments | X | | | | |
| Correlation to Index | | X | | | X |
| Debt Securities | X | | | | |
| Call | X | | | | |
| Credit | X | | | | |
| Interest Rate | X | | | | |
| Equity Securities | X | X | X | X | X |
| Large Market Capitalization Companies | X | X | X | X | X |
| Small and Medium Market Capitalization Companies | X | | | X | |
| Exchange-Traded Funds ("ETFs") | X | X | X | X | X |
| Foreign Investing | X | | | X | |
| Currency Rate | X | | | X | |
| Emerging Market Investing | X | | | X | |
| Fund of Funds | X | X | | X | X |
| High Yield-High Risk Securities (Junk Bonds) | X | | | | |
| Income | X | | | | |
| Industry/Sector Concentration | X | X | X | X | X |
| Leverage | | | X | | |
| Market Volatility | X | X | X | X | X |
| Model Portfolio | X | X | X | X | X |
| Real Estate | X | | | | |
| Sector Focused Investing | X | X | X | X | X |
| Short Sales | | | X | | |
| Short-Term Investments | X | X | | X | X |
| U.S. Government Securities | X | X | X | X | X |

In order to determine which risks are principal risks for a fund, please refer to the table above.

## Commodity and Commodity-Linked Instruments Risk

Investments by a fund in commodities or commodity-linked instruments may subject the fund's portfolio to greater volatility than investments in traditional securities. The value of commodity-linked instruments may be affected by overall market movements, changes in interest rates or factors affecting a particular industry or commodity, such as drought, floods, weather, livestock disease, embargoes, tariffs and international economic, political and regulatory developments. Individual commodity prices can fluctuate widely over short time periods. Commodity investments typically do not have dividends or income and are dependent on price movements to generate returns. Commodity price movements can deviate from equity and fixed income price movements. The means by which a fund seeks exposure to commodities, both directly and indirectly through derivatives, may be limited by the fund's intention to qualify as a regulated investment company under the Internal Revenue Code of 1986, as amended.

## Debt Securities Risk

Debt securities are subject to various risks, the most prominent of which are credit risk and interest rate risk. These risks can affect a security's price volatility to varying degrees, depending upon the nature of the instrument. Risks associated with investing in debt securities include the following:

- **Credit Risk.** The risk that the issuer of a security will fail to pay interest or principal in a timely manner, or that negative perceptions of the issuer's ability to make such payments will cause the price of the security to decline. Debt securities rated below investment-grade are especially susceptible to this risk. *Senior Floating Rate Fund:* Generally, Senior Loans are less susceptible to this risk than certain other types of fixed income securities, because the payment of principal and interest on Senior Loans will take precedence over other payment obligations of the borrower.

- **Interest Rate Risk.** The values of debt securities usually rise and fall in response to changes in interest rates. Declining interest rates generally increase the value of existing debt instruments, and rising interest rates generally decrease the value of existing debt instruments. Changes in a debt instrument's value usually will not affect the amount of interest income paid to the fund, but will affect the value of the fund's shares. Interest rate risk is generally greater for investments with longer maturities.

  Certain securities pay interest at variable or floating rates. Variable rate securities reset at specified intervals, while floating rate securities reset whenever there is a change in a specified index rate. In most cases, these reset provisions reduce the effect of changes in market interest rates on the value of the security. However, some securities do not track the underlying index directly, but reset based on formulas that can produce an effect similar to leveraging; others may also provide for interest payments that vary inversely with market rates. The market prices of these securities may fluctuate significantly when interest rates change.

  Some investments give the issuer the option to call or redeem an investment before its maturity date. If an issuer calls or redeems an investment during a time of declining interest rates, the fund might have to reinvest the proceeds in an investment offering a lower yield, and therefore it might not benefit from any increase in value as a result of declining interest rates.

## Equity Securities Risk

Generally, prices of equity securities are more volatile than those of fixed income securities. The prices of equity securities will rise and fall in response to a number of different factors. In particular, equity securities will respond to events that affect entire financial markets or industries (such as changes in inflation or consumer demand) and to events that affect particular issuers (such as news about the success or failure of a new product). Equity securities also are subject to "stock market risk," meaning that stock prices in general may decline over short or extended periods of time. When the value of the stocks held by the fund goes down, the value of the fund's shares will be affected.

- **Large Market Capitalization Companies.** The value of investments in larger companies may not rise as much as smaller companies, or that larger companies may be unable to respond quickly to competitive challenges, such as changes in technology and consumer tastes.

- **Small and Medium Market Capitalization Companies.** Small-and medium-sized companies often have narrower markets, fewer products or services to offer, and more limited managerial and financial resources than larger, more established companies. As a result, the performance of small-and medium-sized companies may be more volatile, and may face a greater risk of business failure, which could increase the volatility and risk of loss to a fund.

## Exchange-Traded Funds (ETFs) Risk

ETFs invest in a portfolio of securities designed to track a particular market segment or index. The risks associated with investing in ETFs generally reflect the risks of owning shares of the underlying securities the ETF is designed to track, although lack of liquidity in an ETF could result in its value being more volatile than the underlying portfolio of securities. Assets invested in ETFs incur a layering of expenses, including operating costs and advisory fees that fund shareholders indirectly bear; such expenses may exceed the expenses the fund would incur if it invested directly in the

underlying portfolio of securities the ETF is designed to track. Shares of ETFs trade on a securities exchange and may trade at, above, or below their net asset value.

## Foreign Investing Risk

Investing in securities of non-U.S. companies involves special risks and considerations not typically associated with investing in U.S. companies, and the values of non-U.S. securities may be more volatile than those of U.S. securities. The values of non-U.S. securities are subject to economic and political developments in countries and regions where the issuers operate or are domiciled, or where the securities are traded, such as changes in economic or monetary policies, and to changes in currency exchange rates. Values may also be affected by restrictions on receiving the investment proceeds from a non-U.S. country.

In general, less information is publicly available about non-U.S. companies than about U.S. companies. Non-U.S. companies are generally not subject to the same accounting, auditing and financial reporting standards as are U.S. companies. Certain foreign issuers classified as passive foreign investment companies may be subject to additional taxation risk.

- *Currency Rate Risk.* Because the foreign securities in which a fund invests generally trade in currencies other than the U.S. dollar, changes in currency exchange rates will affect the fund's net asset value, the value of dividends and interest earned, and gains and losses realized on the sale of securities. Because the value of the fund's shares is calculated in U.S. dollars, it is possible for the fund to lose money by investing in a foreign security if the local currency of a foreign market depreciates against the U.S. dollar, even if the local currency value of the fund's holdings goes up. Generally, a strong U.S. dollar relative to such other currencies will adversely affect the value of the fund's holdings in foreign securities.

- *Emerging Market Investing Risk.* The risks of foreign investments are generally greater in countries whose markets are still developing than they are in more developed markets. Emerging market countries typically have economic and political systems that are less fully developed, and can be expected to be less stable than those of more developed countries. For example, the economies of such countries can be subject to rapid and unpredictable rates of inflation or deflation. Since these markets are often small, they may be more likely to suffer sharp and frequent price changes or long-term price depression because of adverse publicity, investor perceptions or the actions of a few large investors. They may also have policies that restrict investment by foreigners, or that prevent foreign investors from withdrawing their money at will. Certain emerging markets may also face other significant internal or external risks, including the risk of war and civil unrest. For all of these reasons, investments in emerging markets may be considered speculative.

  To the extent that a fund invests a significant portion of its assets in a particular emerging market, the fund will be more vulnerable to financial, economic, political and other developments in that country, and conditions that negatively impact that country will have a greater impact on the fund as compared with a fund that does not have its holdings concentrated in a particular country.

## Fund of Funds Risk

Achieving a fund's objective will depend on the performance of the underlying mutual funds, which depends on the particular securities in which the underlying mutual funds invest. Indirectly, the fund is subject to all risks associated with the underlying mutual funds. Since a fund's performance depends on that of each underlying mutual fund, it may be subject to increased volatility.

Assets invested in other mutual funds incur a layering of expenses, including operating costs, advisory fees and administrative fees that you, as a shareholder in the fund, indirectly bear. Such fees and expenses may exceed the fees and expenses the fund would have incurred if it invested in the underlying fund's assets directly. As the underlying funds or a fund's allocations among the underlying funds change from time to time, or to the extent that the expense ratio of the underlying funds changes, the weighted average operating expenses borne by the fund may increase or decrease. If a fund invests in closed-end funds, it may incur added expenses such as additional management fees and trading costs and additional risks associated with trading at a discount to NAV and use of leverage.

The underlying funds may change their investment objective or policies without the approval of the fund, and the fund might be forced to withdraw its investment from the underlying fund at a time that is unfavorable to the fund.

Each underlying fund may be subject to risks other than those described because the types of investments made by an underlying fund can change over time. For further description of the risks associated with the underlying funds, please consult the underlying funds' prospectus.

### High Yield-High Risk Fixed Income Securities (Junk Bonds) Risk

Securities rated "BB" or below by S&P or "Ba" or below by Moody's are known as "high yield" securities and are commonly referred to as "junk bonds". Such securities entail greater price volatility and credit and interest rate risk than investment grade securities. Analysis of the creditworthiness of high yield-high risk issuers is more complex than for higher-rated securities, making it more difficult for the subadviser to accurately predict risk. There is a greater risk with high yield-high risk fixed income securities that an issuer will not be able to make principal and interest payments when due. If a fund pursues missed payments, there is a risk that fund expenses could increase. In addition, lower-rated securities may not trade as often and may be less liquid than higher-rated securities, especially during periods of economic uncertainty or change. As a result of all of these factors, these bonds are generally considered to be speculative.

### Income Risk

The income shareholders receive from a fund is based primarily on the dividends and interest the fund earns from its investments, which can vary widely over the short- and long-term. If prevailing market interest rates drop, distribution rates of the fund's preferred stock holdings and any bond holdings could drop as well. The fund's income also would likely be affected adversely when prevailing short-term interest rates increase. For investments in inflation-protected treasuries (TIPS), income may decline due to a decline in inflation (or deflation) or due to changes in inflation expectations.

### Industry/Sector Concentration Risk

The value of the investments of a fund that focuses its investments in a particular industry or market sector will be highly sensitive to financial, economic, political and other developments affecting that industry or market sector, and conditions that negatively impact that industry or market sector will have a greater impact on the fund as compared with a fund that does not have its holdings similarly concentrated. Events negatively affecting the industries or market sectors in which a fund has invested are therefore likely to cause the value of the fund's shares to decrease, perhaps significantly.

### Leverage Risk

When a fund makes investments in futures contracts, forward contracts, swaps and other derivative instruments, the futures contracts, forward contracts, swaps and certain other derivatives provide the economic effect of financial leverage by creating additional investment exposure, as well as the potential for greater loss. When a fund uses leverage through activities such as borrowing, entering into short sales, purchasing securities on margin or on a when-issued basis, or purchasing derivative instruments in an effort to increase its returns, the fund has the risk of magnified capital losses that occur when losses affect an asset base, enlarged by borrowings or the creation of liabilities, that exceeds the net assets of the fund. The value of the shares of a fund employing leverage will be more volatile and sensitive to market movements. Leverage may also involve the creation of a liability that requires the fund to pay interest.

### Market Volatility Risk

The risk that the value of the securities in which a fund invests may go up or down in response to the prospects of individual companies and/or general economic conditions. Price changes may be temporary or may last for extended periods.

Instability in the financial markets has led to volatile financial markets that expose a fund to greater market and liquidity risk and potential difficulty in valuing portfolio instruments that it holds. In response to financial markets that

experienced extreme volatility, and in some cases a lack of liquidity, the U.S. Government has taken a number of unprecedented actions, including acquiring distressed assets from financial institutions and acquiring ownership interests in those institutions. The implications of government ownership and disposition of these assets are unclear. Additional legislation or government regulation may also change the way in which funds themselves are regulated, which could limit or preclude a fund's ability to achieve its investment objective.

## Model Portfolio Risk

Certain funds rely heavily on quantitative models, which are constructed using information and data supplied by third-party vendors. When a model proves to be incorrect or incomplete, any decisions made in reliance thereon expose the fund to potential risks. The success of relying on such models may depend on the accuracy and reliability of historical data supplied by third-party vendors. All models rely on correct market data inputs. If incorrect market data is entered into even a well-founded model, the resulting information will be incorrect. However, even if market data is inputted correctly, "model prices" will often differ substantially from market prices, especially for securities with complex characteristics such as derivative securities, or may perform differently from their expected performance for many reasons, including factors used in building the quantitative analytical framework, the weights placed on each factor, and changing sources of market returns.

Use of a model does not guarantee any particular results. The rebalancing techniques used by the fund's subadviser may result in a higher portfolio turnover rate and related expenses compared to traditional "buy and hold" or index fund strategies. A higher portfolio turnover rate increases the likelihood of higher gains or losses for investors. In addition, others may attempt to utilize public information related to the fund's investment strategy in a way that may affect performance.

## Real Estate Investment Risk

Investing in companies that invest in real estate ("Real Estate Companies") exposes a fund to the risks of owning real estate directly, as well as to risks that relate specifically to the way in which Real Estate Companies are organized and operated. Real estate is highly sensitive to general and local economic conditions and developments, and characterized by intense competition and periodic overbuilding. Real Estate Companies may lack diversification due to ownership of a limited number of properties and concentration in a particular geographic region or property type.

Investing in equity REITs and REIT-like entities involves certain unique risks in addition to those risks associated with investing in the real estate industry in general. REITs and REIT-like entities are typically small or medium market capitalization companies, and they are subject to management fees and other expenses. A fund that invests in REITs and REIT-like entities will bear its proportionate share of the costs of the REITs' and REIT-like entities' operations. REITs and REIT-like entities are dependent upon management skill, may not be diversified, and are subject to heavy cash flow dependency and self-liquidation. REITs and REIT-like entities also are subject to the possibility of failing to qualify for tax-free pass-through of income. Also, because REITs and REIT-like entities typically are invested in a limited number of projects or in a particular market segment, these entities are more susceptible to adverse developments affecting a single project or market segment than more broadly diversified investments. In the event of a default by a borrower or lessee, a REIT may experience delays in enforcing its rights as a mortgagee or lessor and may incur substantial costs associated with protecting its investments. In addition, investment in REITs could cause a fund to possibly fail to qualify as a regulated investment company, depending upon the nature of dividends received by the fund.

## Sector Focused Investing Risk

The value of the investments of a fund that focuses its investments in a particular market sector will be highly sensitive to financial, economic, political and other developments affecting that market sector, and conditions that negatively impact that market sector will have a greater impact on the fund as compared with a fund that does not have its holdings similarly focused. Events negatively affecting the market sectors in which a fund has invested are therefore likely to cause the value of the fund's shares to decrease, perhaps significantly.

## Short Sales Risk

A fund may engage in short sales, which are transactions in which a fund sells a security that it does not own (or that it owns but does not intend to deliver) in anticipation that the price of the security will decline. In order to establish a short position in a security, a fund must first borrow the security from a broker or other institution to complete the sale. The fund may not always be able to borrow a security, or to close out a short position at a particular time or at an acceptable price. If the price of the borrowed security increases between the date of the short sale and the date on which the fund replaces the security, the fund may experience a loss. A fund's loss on a short sale is limited only by the maximum attainable price of the security (which could be limitless) less the price the fund received for the security at the time it was borrowed. When engaging in short sales, the fund will transact with a prime broker. In the event that the prime broker becomes insolvent, the fund may be unable to settle pending short sales, engage in additional short sales and/or access its assets that are held by the broker, for a period of time.

## Short-Term Investments

A fund may invest in short-term investments, which may include money market instruments, repurchase agreements, certificates of deposits and bankers' acceptances and other short-term instruments that are not U.S. Government securities. These securities generally present less risk than many other investments, but they are generally subject to credit risk and may be subject to other risks as well.

## U.S. Government Securities Risk

Obligations issued or guaranteed by the U.S. Government, its agencies, authorities and instrumentalities and backed by the full faith and credit of the United States only guarantee principal and interest will be timely paid to holders of the securities. The entities do not guarantee that the value of fund shares will increase, and in fact, the market values of such obligations may fluctuate. In addition, not all U.S. Government securities are backed by the full faith and credit of the United States; some are the obligation solely of the entity through which they are issued. There is no guarantee that the U.S. Government would provide financial support to its agencies and instrumentalities if not required to do so by law.

# Management of the Funds

## The Adviser

Virtus Investment Advisers, Inc. ("VIA") is the investment adviser to the funds and is located at 100 Pearl Street, Hartford, CT 06103. VIA acts as the investment adviser for over 50 mutual funds and as adviser to institutional clients. As of September 30, 2012, VIA had approximately $27.4 billion in assets under management. VIA has acted as an investment adviser for over 70 years and is an indirect wholly-owned subsidiary of Virtus Investment Partners, Inc. ("Virtus"), a publicly traded multi-manager asset management business.

Subject to the direction of the fund's Board of Trustees, VIA is responsible for managing the funds' investment programs and for the general operations of the funds, including oversight of the funds' subadvisers. Euclid is responsible for providing final allocation and trading decisions following receipt of F-Squared Institutional's or F-Squared Alternative's investment recommendations.

## Management Fees

Each fund pays VIA an investment management fee that is accrued daily against the value of the fund's net assets at the following annual rates.

| | | |
|---|---|---|
| Virtus Premium AlphaSector Fund | | 1.10% |

| | First $1 billion | Over $1 billion |
|---|---|---|
| Virtus AlphaSector Rotation Fund | 0.45% | 0.40% |

| | First $2 billion | $2+ billion through $4 billion | Over $4 billion |
|---|---|---|---|
| Virtus Allocator Premium AlphaSector Fund | 1.10% | 1.05% | 1.00% |
| Virtus Global Premium AlphaSector Fund | 1.10% | 1.05% | 1.00% |

Virtus Dynamic AlphaSector Fund pays VIA an investment management fee that is accrued daily at an annual base rate of 1.50% of the first $1 billion of the fund's average daily Managed Assets and 1.40% of the fund's average daily Managed Assets of the fund exceeding $1 billion. "Managed Assets" means the total assets of the fund, including any assets attributable to borrowings, minus the fund's accrued liabilities other than such borrowings. This fee is subject to a performance adjustment in accordance with a rate schedule (the "fulcrum fee"). The performance adjustment increases or decreases the management fee based on how well the fund has performed relative to the S&P 500® Index (the "Index"). The fee rate will be adjusted by adding or subtracting 0.10% (10 basis points) for each 1.00% of absolute performance by which the fund's performance exceeds or lags that of the Index. The maximum performance adjustment is plus or minus 1.00% (100 basis points), which would occur if the fund performed 10 percentage points better or worse than the Index.

Performance is measured for purposes of the performance adjustment over the most recent 36-month period (*i.e.*, a rolling 36-month period), consisting of the current month for which performance is available plus the previous 35 months. This comparison will be made, and the advisory fee adjusted, at the end of each month. During the period from February 6, 2012 (the date on which the investment management fee was amended to include the performance adjustment) to February 5, 2013, no performance adjustment will apply, and the fund will pay the base fee as it currently does. VIA will be entitled to receive a performance adjustment only after completion of this initial twelve-month period. Beginning on February 6, 2013, the performance adjustment will be calculated based upon the cumulative performance period since February 6, 2012; after 36 months have elapsed since that date, the fund will begin calculating the performance adjustment based upon the most recent 36-month period on a rolling basis. In calculating the fund's investment management fee when the performance adjustment applies, the fee rate as adjusted will be multiplied by the fund's average daily Managed Assets over the same time period used to determine the level of the adjustment (generally, a rolling 36-month period, as set forth above).

Any performance adjustment will be based upon the fund's performance compared to the performance of the Index. A performance adjustment will not be based on whether the fund's absolute performance is positive or negative, but rather based on whether the fund's performance is better or worse than the performance of the Index. The fund could therefore pay a performance adjustment for positive relative performance even if the fund's shares decrease in value, so long as the fund's performance exceeds that of the Index.

In its last fiscal year, those funds that had been in operation for at least one year paid fees to the adviser at the following percentage of average net assets:

| | |
|---|---|
| Virtus Allocator Premium AlphaSector Fund | 1.10% |
| Virtus AlphaSector Rotation Fund | 0.45% |
| Virtus Dynamic AlphaSector Fund* | 1.83% |
| Virtus Global Premium AlphaSector Fund | 1.10% |
| Virtus Premium AlphaSector Fund | 1.10% |

* Fees reflect rates paid under previous fee schedules.

## The Subadvisers

VIA has appointed subadvisers for each of the funds as follows:

| | |
|---|---|
| Virtus Allocator Premium AlphaSector Fund | Euclid and F-Squared Institutional Advisors, LLC ("F-Squared Institutional") |

| Virtus AlphaSector Rotation Fund | Euclid and F-Squared Institutional |
| Virtus Dynamic AlphaSector Fund | Euclid and F-Squared Alternative Investments, LLC ("F-Squared Alternative") |
| Virtus Global Premium AlphaSector Fund | Euclid and F-Squared Institutional |
| Virtus Premium AlphaSector Fund | Euclid and F-Squared Institutional |

Euclid manages the investments of the funds and F-Squared Alternative or F-Squared Institutional are limited services subadvisers.

## Euclid

Euclid, an affiliate of VIA, is located at 100 Pearl Street, Hartford, CT 06103. Euclid serves as subadviser to mutual funds. As subadviser to Virtus Allocator Premium AlphaSector Fund, Virtus AlphaSector Rotation Fund, Virtus Global Premium AlphaSector Fund and Virtus Premium AlphaSector Fund, Euclid is responsible for determining final allocations and trading decisions following receipt of F-Squared Alternative's and F-Squared Institutional's investment recommendations. As of September 30, 2012, Euclid had approximately $5.8 billion in assets under management.

## F-Squared Alternative

F-Squared Alternative is located at 2221 Washington Street, Suite 201, Newton, MA 02462. F-Squared Alternative has been an investment adviser since 2011 and provides investment management and advisory services to institutional and separately managed accounts. As of September 30, 2012, F-Squared Alternative had approximately $14 million in assets under management or advisement.

## F-Squared Institutional

F-Squared Institutional is located at 2221 Washington Street, Suite 201, Newton, MA 02462. F-Squared Institutional has been an investment adviser since 2010 and provides investment management and advisory services to institutional and separately managed accounts. As of September 30, 2012, F-Squared Institutional had approximately $5.3 billion in assets under management or advisement.

VIA pays each subadviser a subadvisory fee which is calculated on the fund's average daily net assets at the following annual rates:

| Virtus Allocator Premium AlphaSector Fund | 20% of net investment management fee to Euclid<br>50% of net investment management fee to F-Squared Institutional |
| Virtus AlphaSector Rotation Fund | Euclid: 20% of the net investment management fee<br>F-Squared Institutional: 0.20% on the first $1 billion, 0.175% over $1 billion |
| Virtus Dynamic AlphaSector Fund* | Euclid: 20% of net investment management fee, as adjusted upward or downward by applying 26% of the performance adjustment<br>F-Squared Alternative: 53.3% of net investment management fee, as adjusted upward or downward by applying 74% of the performance adjustment |
| Virtus Global Premium AlphaSector Fund | 20% of net investment management fee to Euclid<br>50% of net investment management fee to F-Squared Institutional |
| Virtus Premium AlphaSector Fund | 20% of net investment management fee to Euclid<br>50% of net investment management fee to F-Squared Institutional |

* See "Management Fees" for a description of the performance adjustment applicable to the investment management fees paid by Virtus Dynamic AlphaSector Fund.

A discussion regarding the basis for the Board of Trustees approving the investment advisory and subadvisory agreements is expected to be available in the funds' 2013 semiannual report, covering the period October 1, 2012 through March 31, 2013.

VIA and the funds, except Virtus AlphaSector Rotation Fund, have received an exemptive order from the SEC that permits VIA, subject to certain conditions, and without the approval of shareholders, to: (a) employ a new unaffiliated subadviser for a fund pursuant to the terms of a new subadvisory agreement, in each case either as a replacement for an existing subadviser or as an additional subadviser; (b) change the terms of any subadvisory agreement; and (c) continue the employment of an existing subadviser on the same subadvisory agreement terms where an agreement has been assigned because of a change in control of the subadviser. In such circumstances, shareholders would receive notice of such action.

## Portfolio Management

The following individuals are responsible for the day-to-day management of the funds' portfolios.

| | |
|---|---|
| Virtus Allocator Premium AlphaSector Fund | Howard Present (since inception in March 2011)<br>Amy Robinson (since the funds inception in March 2011) |
| Virtus AlphaSector Rotation Fund | Howard Present (since 2009)<br>Amy Robinson (since 2009) |
| Virtus Dynamic AlphaSector Fund | Howard Present (since February 2012)<br>Amy Robinson (since February 2012) |
| Virtus Global Premium AlphaSector Fund | Howard Present (since inception in March 2011)<br>Amy Robinson (since the funds inception in March 2011) |
| Virtus Premium AlphaSector Fund | Howard Present (since inception in July 2010)<br>Amy Robinson (since the funds inception in July 2010) |

### *Euclid*

**Amy Robinson.** Ms. Robinson is Managing Director of Euclid (since September 2011), and leads Euclid's equity trading function. She also served in this role for VIA from 1992 to 2011. In this role, Ms. Robinson is responsible for all trading activities of investment portfolios and mutual funds; she also manages strategic operational initiatives for the firm. As portfolio manager of the above-named funds, she is responsible for determining final allocations and trading decisions following receipt of the limited services subadviser's investment recommendations. Ms. Robinson has 33 years of investment experience and is former president of the Security Traders Association of Connecticut.

### *F-Squared Alternative and F-Squared Institutional*

**Howard Present.** Mr. Present is co-founder, President and CEO of F-Squared Alternative and F-Squared Institutional ("F-Squared"). As Portfolio Manager of the above-named funds, he is responsible for providing the model portfolios to Virtus. Prior to F-Squared, he was founder and President of Helicon Partners LLC (2004-2006), a boutique management firm specializing in new business development within the financial services industry. Mr. Present has over 24 years of investment management industry experience.

# Additional Investment Techniques

In addition to the Principal Investment Strategies and Risks Related to Principal Investment Strategies, the funds may engage in Securities Lending. Other techniques that are relied upon to a lesser degree are more fully described in the SAI.

## Securities Lending

A fund may loan portfolio securities with a value up to one-third of its total assets to increase its investment returns. If the borrower is unwilling or unable to return the borrowed securities when due, the respective fund can suffer losses. In addition, there is a risk of delay in receiving additional collateral or in the recovery of the securities, and a risk of loss of rights in the collateral, in the event that the borrower fails financially. There is also a risk that the value of the investment of the collateral could decline, causing a loss to the fund.

*The funds may buy other types of securities or employ other portfolio management techniques. Please refer to the SAI for more detailed information about these and other investment techniques of the funds.*

# Pricing of Fund Shares

## How is the Share Price determined?

Each fund calculates a share price for each class of its shares. The share price for each class is based on the net assets of the fund and the number of outstanding shares of that class. In general, each fund calculates a share price for each class by:

- adding the values of all securities and other assets of the fund;
- subtracting liabilities; and
- dividing the result by the total number of outstanding shares of that class.

*Assets:* ETFs, and equity securities held directly by the funds, are valued at the official closing price (typically last sale) on the exchange on which the securities are primarily traded, or, if no closing price is available, at the last bid price. Debt securities (other than short-term investments) held by the funds are valued on the basis of broker quotations or valuations provided by a pricing service, which in determining value utilizes information with respect to recent sales, market transactions in comparable securities, quotations from dealers, and various relationships between securities. Securities held by any underlying unaffiliated funds will be valued as set forth in the respective prospectuses of the underlying unaffiliated funds. Short-term investments having a remaining maturity of 60 days or less are valued at amortized cost, which approximates market value. Other assets, such as accrued interest, accrued dividends and cash are also included in determining the fund's NAV. As required, some securities and assets held by the funds are valued at fair value as determined in good faith by, or under the direction of, the Board of Trustees.

*Liabilities:* Accrued liabilities for class-specific expenses (if any), distribution fees, service fees and other liabilities are deducted from the assets of each class. Accrued expenses and liabilities that are not class specific (such as management fees) are allocated to each class in proportion to each class's net assets except where an alternative allocation can be more appropriately made.

*Net Asset Value:* The liabilities allocated to a class are deducted from the proportionate interest of such class in the assets of the applicable fund. The resulting amount for each class is then divided by the number of shares outstanding of that class to produce each class's NAV per share.

The NAV per share of each class of each fund is determined as of the close of regular trading (normally 4:00 PM eastern time) on days when the New York Stock Exchange ("NYSE") is open for trading. A fund will not calculate its NAV per share class on days when the NYSE is closed for trading. If a fund (or underlying fund, as applicable) holds securities that are traded on foreign exchanges that trade on weekends or other holidays when the funds do not price

their shares, the NAV of the funds' shares may change on days when shareholders will not be able to purchase or redeem the funds' shares.

## How are securities fair valued?

If market quotations are not readily available or available prices are not reliable, the funds (or underlying funds, as applicable) determine a "fair value" for an investment according to policies and procedures approved by the Board of Trustees. The types of assets for which such pricing might be required include (i) securities whose trading has been suspended; (ii) securities where the trading market is unusually thin or trades have been infrequent; (iii) debt securities that have recently gone into default and for which there is no current market quotation; (iv) a security whose market price is not available from an independent pricing source and for which otherwise reliable quotes are not available; (v) securities of an issuer that has entered into a restructuring; (vi) a security whose price as provided by any pricing source does not, in the opinion of the adviser/subadviser, reflect the security's market value; (vii) foreign securities subject to trading collars for which no or limited trading takes place; and (viii) securities where the market quotations are not readily available as a result of "significant" events. This list is not inclusive of all situations that may require a security to be fair valued, nor is it intended to be conclusive in determining whether a specific event requires fair valuation.

The value of any portfolio security held by a fund for which market quotations are not readily available shall be determined in good faith and in a manner that assesses the security's "fair value" on the valuation date (*i.e.*, the amount that the fund might reasonably expect to receive for the security upon its current sale), based on a consideration of all available facts and all available information, including, but not limited to, the following: (i) the fundamental analytical data relating to the investment; (ii) an evaluation of the forces which influence the market in which these securities are purchased and sold (*e.g.*, the existence of merger proposals or tender offers that might affect the value of the security); (iii) price quotes from dealers and/or pricing services; (iv) an analysis of the company's financial statements; (v) trading volumes on markets, exchanges or among dealers; (vi) recent news about the security or issuer; (vii) changes in interest rates; (viii) information obtained from the issuer, analysts, other financial institutions and/or the appropriate stock exchange (for exchange traded securities); (ix) whether two or more dealers with whom the adviser/subadviser regularly effects trades are willing to purchase or sell the security at comparable prices; (x) other news events or relevant matters; and (xi) government (domestic or foreign) actions or pronouncements.

Certain foreign common stocks may be fair valued in cases where closing prices are not readily available or are deemed not reflective of readily available market prices. For example, events (such as movement in the U.S. securities market, or other regional and local developments) may occur between the time that foreign markets close (where the security is principally traded) and the time that the fund calculates its NAV (generally, the close of regular trading on the NYSE) that may impact the value of securities traded in these foreign markets. In such cases, information from an external vendor may be utilized to adjust closing market prices of certain foreign common stocks to reflect their fair value. Because the frequency of significant events is not predictable, fair valuation of certain foreign common stocks may occur on a frequent basis.

The value of a security, as determined using the funds' fair valuation procedures, may not reflect such security's market value.

## At what price are shares purchased?

All investments received by the funds' authorized agents in good order prior to the close of regular trading on the NYSE (normally 4:00 PM eastern time) will be executed based on that day's NAV. Shares credited to your account from the reinvestment of fund distributions will be in full and fractional shares that are purchased at the closing net asset value on the next business day on which the respective fund's NAV is calculated following the dividend record date.

# Sales Charges

## What are the classes and how do they differ?

Presently, each fund offers multiple classes of shares. With the exception of Class I Shares, each class of shares has different sales and distribution charges. (See "Fees and Expenses" in each fund's "Fund Summary," previously in this prospectus.) For certain classes of shares, the funds have adopted distribution and service plans allowed under Rule 12b-1 of the 1940 Act, as amended, that authorize the funds to pay distribution and service fees for the sale of their shares and for services provided to shareholders.

## Important Information about Class B Shares (Virtus Dynamic AlphaSector only).
Class B shares of the fund are no longer available for purchase by new or existing shareholders, except by existing shareholders through "Qualifying Transactions," which consist of the following: (1) reinvestment of dividends and/or capital gain distributions; and (2) exchange of Class B shares for Class B shares of other Virtus Mutual Funds, as permitted by the existing exchange privileges (discussed below under the heading "Exchange Privileges" within the section entitled "Account Policies"). Shareholders who own Class B Shares may continue to hold such shares until they convert to Class A Shares under the existing conversion schedule, as described in this prospectus section under the heading "What arrangement is best for you?"

## What arrangement is best for you?

The different classes of shares permit you to choose the method of purchasing shares that is most beneficial to you. In choosing a class of shares, consider the amount of your investment, the length of time you expect to hold the shares, whether you decide to receive distributions in cash or to reinvest them in additional shares, and any other personal circumstances. Depending upon these considerations, the accumulated distribution and service fees and contingent deferred sales charges of one class of shares may be more or less than the initial sales charge and accumulated distribution and service fees of another class of shares bought at the same time. Because distribution and service fees are paid out of a fund's assets on an ongoing basis, over time these fees will increase the cost of your investment and may cost you more than paying other types of sales charges.

Your financial representative should recommend only those arrangements that are suitable for you based on known information. In certain instances, you may be entitled to a reduction or waiver of sales charges. For instance, you may be entitled to a sales charge discount on Class A Shares if you purchase more than certain breakpoint amounts. You should inform or inquire of your financial representative whether or not you may be entitled to a sales charge discount attributable to your total holdings in a fund or affiliated funds. To determine eligibility for a sales charge discount, you may aggregate all of your accounts (including joint accounts, retirement accounts such as IRAs, non-IRAs, etc.) and those of your spouse and minor children. The financial representative may request you to provide an account statement or other holdings information to determine your eligibility for a breakpoint and to make certain all involved parties have the necessary data. Additional information about the classes of shares offered, sales charges, breakpoints and discounts follows in this section and also may be found in the SAI in the section entitled "How to Buy Shares." This information is available free of charge, and in a clear and prominent format, at the Individual Investors section of *virtus.com*. Please be sure that you fully understand these choices before investing. If you or your financial representative require additional assistance, you may also contact Virtus Mutual Fund Services by calling toll-free 800-243-1574.

## Class A Shares (all funds).
If you purchase Class A Shares, you will pay a sales charge at the time of purchase equal to 5.75% of the offering price (6.10% of the amount invested). The sales charge may be reduced or waived under certain conditions. (See "Initial Sales Charge Alternative—Class A Shares" below.) Generally, Class A Shares are not subject to any charges by the fund when redeemed; however, a contingent deferred sales charge ("CDSC") may be imposed on certain redemptions within 18 months on exchanges from a Virtus non-money market fund into a Virtus money market fund and purchases on which a finder's fee has been paid. For Virtus AlphaSector Rotation Fund, the CDSC is 0.50%; for all other funds, the CDSC is 1.00%. The 18-month period begins on the last day of the month preceding the month in which the purchase was made. Class A Shares have lower distribution and service fees (0.25%) and generally pay higher dividends than Class B Shares and Class C Shares.

**Class B Shares (Virtus Dynamic AlphaSector Fund only).** If you sell your Class B Shares within the first five years after they were purchased, you will pay a deferred sales charge of up to 5% of your shares' value. (See "Deferred Sales Charge Alternative—Class B Shares and Class C Shares" below.) This charge declines to 0% over a period of five years, and may be waived under certain conditions. Class B Shares have higher distribution and service fees (1.00%) and pay lower dividends than Class A Shares. Class B Shares automatically convert to Class A Shares seven years after purchase.

**Class C Shares.** If you purchase Class C Shares, you will not pay a sales charge at the time of purchase. If you sell your Class C Shares within the first year after they are purchased, you will pay a deferred sales charge of 1%. (See "Deferred Sales Charge Alternative—Class B Shares and Class C Shares" below.) Class C Shares do not convert to any other class of shares of the fund, so the higher distribution and service fees paid by Class C Shares continue for the life of the account.

**Class I Shares.** Class I shares are offered primarily to clients of financial intermediaries that (i) charge such clients an ongoing fee for advisory, investment, consulting or similar services, or (ii) have entered into an agreement with the funds' distributor to offer Class I shares through a no-load network or platform. Such clients may include pension and profit sharing plans, other employee benefit trusts, endowments, foundations and corporations. Class I shares are also offered to private and institutional clients of, or referred by, the adviser, a subadviser or their affiliates, and to Trustees of the funds and trustees/directors of affiliated open- and closed-end funds, and directors, officers and employees of Virtus and its affiliates. If you are eligible to purchase and do purchase Class I Shares, you will pay no sales charge at any time. There are no distribution and service fees applicable to Class I Shares. For additional information about purchasing Class I Shares, please contact Virtus Mutual Fund Services by calling 800-243-1574.

### Initial Sales Charge Alternative—Class A Shares

The public offering price of Class A Shares is the NAV plus a sales charge that varies depending on the size of your purchase. (See "Class A Shares—Reduced Initial Sales Charges" in the SAI.) Shares purchased based on the automatic reinvestment of income dividends or capital gain distributions are not subject to any sales charges. The sales charge is divided between your investment dealer and VP Distributors, LLC ("the Distributor.")

### Sales Charge you may pay to purchase Class A Shares

| | Sales Charge as a percentage of | |
| Amount of Transaction at Offering Price | Offering Price | Net Amount Invested |
|---|---|---|
| Under $50,000 | 5.75% | 6.10% |
| $50,000 but under $100,000 | 4.75 | 4.99 |
| $100,000 but under $250,000 | 3.75 | 3.90 |
| $250,000 but under $500,000 | 2.75 | 2.83 |
| $500,000 but under $1,000,000 | 2.00 | 2.04 |
| $1,000,000 or more | None | None |

### Class A Sales Charge Reductions and Waivers

Investors may reduce or eliminate sales charges applicable to purchases of Class A Shares through utilization of Combination Purchase Privilege, Letter of Intent, Right of Accumulation, Purchase by Associations or the Account Reinstatement Privilege. These programs are summarized below and are described in greater detail in the SAI. Investors buying Class A Shares on which a finder's fee has been paid may incur a CDSC if they redeem their shares within 18 months of purchase. For Virtus AlphaSector Rotation Fund, the CDSC is 0.50%; for all other funds, the CDSC is 1.00%.

*Combination Purchase Privilege.* Your purchase of any class of shares of these funds or any other Virtus Mutual Fund (other than any Virtus money market fund), if made at the same time by the same person, will be added together with any existing Virtus Mutual Fund account values to determine whether the combined sum entitles you to an immediate

reduction in sales charges. A "person" is defined in this and the following sections as (a) any individual, their spouse and minor children purchasing shares for his or their own account (including an IRA account) including his or their own trust; (b) a trustee or other fiduciary purchasing for a single trust, estate or single fiduciary account (even though more than one beneficiary may exist); (c) multiple employer trusts or certain Section 403(b) plans for the same employer; (d) multiple accounts (up to 200) under a qualified employee benefit plan or administered by a third party administrator; or (e) trust companies, bank trust departments, registered investment advisers, and similar entities placing orders or providing administrative services with respect to accounts over which they exercise discretionary investment authority and which are held in a fiduciary, agency, custodial or similar capacity, provided all shares are held of record in the name, or nominee name, of the entity placing the order.

*Letter of Intent.* If you sign a Letter of Intent, your purchase of any class of shares of these funds or any other Virtus Mutual Fund (other than any Virtus money market fund), if made by the same person within a 13-month period, will be added together to determine whether you are entitled to an immediate reduction in sales charges. Sales charges are reduced based on the overall amount you indicate that you will buy under the Letter of Intent. The Letter of Intent is a mutually non-binding arrangement between you and Virtus Mutual Funds. Shares worth 5% of the amount of each purchase will be held in escrow (while remaining registered in your name) to secure payment of the higher sales charges applicable to the shares actually purchased in the event the full intended amount is not purchased.

*Right of Accumulation.* The value of your account(s) in any class of shares of these funds or any other Virtus Mutual Fund (other than any Virtus money market fund) if made over time by the same person, may be added together at the time of each purchase to determine whether the combined sum entitles you to a prospective reduction in sales charges. You must provide certain account information to Virtus Mutual Funds or their agents at the time of purchase to exercise this right.

*Purchase by Associations.* Certain groups or associations may be treated as a "person" and qualify for reduced Class A Share sales charges. The group or association must: (1) have been in existence for at least six months; (2) have a legitimate purpose other than to purchase mutual fund shares at a reduced sales charge; (3) work through an investment dealer; and (4) not be a group whose sole reason for existing is to consist of members who are credit card holders of a particular company, policyholders of an insurance company, customers of a bank or a broker-dealer or clients of an investment adviser.

*Account Reinstatement Privilege.* Subject to the funds' policies and procedures regarding market timing, for 180 days after you sell your Class A Shares or Class B Shares on which you previously paid a sales charge, you may purchase Class A Shares of any Virtus Mutual Fund at NAV, with no sales charge, by reinvesting all or part of your proceeds, but not more.

*Sales at Net Asset Value.* In addition to the programs summarized above, the funds may sell their Class A Shares at NAV without an initial sales charge to certain types of accounts or account holders, including, but not limited to: trustees of the Virtus Mutual Funds; directors, officers, employees and sales representatives of the adviser, subadviser (if any) or Distributor or a corporate affiliate of the adviser, subadviser or Distributor; private clients of an adviser or subadviser to any of the Virtus Mutual Funds; registered representatives and employees of dealers with which the Distributor has sales agreements; and certain qualified employee benefit plans, endowment funds or foundations. Please see the SAI for more information about qualifying for purchases of Class A Shares at NAV.

## Deferred Sales Charge Alternative—Class B Shares and Class C Shares

Class B Shares and Class C Shares are purchased without an initial sales charge; however, shares sold within a specified time period are subject to a declining CDSC at the rates listed below. The sales charge will be multiplied by the then current market value or the initial cost of the shares being redeemed, whichever is less. No sales charge will be imposed on increases in NAV or on shares purchased through the reinvestment of income dividends or capital gain distributions. To minimize the sales charge, shares not subject to any charge will be redeemed first, followed by shares held the longest time. To calculate the number of shares owned and time period held, all Class B Shares purchased in any month are considered purchased on the last day of the preceding month, and all Class C Shares are considered purchased on the trade date.

## Deferred Sales Charge you may pay to sell Class B Shares

### Virtus Dynamic AlphaSector Fund Only

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7+ |
|------|-----|-----|-----|-----|-----|-----|-----|
| CDSC | 5% | 4% | 3% | 3% | 2% | 1% | 0% |

## Deferred Sales Charge you may pay to sell Class C Shares

### Virtus Dynamic AlphaSector Fund Only

| Year | 1 | 2+ |
|------|------|-----|
| CDSC | 1.25% | 0% |

### All Other Funds

| Year | 1 | 2+ |
|------|-----|-----|
| CDSC | 1% | 0% |

## Compensation to Dealers

Dealers with whom the Distributor has entered into sales agreements receive a discount or commission on Class A Shares as described below.

| Amount of Transaction at Offering Price | Sales Charge as a Percentage of Offering Price | Sales Charge as a Percentage of Amount Invested | Dealer Discount as a Percentage of Offering Price |
|------|-----|-----|-----|
| Under $50,000 | 5.75% | 6.10% | 5.00% |
| $50,000 but under $100,000 | 4.75 | 4.99 | 4.25 |
| $100,000 but under $250,000 | 3.75 | 3.90 | 3.25 |
| $250,000 but under $500,000 | 2.75 | 2.83 | 2.25 |
| $500,000 but under $1,000,000 | 2.00 | 2.04 | 1.75 |
| $1,000,000 or more | None | None | None |

With respect to Class C Shares, the Distributor intends to pay investment dealers a sales commission of 1% of the sale price of Class C Shares. (This sales commission will not be paid to dealers for sales of Class C Shares purchased by 401(k) participants of the Merrill Lynch Daily K Plan due to a waiver of the CDSC for these plan participants' purchases.) Your broker, dealer or financial advisor may also charge you additional commissions or fees for their services in selling shares to you provided they notify the Distributor of their intention to do so.

Dealers and other entities that enter into special arrangements with the Distributor may receive compensation for the sale and promotion of shares of these funds and/or for providing other shareholder services. Such fees are in addition to the sales commissions referenced above and may be based upon the amount of sales of fund shares by a dealer; the provision of assistance in marketing of fund shares; access to sales personnel and information dissemination services; provision of recordkeeping and administrative services to qualified employee benefit plans; and other criteria as established by the Distributor. Depending on the nature of the services, these fees may be paid either from the funds through distribution fees, service fees or transfer agent fees or, in some cases, the Distributor may pay certain fees from its own profits and resources.

From its own profits and resources, the Distributor may, from time to time, make payments to qualified wholesalers, registered financial institutions and third party marketers for marketing support services and/or retention of assets. Among others, the Distributor has agreed to make such payments for marketing support services to AXA Advisors, LLC. Additionally, for Virtus AlphaSector Rotation Fund, the Distributor may pay broker-dealers a finder's fee in an amount equal to 0.50% of eligible Class A Share purchases from $1,000,000 to $3,000,000 and 0.25% on amounts greater than $3,000,000. For all other AlphaSector Funds, the Distributor may pay broker-dealers a finder's fee in an amount equal to 1.00% of eligible Class A Share purchases from $1,000,000 to $3,000,000, 0.50% on amounts of $3,000,001 to $10,000,000, and 0.25% on amounts greater than $10,000,000. Purchases by an account in the name of

a qualified employee benefit plan are eligible for a finder's fee only if such plan has at least 100 eligible employees. A CDSC may be imposed on certain redemptions of such investments within 18 months of purchase. For Virtus AlphaSector Rotation Fund, the CDSC is 0.50%; for all other AlphaSector Funds, the CDSC is 1.00%. For purposes of determining the applicability of the CDSC, the 18-month period begins on the last day of the month preceding the month in which the purchase was made. The Distributor will also pay broker-dealers a service fee of 0.25% beginning in the thirteenth month following purchase of Class A Shares on which a finder's fee has been paid. The Distributor reserves the right to discontinue or alter such fee payment plans at any time.

From its own resources or pursuant to the distribution and shareholder servicing plans, and subject to the dealers' prior approval, the Distributor may provide additional compensation to registered representatives of dealers in the form of travel expenses, meals, and lodging associated with training and educational meetings sponsored by the Distributor. The Distributor may also provide gifts amounting in value to less than $100, and occasional meals or entertainment, to registered representatives of dealers. Any such travel expenses, meals, lodging, gifts or entertainment paid will not be preconditioned upon the registered representatives' or dealers' achievement of a sales target. The Distributor may, from time to time, reallow the entire portion of the sales charge on Class A Shares which it normally retains to individual selling dealers. However, such additional reallowance generally will be made only when the selling dealer commits to substantial marketing support such as internal wholesaling through dedicated personnel, internal communications and mass mailings.

The Distributor has agreed to pay fees to certain distributors for preferred marketing opportunities. These arrangements may be viewed as creating a conflict of interest between these distributors and investors. Investors should make due inquiry of their selling agents to ensure that they are receiving the requisite point of sale disclosures and suitable recommendations free of any influence by reason of these arrangements.

## Your Account

### Opening an Account

Your financial advisor can assist you with your initial purchase as well as all phases of your investment program. If you are opening an account by yourself, please follow the instructions outlined below. These procedures do not apply to purchases of Class I Shares. For information about purchasing Class I Shares, please contact Virtus Mutual Fund Services by calling 800-243-1574.

The funds have established the following preferred methods of payment for fund shares:

- Checks drawn on an account in the name of the investor and made payable to Virtus Mutual Funds;

- Checks drawn on an account in the name of the investor's company or employer and made payable to Virtus Mutual Funds; or

- Wire transfers or Automated Clearing House ("ACH") transfers from an account in the name of the investor, or the investor's company or employer.

Payment in other forms may be accepted at the discretion of the funds; however, the funds generally do not accept such other forms of payment as cash equivalents (such as traveler's checks, cashier's checks, money orders or bank drafts), starter checks, credit card convenience checks, or certain third party checks. Please specify the name(s) of the fund or funds in which you would like to invest on the check or transfer instructions.

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. Accordingly, when you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may check the information you provide against publicly available databases, information obtained from consumer reporting agencies, other financial institutions or other sources. If, after reasonable effort, we cannot verify your identity, we reserve the right to close the account and redeem the shares at the NAV next calculated after the decision is made by us to close the account.

**Step 1.**

Your first choice will be the initial amount you intend to invest.

Minimum **initial** investments:

> $100 for individual retirement accounts (IRAs), accounts that use the systematic exchange privilege or accounts that use the Systematic Purchase program. (See below for more information on the Systematic Purchase program.)

> There is no initial dollar requirement for defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans. There is also no minimum for reinvesting dividends and capital gains into another account. Additionally, shareholders who own Class B Shares of a fund may purchase Class A Shares or Class C Shares of the same fund without regard to the minimum initial investment requirements.

> $2,500 for all other accounts.

Minimum **additional** investments:

> $100 for any account.

> There is no minimum additional investment requirement for defined contribution plans, asset-based fee programs, profit-sharing plans or employee benefit plans. There is also no minimum additional investment requirement for reinvesting dividends and capital gains into an existing account.

The funds reserve the right to refuse a purchase order for any reason.

**Step 2.**

Your second choice will be what class of shares to buy. Each share class has different sales and distribution charges. Because all future investments in your account will be made in the share class you choose when you open your account, you should make your decision carefully. Your financial advisor can help you pick the share class that makes the most sense for your situation.

**Step 3.**

Your next choice will be how you want to receive any dividends and capital gain distributions. Your options are:

> Receive both dividends and capital gain distributions in additional shares;

> Receive dividends in additional shares and capital gain distributions in cash;

> Receive dividends in cash and capital gain distributions in additional shares; or

> Receive both dividends and capital gain distributions in cash.

No interest will be paid on uncashed distribution checks.

## How to Buy Shares

| | To Open An Account<br>(Class A and Class C Shares only) |
|---|---|
| Through a financial advisor | Contact your advisor. Some advisors may charge a fee and may set different minimum investments or limitations on buying shares. |
| Through the mail | Complete a New Account Application and send it with a check payable to the fund. Mail them to: Virtus Mutual Funds, P.O. Box 9874, Providence, RI 02940-8074. |
| Through express delivery | Complete a New Account Application and send it with a check payable to the fund. Send them to: Virtus Mutual Funds, 4400 Computer Drive, Westborough, MA 01581-1722. |
| By Federal Funds wire | Call us at 800-243-1574 (press 1, then 0). |
| By Systematic Purchase | Complete the appropriate section on the application and send it with your initial investment payable to the fund. Mail them to: Virtus Mutual Funds, P.O. Box 9874, Providence, RI 02940-8074. |
| By telephone exchange | Call us at 800-243-1574 (press 1, then 0). |

The price at which a purchase is effected is based on the NAV determined after receipt of a purchase order in good order by the funds' transfer agent, Virtus Fund Services, LLC (the "Transfer Agent"). A purchase order is generally in "good order" if an acceptable form of payment accompanies the purchase order and the order includes the appropriate application(s) and/or other form(s) and any supporting legal documentation required by the Transfer Agent, each in legible form.

Each fund reserves the right to refuse any order that may disrupt the efficient management of that fund.

## How to Sell Shares

You have the right to have the funds buy back shares at the NAV next determined after receipt of a redemption order by the funds' Transfer Agent or an authorized agent. In the case of a Class B Share and Class C Share redemption, and certain Class A Share redemptions, you will be subject to the applicable contingent deferred sales charge, if any, for such shares. Subject to certain restrictions, shares may be redeemed by telephone or in writing. In addition, shares may be sold through securities dealers, brokers or agents who may charge customary commissions or fees for their services. The funds do not charge any redemption fees. Payment for shares redeemed is generally made within seven days; however, redemption proceeds will not be disbursed until each check used for purchases of shares has been cleared for payment by your bank, which may take up to 15 days after receipt of the check.

| | To Sell Shares<br>(Class A, Class B and Class C Shares only) |
|---|---|
| Through a financial advisor | Contact your advisor. Some advisors may charge a fee and may set different minimums on redemptions of accounts. |
| Through the mail | Send a letter of instruction to: Virtus Mutual Funds, P.O. Box 9874, Providence, RI 02940-8074. Be sure to include the registered owner's name, fund and account number and number of shares or dollar value you wish to sell. |
| Through express delivery | Send a letter of instruction to: Virtus Mutual Funds, 4400 Computer Drive, Westborough, MA 01581-1722. Be sure to include the registered owner's name, fund and account number and number of shares or dollar value you wish to sell. |
| By telephone | For sales up to $50,000, requests can be made by calling 800-243-1574. |
| By telephone exchange | Call us at 800-243-1574 (press 1, then 0). |

You may realize a taxable gain or loss (for federal income tax purposes) if you redeem shares of the funds. Each fund reserves the right to pay large redemptions "in kind" (*i.e.*, in securities owned by the fund) rather than in cash. Large redemptions are those that exceed $250,000 or 1% of the fund's net assets, whichever is less, over any 90-day period. Additional documentation will be required for redemptions by organizations, fiduciaries, or retirement plans, or if a redemption is requested by anyone but the shareholder(s) of record. Transfers between broker-dealer "street" accounts are governed by the accepting broker-dealer.

Questions regarding this type of transfer should be directed to your financial advisor. Redemption requests will not be honored until all required documents, in proper form, have been received. To avoid delay in redemption or transfer, shareholders having questions about specific requirements should contact the funds' Transfer Agent at 800-243-1574.

## Redemptions by Mail

➤ If you are selling shares held individually, jointly, or as custodian under the Uniform Gifts to Minors Act or Uniform Transfers to Minors Act:

Send a clear letter of instruction if both of these apply:

- The proceeds do not exceed $50,000.

- The proceeds are payable to the registered owner at the address on record.

- Send a clear letter of instruction with a signature guarantee when any of these apply:

- You are selling more than $50,000 worth of shares.

- The name or address on the account has changed within the last 30 days.

- You want the proceeds to go to a different name or address than on the account.

➤ If you are selling shares held in a corporate or fiduciary account, please contact the funds' Transfer Agent at 800-243-1574.

If required, the signature guarantee must be a STAMP 2000 Medallion guarantee and be made by an eligible guarantor institution as defined by the funds' Transfer Agent in accordance with its signature guarantee procedures. Guarantees using previous technology medallions will not be accepted. As of the date of the Prospectus, the Transfer Agent's signature guarantee procedures generally permit guarantees by banks, broker-dealers, credit unions, national securities exchanges, registered securities associations, clearing agencies and savings associations.

## Selling Shares by Telephone

The Transfer Agent will use reasonable procedures to confirm that telephone instructions are genuine. Address and bank account information are verified, redemption instructions are taped, and all redemptions are confirmed in writing.

The individual investor bears the risk from instructions given by an unauthorized third-party that the Transfer Agent reasonably believed to be genuine.

The Transfer Agent may modify or terminate the telephone redemption privilege at any time with 60 days' notice to shareholders, except for instances of disruptive trading or market timing; in such cases, the telephone redemption privilege may be suspended immediately, followed by written notice. (See "Disruptive Trading and Market Timing" in this prospectus.)

During times of drastic economic or market changes, telephone redemptions may be difficult to make or temporarily suspended.

### Account Reinstatement Privilege

Subject to the funds' policies and procedures regarding market timing, for 180 days after you sell your Class A Shares or Class B Shares on which you have previously paid a sales charge, you may purchase Class A Shares of any Virtus Mutual Fund at NAV, with no sales charge, by reinvesting all or part of your proceeds, but not more. Send your written request to Virtus Mutual Funds, P.O. Box 9874, Providence, RI 02940-8074. You can call Virtus Mutual Fund Services at 800-243-1574 for more information.

Please remember, a redemption and reinvestment are considered to be a sale and purchase for tax-reporting purposes. Class B shareholders who have had the contingent deferred sales charge waived because they are in the Systematic Withdrawal Program are not eligible for this reinstatement privilege.

### Annual Fee on Small Accounts

To help offset the costs associated with maintaining small accounts, Virtus Mutual Funds reserve the right to assess an annual $25 small account fee on fund accounts with a balance below $2,500. The small account fee may be waived in certain circumstances, such as for accounts that have elected electronic delivery of statements/regulatory documents and accounts owned by shareholders having multiple accounts with a combined value of over $25,000. The small account fee does not apply to accounts held through a financial intermediary.

The small account fee will be collected through the automatic sale of shares in your account. We will send you written notice before we charge the $25 fee so that you may increase your account balance above the minimum, sign up for electronic delivery, consolidate your accounts or liquidate your account. You may take these actions at any time by contacting your investment professional of the Transfer Agent.

### Redemption of Small Accounts

Due to the high cost of maintaining small accounts, if your redemption activity causes your account balance to fall below $200, you may receive a notice requesting you to bring the balance up to $200 within 60 days. If you do not, the shares in the account will be sold at NAV, and a check will be mailed to the address of record.

### Distributions of Small Amounts

Distributions in amounts less than $10 will automatically be reinvested in additional shares of the applicable fund.

### Uncashed Checks

If any correspondence sent by a fund is returned by the postal or other delivery service as "undeliverable," your dividends or any other distribution may be automatically reinvested in the respective fund.

If your distribution check is not cashed within six months, the distribution may be reinvested in the fund at the current NAV. You will not receive any interest on uncashed distribution or redemption checks. This provision may not apply to certain retirement or qualified accounts.

### Inactive Accounts

As required by the laws of certain states, if no activity occurs in an account within the time period specified by your state law, the assets in your account may be transferred to the state.

## Exchange Privileges

You should read the prospectus of the Virtus Mutual Fund(s) into which you want to make an exchange before deciding to make an exchange. You can obtain a prospectus from your financial advisor; by calling 800-243-4361; or on the Internet at *virtus.com*.

- You may exchange shares of one fund for the same class of shares of another Virtus Mutual Fund (*e.g.*, Class A Shares for Class A Shares). Class C Shares are also exchangeable for Class T Shares of those Virtus Mutual Funds offering them. Exchange privileges may not be available for all Virtus Mutual Funds and may be rejected or suspended.

- On exchanges into Class A of a Virtus money market fund from Class A of a Virtus non-money market fund made within 18 months of a finder's fee being paid on such Virtus non-money market fund shares, a CDSC may be assessed on exchange proceeds. For Virtus AlphaSector Rotation Fund, the CDSC is 0.50%; for all other AlphaSector Funds, the CDSC is 1.00%.

- Exchanges may be made by telephone (800-243-1574) or by mail (Virtus Mutual Funds, P.O. Box 9874, Providence, RI 02940-8074)).

- The amount of the exchange must be equal to or greater than the minimum initial investment required, unless the minimum has been waived (as described in the SAI).

- The exchange of shares is treated as a sale and a purchase for federal income tax purposes.

- In certain circumstances, a fund or the Distributor may enter into an agreement with a financial intermediary to permit exchanges from one class of a fund into another class of the same fund, subject to certain conditions. Such exchanges will only be permitted if, among other things, the financial intermediary agrees to follow procedures established by the fund or Distributor, which generally will require that the exchanges be carried out (i) within accounts maintained and controlled by the intermediary, (ii) on behalf of all or a particular segment of beneficial owners holding shares of the affected fund within those accounts, and (iii) all at once or within a given time period, or as agreed upon in writing by the fund or the Distributor and the financial intermediary. A shareholder's ability to make this type of exchange may be limited by operational or other limitations of his or her financial intermediary or the fund.

## Disruptive Trading and Market Timing

These funds are not suitable for market timers and market timers are discouraged from becoming investors. Your ability to make exchanges among Virtus Mutual Funds is subject to modification if we determine, in our sole opinion, that your exercise of the exchange privilege may disadvantage or potentially harm the rights or interests of other shareholders.

Frequent purchases, redemptions and exchanges, programmed exchanges, exchanges into and then out of a fund in a short period of time, and exchanges of large amounts at one time may be indicative of market timing and otherwise disruptive trading ("Disruptive Trading") which can have risks and harmful effects for other shareholders. These risks and harmful effects include:

- dilution of the interests of long-term investors, if market timers or others exchange into a fund at prices that are below the true value or exchange out of a fund at prices that are higher than the true value;

- an adverse effect on portfolio management, as determined by portfolio management in its sole discretion, such as causing the fund to maintain a higher level of cash than would otherwise be the case, or causing the fund to liquidate investments prematurely; and

- reducing returns to long-term shareholders through increased brokerage and administrative expenses.

Additionally, the nature of the portfolio holdings of the funds and of the ETFs in which the funds may invest, may expose the fund to investors who engage in the type of market timing trading that seeks to take advantage of possible delays between the change in the value of a mutual fund's portfolio holdings and the reflection of the change in the

NAV of the fund's shares, sometimes referred to as "time-zone arbitrage." Arbitrage market timers seek to exploit possible delays between the change in the value of a mutual fund's portfolio holdings and the NAV of the fund's shares in funds that hold significant investments in foreign securities because certain foreign markets close several hours ahead of the U.S. markets. If an arbitrageur is successful, the value of the fund's shares may be diluted if redeeming shareholders receive proceeds (and buying shareholders receive shares) based upon NAVs which do not reflect appropriate fair value prices.

In order to attempt to protect our shareholders from the potential harmful effects of Disruptive Trading, the funds' Board of Trustees has adopted market timing policies and procedures designed to discourage Disruptive Trading. The Board has adopted these policies and procedures as a preventive measure to protect all shareholders from the potential effects of Disruptive Trading, while also abiding by any rights that shareholders may have to make exchanges and provide reasonable and convenient methods of making exchanges that do not have the potential to harm other shareholders.

Excessive trading activity is measured by the number of roundtrip transactions in an account. A roundtrip transaction is one where a shareholder buys and then sells, or sells and then buys, shares of any fund within 30 days. Shareholders of the funds are limited to one roundtrip transaction within any rolling 30-day period. Roundtrip transactions are counted at the shareholder level. In considering a shareholder's trading activity, the funds may consider, among other factors, the shareholder's trading history both directly and, if known, through financial intermediaries, in the funds, in other funds within the Virtus Mutual Fund complex, in non-Virtus mutual funds or in accounts under common control or ownership. We do not include exchanges made pursuant to the dollar cost averaging or other similar programs when applying our market timing policies. Systematic withdrawal and/or contribution programs, mandatory retirement distributions, and transactions initiated by a plan sponsor also will not count towards the roundtrip limits. The funds may permit exchanges that they believe, in the exercise of their judgment, are not disruptive. The size of the fund and the size of the requested transaction may be considered when determining whether or not the transaction would be disruptive.

Shareholders holding shares for at least 30 days following investment will ordinarily be in compliance with the funds' policies regarding market timing. The funds may, however, take action if activity is deemed disruptive even if shares are held longer than 30 days, such as a request for a transaction of an unusually large size. The size of the fund and the size of the requested transaction may be considered when determining whether or not the transaction would be disruptive.

Under our market timing policies, we may modify your exchange privileges for some or all of the funds by not accepting an exchange request from you or from any person, asset allocation service, and/or market timing services made on your behalf. We may also limit the amount that may be exchanged into or out of any fund at any one time or could revoke your right to make Internet, telephone or facsimile exchanges. We may reinstate Internet, telephone and facsimile exchange privileges after they are revoked, but we will not reinstate these privileges if we have reason to believe that they might be used thereafter for Disruptive Trading.

The funds currently do not charge exchange or redemption fees, or any other administrative charges on fund exchanges. The funds reserve the right to impose such fees and/or charges in the future.

Orders for the purchase of fund shares are subject to acceptance by the relevant fund. We reserve the right to reject, without prior notice, any exchange request into any fund if the purchase of shares in the corresponding fund is not accepted for any reason.

The funds do not have any arrangements with any person, organization or entity to permit frequent purchases and redemptions of fund shares.

We may, without prior notice, take whatever action we deem appropriate to comply with or take advantage of any state or federal regulatory requirement. The funds reserve the right to reject any purchase or exchange transaction at any time. If we reject a purchase or exchange for any reason, we will notify you of our decision in writing.

The funds cannot guarantee that their policies and procedures regarding market timing will be effective in detecting and deterring all Disruptive Trading.

**Retirement Plans**

Shares of the funds may be used as investments under the following retirement plans: traditional IRA, rollover IRA, SEP-IRA, SIMPLE IRA, Roth IRA, 401(k) plans, profit-sharing, money purchase plans, and certain 403(b) plans. For more information, call 800-243-4361.

## Investor Services and Other Information

*Systematic Purchase* is a systematic investment plan that allows you to have a specified amount automatically deducted from your checking or savings account and then deposited into your mutual fund account. Just complete the Systematic Purchase Section on the application and include a voided check.

*Systematic Exchange* allows you to automatically move money from one Virtus Mutual Fund to another on a monthly, quarterly, semiannual or annual basis. Shares of one Virtus Mutual Fund will be exchanged for shares of the same class of another Virtus Mutual Fund at the interval you select. To sign up, just complete the Systematic Exchange Section on the application. Exchange privileges may not be available for all Virtus Mutual Funds, and may be rejected or suspended.

*Telephone Exchange* lets you exchange shares of one Virtus Mutual Fund for the same class of shares in another Virtus Mutual Fund, using our customer service telephone service. (See the "Telephone Exchange" section on the application.) Exchange privileges may not be available for all Virtus Mutual Funds, and may be rejected or suspended.

*Systematic Withdrawal* allows you to periodically redeem a portion of your account on a predetermined monthly, quarterly, semiannual, or annual basis. Sufficient shares from your account will be redeemed at the closing net asset value on the applicable payment date, with proceeds to be mailed to you or sent through ACH to your bank (at your selection). For payments to be mailed, shares will be redeemed on the 15th of the month so that the payment is made about the 20th of the month. For ACH payments, you may select the day of the month for the payments to be made; if no date is specified, the payments will occur on the 15th of the month. The minimum withdrawal is $25, and minimum account balance requirements continue to apply. Shareholders in the program must own Virtus Mutual Fund shares worth at least $5,000.

*Disclosure of Fund Holdings.* A description of the funds' policies and procedures with respect to the disclosure of the funds' portfolio securities is available in the SAI.

## Tax Status of Distributions

The funds plan to make distributions from net investment income semiannually and to distribute net realized capital gains, if any, at least annually.

Distributions of short-term capital gains (gains on securities held for a year or less) and net investment income are taxable to shareholders as ordinary income. Certain distributions of long-term capital gains and certain dividends are taxable at a lower rate than ordinary income. Long-term capital gains, if any, distributed to shareholders and which are designated by a fund as capital gain distributions, are taxable to shareholders as long-term capital gain distributions regardless of the length of time you have owned your shares. The use of a fund of funds structure may affect the amount, timing and character of distributions to shareholders.

Unless you elect to receive distributions in cash, dividends and capital gain distributions are paid in additional shares. All distributions, cash or additional shares, are subject to federal income tax and may be subject to state, local and other taxes.

# Financial Highlights

These tables are intended to help you understand the funds' financial performance for the past five years or since inception. For certain of the funds, the tables present performance of a predecessor fund for certain prior periods. Some of the information reflects financial information for a single fund share. The total returns in the tables represent the rate that a investor would have earned or lost on an investment in the fund (assuming reinvestment of all dividends and distributions). This information has been audited by PricewaterhouseCoopers LLP, the funds' independent registered public accounting firm. Its report, together with the funds' financial statements, is included in the funds' most recent Annual Report, which is available upon request.

| | Net Asset Value, Beginning of Period | Net Investment Income (Loss)[2] | Capital Gains Distributions Received from Affiliated Funds[2] | Net Realized and Unrealized Gain (Loss) | Total from Investment Operations | Dividends from Net Investment Income | Distributions from Net Realized Gains | Total Distributions |
|---|---|---|---|---|---|---|---|---|
| **Allocator Premium AlphaSector™ Fund** | | | | | | | | |
| **Class A** | | | | | | | | |
| 10/1/11 to 9/30/12 | $ 9.69 | 0.09 | — | 0.98 | 1.07 | (0.09) | — | (0.09) |
| 3/15/11[6] to 9/30/11 | 10.00 | 0.07 | — | (0.38) | (0.31) | — | — | — |
| **Class C** | | | | | | | | |
| 10/1/11 to 9/30/12 | $ 9.66 | 0.02 | — | 0.96 | 0.98 | (0.04) | — | (0.04) |
| 3/15/11[6] to 9/30/11 | 10.00 | 0.02 | — | (0.36) | (0.34) | — | — | — |
| **Class I** | | | | | | | | |
| 10/1/11 to 9/30/12 | $ 9.71 | 0.12 | — | 0.96 | 1.08 | (0.10) | — | (0.10) |
| 3/15/11[6] to 9/30/11 | 10.00 | 0.10 | — | (0.39) | (0.29) | — | — | — |
| **AlphaSector™ Rotation Fund** | | | | | | | | |
| **Class A** | | | | | | | | |
| 10/1/11 to 9/30/12 | $10.67 | 0.14 | — | 1.68 | 1.82 | (0.12) | (0.22) | (0.34) |
| 10/1/10 to 9/30/11 | 10.18 | 0.11 | — | 0.54 | 0.65 | (0.16) | — | (0.16) |
| 10/1/09 to 9/30/10 | 9.34 | 0.14 | — | 0.76 | 0.90 | (0.06) | — | (0.06) |
| 10/1/08 to 9/30/09 | 9.95 | 0.15 | — | (0.48) | (0.33) | (0.15) | (0.13) | (0.28) |
| 10/1/07 to 9/30/08 | 12.81 | 0.18 | 0.29 | (2.92) | (2.45) | (0.24) | (0.17) | (0.41) |
| **Class C** | | | | | | | | |
| 10/1/11 to 9/30/12 | $10.56 | 0.06 | — | 1.67 | 1.73 | (0.04) | (0.22) | (0.26) |
| 10/1/10 to 9/30/11 | 10.09 | 0.04 | — | 0.52 | 0.56 | (0.09) | — | (0.09) |
| 10/1/09 to 9/30/10 | 9.29 | 0.07 | — | 0.75 | 0.82 | (0.02) | — | (0.02) |
| 10/1/08 to 9/30/09 | 9.88 | 0.08 | — | (0.45) | (0.37) | (0.09) | (0.13) | (0.22) |
| 10/1/07 to 9/30/08 | 12.74 | 0.09 | 0.30 | (2.92) | (2.53) | (0.16) | (0.17) | (0.33) |
| **Class I** | | | | | | | | |
| 10/1/11 to 9/30/12 | $10.67 | 0.17 | — | 1.68 | 1.85 | (0.15) | (0.22) | (0.37) |
| 10/1/10 to 9/30/11 | 10.18 | 0.14 | — | 0.54 | 0.68 | (0.19) | — | (0.19) |
| 10/1/09[6] to 9/30/10 | 9.11 | 0.20 | — | 0.94 | 1.14 | (0.07) | — | (0.07) |

The footnote legend is at the end of the financial highlights.

| Change in Net Asset Value | Net Asset Value, End of Period | Total Return[1] | Net Assets, End of Period (in thousands) | Ratio of Net Operating Expenses to Average Net Assets[8] | Ratio of Gross Expenses to Average Net Assets (before waivers and reimbursements)[8] | Ratio of Net Investment Income (Loss) to Average Net Assets | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|
| 0.98 | $10.67 | 11.08% | $ 66,122 | 1.73% | 1.70% | 0.84%[3] | 211% |
| (0.31) | 9.69 | (3.10)[4] | 12,232 | 1.75%[3] | 2.17%[3] | 1.35%[3] | 153%[4] |
| | | | | | | | |
| 0.94 | $10.60 | 10.13% | $131,330 | 2.45% | 2.45% | 0.16% | 211% |
| (0.34) | 9.66 | (3.40)[4] | 32,390 | 2.50%[3] | 2.85%[3] | 0.43%[3] | 153%[4] |
| | | | | | | | |
| 0.98 | $10.69 | 11.24% | $146,634 | 1.49% | 1.46% | 1.17% | 211% |
| (0.29) | 9.71 | (2.90)[4] | 19,131 | 1.50%[3] | 2.01%[3] | 1.82%[3] | 153%[4] |
| | | | | | | | |
| 1.48 | $12.15 | 17.51% | $199,268 | 1.02% | 1.02% | 1.22% | 190% |
| 0.49 | 10.67 | 6.20 | 184,613 | 1.04 | 1.04 | 0.97 | 134 |
| 0.84 | 10.18 | 9.63 | 192,375 | 1.06 | 1.06 | 1.41 | 245 |
| (0.61) | 9.34 | (2.81) | 37,722 | 0.64 | 0.64 | 1.80 | 131 |
| (2.86) | 9.95 | (19.66) | 41,396 | 0.21%[7] | 0.45 | 1.57 | 23 |
| | | | | | | | |
| 1.47 | $12.03 | 16.60% | $157,461 | 1.75% | 1.77% | 0.53% | 190% |
| 0.47 | 10.56 | 5.49 | 144,813 | 1.71 | 1.79 | 0.33 | 134 |
| 0.80 | 10.09 | 8.79 | 133,453 | 1.81 | 1.81 | 0.68 | 245 |
| (0.59) | 9.29 | (3.41) | 40,118 | 1.38 | 1.38 | 1.03 | 131 |
| (2.86) | 9.88 | (20.35) | 50,007 | 0.96%[7] | 1.20 | 0.81 | 23 |
| | | | | | | | |
| 1.48 | $12.15 | 17.71% | $122,198 | 0.77% | 0.77% | 1.53% | 190% |
| 0.49 | 10.67 | 6.56 | 85,585 | 0.82 | 0.82 | 1.26 | 134 |
| 1.07 | 10.18 | 12.63%[4] | 112,132 | 0.83%[3] | 0.83%[3] | 2.04%[3] | 245 |

| | Net Asset Value, Beginning of Period | Net Investment Income (Loss)[2] | Net Realized and Unrealized Gain (Loss) | Total from Investment Operations | Dividends from Net Investment Income | Distributions from Net Realized Gains | Total Distributions |
|---|---|---|---|---|---|---|---|
| **Dynamic AlphaSector™ Fund** | | | | | | | |
| **Class A** | | | | | | | |
| 10/1/11 to 9/30/12 | $ 9.09 | 0.08 | 0.73 | 0.81 | — | — | — |
| 10/1/10 to 9/30/11 | 10.57 | (0.28) | (0.91) | (1.19) | — | (0.29) | (0.29) |
| 10/1/09 to 9/30/10 | 10.50 | (0.25) | 0.32 | 0.07 | — | — | — |
| 10/1/08 to 9/30/09 | 9.81 | (0.01) | 0.70 | 0.69 | — | — | — |
| 10/1/07 to 9/30/08 | 10.53 | (0.09) | (0.47) | (0.56) | (0.16) | — | (0.16) |
| **Class B** | | | | | | | |
| 10/1/11 to 9/30/12 | $ 8.54 | (0.19) | 0.89 | 0.70 | — | — | — |
| 10/1/10 to 9/30/11 | 10.04 | (0.33) | (0.88) | (1.21) | — | (0.29) | (0.29) |
| 10/1/09 to 9/30/10 | 10.06 | (0.32) | 0.30 | (0.02) | — | — | — |
| 10/1/08 to 9/30/09 | 9.47 | (0.08) | 0.67 | 0.59 | — | — | — |
| 10/1/07 to 9/30/08 | 10.17 | (0.12) | (0.49) | (0.61) | (0.09) | — | (0.09) |
| **Class C** | | | | | | | |
| 10/1/11 to 9/30/12 | $ 8.52 | 0.01 | 0.68 | 0.69 | — | — | — |
| 10/1/10 to 9/30/11 | 10.00 | (0.33) | (0.86) | (1.19) | — | (0.29) | (0.29) |
| 10/1/09 to 9/30/10 | 10.02 | (0.32) | 0.30 | (0.02) | — | — | — |
| 10/1/08 to 9/30/09 | 9.43 | (0.07) | 0.66 | 0.59 | — | — | — |
| 10/1/07 to 9/30/08 | 10.12 | (0.12) | (0.49) | (0.61) | (0.08) | — | (0.08) |
| **Class I** | | | | | | | |
| 10/1/11 to 9/30/12 | $ 9.12 | 0.05 | 0.81 | 0.86 | — | — | — |
| 10/1/10 to 9/30/11 | 10.58 | (0.25) | (0.92) | (1.17) | — | (0.29) | (0.29) |
| 10/1/09[6] to 9/30/10 | 10.49 | (0.23) | 0.32 | 0.09 | — | — | — |

The footnote legend is at the end of the financial highlights.

| Change in Net Asset Value | Net Asset Value, End of Period | Total Return[1] | Net Assets, End of Period (in thousands) | Ratio of Expenses (including dividends and interest on short sales after expense waivers and reimbursements, if any) to Average Net Assets[8] | Ratio of Expenses (including dividends and interest on short sales before expense waivers and reimbursements, if any) to Average Net Assets[8] | Ratio of Net Investment Income (Loss) to Average Net Assets | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|
| 0.81 | $ 9.90 | 8.91% | $109,724 | 2.78%[12] | 3.06% | 0.86% | 165% |
| (1.48) | 9.09 | (11.59) | 6,615 | 4.35 | 4.65 | (2.79) | 186 |
| 0.07 | 10.57 | 0.67 | 17,556 | 3.76[7] | 4.04 | (2.33) | 155 |
| 0.69 | 10.50 | 7.03 | 74,749 | 4.04 | 4.23 | (0.08) | 253 |
| (0.72) | 9.81 | (5.36) | 119,387 | 3.49 | 3.84 | (0.85) | 285 |
| 0.70 | $ 9.24 | 8.20% | $ 150 | 4.23%[12] | 4.81% | (2.19)% | 165% |
| (1.50) | 8.54 | (12.42) | 260 | 5.02 | 5.32 | (3.49) | 186 |
| (0.02) | 10.04 | (0.20) | 670 | 4.55[7] | 4.83 | (3.15) | 155 |
| 0.59 | 10.06 | 6.23 | 1,435 | 4.83 | 5.02 | (0.79) | 253 |
| (0.70) | 9.47 | (6.04) | 1,678 | 4.19 | 4.55 | (1.19) | 285 |
| 0.69 | $ 9.21 | 8.10% | $ 27,123 | 3.61%[12] | 3.91% | 0.12% | 165% |
| (1.48) | 8.52 | (12.26) | 2,330 | 5.07 | 5.38 | (3.50) | 186 |
| (0.02) | 10.00 | (0.20) | 4,249 | 4.62[7] | 4.90 | (3.17) | 155 |
| 0.59 | 10.02 | 6.26 | 4,434 | 4.84 | 5.03 | (0.77) | 253 |
| (0.69) | 9.43 | (6.04) | 4,983 | 4.19 | 4.55 | (1.21) | 285 |
| 0.86 | $ 9.98 | 9.43% | $112,349 | 2.78%[12] | 3.06% | 0.49% | 165% |
| (1.46) | 9.12 | (11.47) | 27,976 | 4.03 | 4.33 | (2.48) | 186 |
| 0.09 | 10.58 | 0.95[4] | 70,434 | 3.69[3][7] | 3.97[3] | (2.20)[3] | 155 |

# Financial Highlights (continued)

| | Net Asset Value, Beginning of Period | Net Investment Income (Loss)[2] | Net Realized and Unrealized Gain (Loss) | Total from Investment Operations | Dividends from Net Investment Income | Distributions from Net Realized Gains | Total Distributions |
|---|---|---|---|---|---|---|---|
| **Global Premium AlphaSector™ Fund** | | | | | | | |
| **Class A** | | | | | | | |
| 10/1/11 to 9/30/12 | $ 9.42 | 0.08 | 1.12 | 1.20 | (0.06) | — | (0.06) |
| 3/15/11[6] to 9/30/11 | 10.00 | 0.07 | (0.63) | (0.56) | (0.02) | — | (0.02) |
| **Class C** | | | | | | | |
| 10/1/11 to 3/31/12[13] | $ 9.40 | — | 1.12 | 1.12 | (0.02) | — | (0.02) |
| 3/15/11[6] to 9/30/11 | 10.00 | 0.01 | (0.61) | (0.60) | —[5] | — | — |
| **Class I** | | | | | | | |
| 10/1/11 to 9/30/12 | $ 9.42 | 0.09 | 1.14 | 1.23 | (0.07) | — | (0.07) |
| 3/15/11[6] to 9/30/11 | 10.00 | 0.07 | (0.63) | (0.56) | (0.02) | — | (0.02) |
| **Premium AlphaSector™ Fund** | | | | | | | |
| **Class A** | | | | | | | |
| 10/1/11 to 9/30/12 | $11.69 | 0.10 | 1.73 | 1.83 | (0.09) | — | (0.09) |
| 10/1/10 to 9/30/11 | 11.17 | 0.10 | 0.52 | 0.62 | (0.08) | (0.02) | (0.10) |
| 7/1/10[6] to 9/30/10 | 10.00 | 0.12 | 1.05 | 1.17 | — | — | — |
| **Class C** | | | | | | | |
| 10/1/11 to 9/30/12 | $11.62 | 0.01 | 1.72 | 1.73 | (0.01) | — | (0.01) |
| 10/1/10 to 9/30/11 | 11.15 | 0.02 | 0.51 | 0.53 | (0.04) | (0.02) | (0.06) |
| 7/1/10[6] to 9/30/10 | 10.00 | 0.09 | 1.06 | 1.15 | — | — | — |
| **Class I** | | | | | | | |
| 10/1/11 to 9/30/12 | $11.71 | 0.14 | 1.72 | 1.86 | (0.12) | — | (0.12) |
| 10/1/10 to 9/30/11 | 11.17 | 0.14 | 0.52 | 0.66 | (0.10) | (0.02) | (0.12) |
| 7/1/10[6] to 9/30/10 | 10.00 | 0.11 | 1.06 | 1.17 | — | — | — |

The footnote legend is at the end of the financial highlights.

| Change in Net Asset Value | Net Asset Value, End of Period | Total Return[1] | Net Assets, End of Period (in thousands) | Ratio of Net Operating Expenses to Average Net Assets[8] | Ratio of Gross Expenses to Average Net Assets (before waivers and reimbursements)[8] | Ratio of Net Investment Income (Loss) to Average Net Assets | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|
| 1.14 | $10.56 | 12.75% | $ 27,699 | 1.75% | 1.78% | 0.83% | 258% |
| (0.58) | 9.42 | (5.62)[4] | 5,467 | 1.75[3] | 2.88[3] | 1.23[3] | 199[4] |
| 1.10 | $10.50 | 12.04% | $ 21,051 | 2.50% | 2.53% | 0.01% | 258% |
| (0.60) | 9.40 | (6.09)[4] | 4,885 | 2.50[3] | 3.81[3] | 0.17[3] | 199[4] |
| 1.16 | $10.58 | 13.15% | $ 19,112 | 1.50% | 1.52% | 0.90% | 258% |
| (0.58) | 9.42 | (5.59)[4] | 9,565 | 1.50[3] | 2.85[3] | 1.37[3] | 199[4] |
| 1.74 | $13.43 | 15.74% | $1,323,109 | 1.64% | 1.64% | 0.80% | 297% |
| 0.52 | 11.69 | 5.47 | 958,603 | 1.67[9] | 1.67 | 0.80 | 247 |
| 1.17 | 11.17 | 11.70[4] | 88,916 | 1.70[3] | 1.83[3] | 4.64[3] | 47[4] |
| 1.72 | $13.34 | 14.91% | $ 767,602 | 2.38% | 2.39% | 0.09% | 297% |
| 0.47 | 11.62 | 4.68 | 457,630 | 2.38[9] | 2.42 | 0.13 | 247 |
| 1.15 | 11.15 | 11.50[4] | 29,864 | 2.45[3] | 2.67[3] | 3.51[3] | 47[4] |
| 1.74 | $13.45 | 15.98% | $1,479,042 | 1.39% | 1.39% | 1.10% | 297% |
| 0.54 | 11.71 | 5.78 | 754,415 | 1.42[9] | 1.42 | 1.09 | 247 |
| 1.17 | 11.17 | 11.70[4] | 24,549 | 1.45[3] | 1.75[3] | 4.02[3] | 47[4] |

# Appendix A
## Additional Information About The AlphaSector℠ Rotation Index

The AlphaSector℠ Rotation Index (ASRX) is an active public index published by NASDAQ and designed to outperform the S&P 500® Index while also seeking to manage downside risk and lower overall volatility. It is an equal weighted index comprised of a limited number of sector-based exchange-traded funds ("ETFs") and a short-term Treasury bond ETF as a cash proxy. The ETFs are selected monthly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility. The Index is constituted to focus on avoiding losses of its underlying ETFs, and has the ability to move defensively to large "cash" positions in periods of broader market weakness.

The tables below show performance of the AlphaSector Rotation Index as compared with the performance of the S&P 500® Index. The AlphaSector Rotation Index and the S&P 500® Index are not available for direct investment and their performance does not reflect the fees, expenses or taxes associated with the active management of an actual portfolio. Both indexes are calculated on a total return basis with dividends reinvested.

| Annual Returns (calendar year) | AlphaSector Rotation Index | S&P 500® Index |
|---|---|---|
| 2003 | 9.38% | 28.71% |
| 2004 | 13.89% | 10.86% |
| 2005 | 5.65% | 4.93% |
| 2006 | 14.40% | 15.78% |
| 2007 | 14.18% | 5.49% |
| 2008 | -8.54% | -37.00% |
| 2009 | 25.37% | 26.46% |
| 2010 | 15.50% | 15.06% |
| 2011 | 1.35% | 2.11% |
| 2012 | 14.47% | 16.00% |

| Average Annual Total Return (for the periods ended 12/31/12) | 1 Year | 5 Years | 10 Years | Since Inception of AlphaSector Rotation Index (4/1/01)[1] |
|---|---|---|---|---|
| AlphaSector Rotation Index | 14.47% | 8.97% | 10.20% | 7.90% |
| S&P 500® Index | 16.00% | 1.66% | 7.10% | 3.78% |

[1] The Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00 on October 13, 2008.

Active Index Solutions, LLC is the source and owner of the trademarks, service marks and copyrights related to the AlphaSector Rotation Index, including the AlphaSector name. Use of these marks by certain Virtus Mutual Funds has been licensed by and through F-Squared Investments, Inc.

# Appendix B
## Additional Information About The Premium AlphaSector^SM Index

The Premium AlphaSector^SM Index (ASRP) is an active public index published by NASDAQ and designed to outperform the S&P 500® Index while also seeking to manage downside risk and lower overall volatility. It is an equal weighted index comprised of a limited number of sector-based exchange traded funds (ETFs) and a short-term Treasury bond ETF as a cash proxy. The ETFs are selected weekly based on the output of a proprietary analytical model that evaluates sector trends while adjusting for changing levels of volatility. The Index is constituted to focus on avoiding losses of its underlying ETFs, and has the ability to move defensively to large "cash" positions in periods of broader market weakness.

The tables below show performance of the Premium AlphaSector Index as compared with the performance of the S&P 500® Index. The Premium AlphaSector Index and the S&P 500® Index are not available for direct investment and their performance does not reflect the fees, expenses or taxes associated with the active management of an actual portfolio. Both indexes are calculated on a total return basis with dividends reinvested.

| | Premium AlphaSector Index | S&P 500® Index |
|---|---|---|
| **Annual Returns (calendar year)** | | |
| 2003 | 24.07% | 28.71% |
| 2004 | 14.90% | 10.86% |
| 2005 | 6.83% | 4.93% |
| 2006 | 16.81% | 15.78% |
| 2007 | 14.86% | 5.49% |
| 2008 | -1.13% | -37.00% |
| 2009 | 32.22% | 26.46% |
| 2010 | 17.66% | 15.06% |
| 2011 | 1.68% | 2.11% |
| 2012 | 13.90% | 16.00% |

| | 1 Year | 5 Years | 10 Years | Since Inception of Premium AlphaSector Index (4/1/01)[1] |
|---|---|---|---|---|
| **Average Annual Total Return (for the periods ended 12/31/12)** | | | | |
| Premium AlphaSector Index | 13.90% | 12.24% | 13.79% | 12.65% |
| S&P 500® Index | 16.00% | 1.66% | 7.10% | 3.78% |

[1] The Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 100.00 on January 3, 2011.

Active Index Solutions, LLC is the source and owner of the trademarks, service marks and copyrights related to the Premium AlphaSector Index, including the AlphaSector name. Use of these marks by certain Virtus Mutual Funds has been licensed by and through F-Squared Investments, Inc.



c/o Virtus Mutual Funds
P.O. Box 9874
Providence, RI 02940-8074

## ADDITIONAL INFORMATION

You can find more information about the funds in the following documents:

### Annual and Semiannual Reports

Annual and semiannual reports contain more information about the funds' investments. The annual report discusses the market conditions and investment strategies that significantly affected the funds' performance during the last fiscal year.

### Statement of Additional Information (SAI)

The SAI contains more detailed information about the funds. It is incorporated by reference and is legally part of the prospectus.

To obtain free copies of these documents, you can download copies from the Individual Investors section of *virtus.com*, or you can request copies by calling Virtus Mutual Fund Services toll-free at 800-243-1574.

Information about the funds (including the SAI) can be reviewed and copied at the Securities and Exchange Commission's (SEC) Public Reference Room in Washington, DC. For information about the operation of the Public Reference Room, call 202-551-8090. This information is also available on the SEC's Internet site at sec.gov. You may also obtain copies upon payment of a duplicating fee by writing the Public Reference Section of the SEC, Washington, DC 20549-6009 or by electronic request at publicinfo@sec.gov.

Virtus Mutual Fund Services: 800-243-1574