UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                  :
                                  :
In re VIRTUS INVESTMENT PARTNERS, INC.  :     15cv1249
Securities Litigation                        :
                                  :     OPINION & ORDER
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
WILLIAM H. PAULEY III, District Judge:

            Lead Plaintiff, the Arkansas Teacher Retirement System, brings this securities

class action on behalf of itself and others who purchased the publicly traded securities of

Defendant Virtus Investment Partners ("Virtus Partners") between January 25, 2013 and May 11,

2015.  Defendants Virtus Partners, Virtus Opportunities Trust ("Virtus Trust"), George R.

Aylward, Michael A. Angerthal, Jeffrey T. Cerutti, and Francis G. Waltman (collectively,

"Defendants") move to dismiss the Consolidated Class Action Complaint ("Complaint").

Defendants' motion to dismiss is granted in part and denied in part.

BACKGROUND

            The allegations in the Complaint are presumed to be true for purposes of this

motion.  In 2009, after its initial public offering, Virtus Partners began marketing a new family

of funds called "AlphaSector."  (Complaint ¶ 4–5.)  AlphaSector was based on an algorithm

formulated by a 20-year old intern, purporting to use a proprietary strategy that had

outperformed the S&P 500 for years.  (Complaint ¶ 5.)  Virtus Investment Advisers ("Virtus

Advisers"), an entity owned and controlled by Virtus Partners, retained F-Squared Investments,

Inc. ("F-Squared") to sub-advise on AlphaSector funds offered by Virtus Trust.

            In marketing materials, Virtus Trust represented that the outsized performance of

the AlphaSector indices was achieved through live trading with real client assets beginning in

2001.  (Complaint ¶ 6.)  In fact, the AlphaSector indices did not come into existence until <u>2008</u>.

(Complaint ¶ 50.)  Over the next four years, Defendants marketed the AlphaSector funds under the Virtus moniker, emphasizing its stellar performance record.

  A.  The Boca Raton Conference

      In December 2012, Virtus Partners convened a conference in Boca Raton for its wholesalers.  Cerutti and Waltman attended and Aylward participated by telephone.  (Complaint ¶ 79.)  During the conference, Howard Present, F-Squared's principal, lauded AlphaSector's returns and performance record to the assembled sales force.  He noted that "the AlphaSector Premium Index [was] based on an active strategy with an inception date of April 1, 2001.  Inception date is defined as the date as on which investor assets began tracking the strategy."  (Complaint ¶ 80.)  After Present addressed the conferees, Virtus Partners' product manager cautioned the wholesalers to disregard Present's claim that AlphaSector's performance was based on a live strategy going back to 2001 because the index was only developed in 2008, and pre-2008 returns were based on back-tested, hypothetical assets.  (Complaint ¶ 81.)  According to the Complaint, Defendants' senior management sat "stone-faced" while the sales force expressed visible shock at this revelation.  (Complaint ¶¶ 82–85.)

  B.  The 2013 Registration Statements and SEC Investigation

      Despite the startling disclosure at the Boca Raton conference, Defendants continued to tout AlphaSector's performance.  (Complaint ¶ 86.)  Indeed, the January 25, 2013 Registration Statement, signed by Aylward, and the accompanying January 31, 2013 Prospectus—both issued by Virtus Trust and filed with the SEC—noted that the "inception date" of the indices was April 1, 2001 and continued to report pre-October 2008 performance as "live." (Complaint ¶ 91.)

In July 2013, the SEC initiated an investigation into F-Squared and AlphaSector's performance history.  (Complaint ¶ 97.)  In the wake of that investigation, Virtus Trust excised that portion of its registration statement discussing AlphaSector's pre-2008 track record without making any corrective disclosure.  (Complaint ¶¶ 104–05.)  Shortly thereafter, Aylward (and other non-defendants) organized a conference call and told Virtus employees to destroy any materials they had relating to AlphaSector's track record.  (Complaint ¶ 102.)

In September 2013, Virtus Partners issued 1,129,000 shares of common stock.  At the time, Virtus Trust's operative registration statement and prospectus, filed in June 2013, highlighted Virtus Partners' ability to monitor the "quality" of its sub-advisers, including F-Squared:  "We monitor the quality of our products by assessing the managers' performance, style, consistency and the discipline with which they apply their investment process. . . .  Our primary objective is to provide clients with a diverse offering of high-quality investment capabilities from the best managers."  (Complaint ¶ 95.)

In December 2013, *The Wall Street Journal* reported that F-Squared was "under scrutiny" because its marketing materials reflected theoretical performance, not actual investor returns.  Eleven months later, Present resigned from F-Squared.  (Complaint ¶ 116.)  And in December 2014, F-Squared admitted to "willfully" violating securities laws, and settled with the SEC by paying $35 million in disgorgement and civil monetary penalties.  (Complaint ¶ 117.)

In February 2015, Plaintiff filed this securities class action, asserting claims under Sections 10(b) and 20(a) of the Securities Act of 1934 and Rule 10b-5 promulgated thereunder.

## LEGAL STANDARD

To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In

assessing plausibility, courts follow a "two-pronged approach."  Iqbal, 556 U.S. at 679.  First, a

court must take the plaintiff's "factual allegations to be true and draw[] all reasonable inferences

in the plaintiff's favor."  Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted).  But

"the tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions."  Iqbal, 556 U.S. at 678.  Second, a court must determine

"whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an

entitlement to relief.'"  Hayden v. Patterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal,

556 U.S. at 679).

Under Fed. R. Civ. P. 9(b), a securities fraud complaint must satisfy heightened

pleading requirements, "stating with particularity the circumstances of fraud."  Employees' Ret.

Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (citation

omitted).  Additionally, the Private Securities Litigation Reform Act ("PSLRA") requires that a

complaint state with particularity "each statement alleged to have been misleading," the "reason

or reasons why the statement is misleading," and facts "giving rise to a strong inference that the

defendant acted with the required state of mind."  15 U.S.C. § 78u4(b)(1), (2)(A).

DISCUSSION

I.   Primary Liability Under Section 10(b) and Rule 10b-5

Rule 10b-5, as authorized by Section 10(b) of the Securities Exchange Act,

prohibits the "mak[ing] [of] any untrue statement of material fact" in connection with the

purchase or sale of a security.  17 C.F.R. § 240.10b-5(b).  To maintain claims under Section

10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the

defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation." Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP, 603 F.3d 144, 151

(2d Cir. 2010). Defendants argue that the Complaint fails to adequately allege a misstatement or

omission, that any misstatement or omission can be attributed to Defendants, or that a strong

inference can be drawn that Defendants acted with scienter.

A. *Alleged Misstatements and Omissions*

1. AlphaSector's Track Record

The Complaint alleges that Defendants misled investors by representing that the

historical track record of the AlphaSector funds was based on live client assets. Specifically,

Plaintiff contends that Defendants inaccurately stated that the AlphaSector index had an

"inception date" of April 1, 2001, when it is undisputed that AlphaSector returns were based on

hypothetical, back-tested data until 2008. These allegations are premised on a footnote to a chart

in the appendices to Defendants' prospectus and registration statement that compares the post-

2001 historical "performance" of the AlphaSector index with the performance of the S&P 500.

(Complaint ¶¶ 141–43.) The footnote reads, "[t]he Index inception date is April 1, 2001; it

commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00

on October 13, 2008." (Complaint, Ex. A at 60.)

Defendants urge this Court to reject Plaintiff's attempts to "isolate and construe a

single element" of its SEC filings. See In re ProShares Trust Sec. Litig., 728 F.3d 96, 106 (2d

Cir. 2013) (finding that tables listing investment costs in a prospectus were not misleading

"when placed in context"). Defendants point to the second half of the footnote which states that

the AlphaSector index "commenced daily calculation and dissemination by NASDAQ OMX . . .

on October 13, 2008 for the Alpha Sector Rotation Index." (Complaint, Ex. A at 60–61.)

Unlike In re ProShares, Defendants' public filings do not make clear that the pre-2008 results were achieved through hypothetical back-testing.  See In re ProShares, 728 F.3d at 106 (noting that the defendants disclosed that certain fees were "for illustration purposes only" and "not meant to suggest actual . . . fees or returns").  The first part of the footnote—which Plaintiff claims is misleading—explicitly states that the index "inception date" was 2001, and that the "returns" reflected actual performance post-2001, while the second half—that Defendants claim provides clarification—only indicates that the index was first calculated and disseminated by NASDAQ in October 2008.  Viewing Plaintiff's allegations in a favorable light, a reasonable investor may have understood Defendants' SEC filings to state that pre-2008 returns were achieved through actual asset management rather than hypothetical back testing.[1]

2.  Virtus Partners' Revenue

The Complaint also alleges that Defendants "made a number of materially false and misleading statements or omissions" by failing to disclose "the cause of its steadily rising revenues."  (Complaint ¶¶ 165–71.)  Defendants claim that such statements are inactionable because defendants are not required to accuse themselves of wrongdoing and, in any event, they accurately reported Virtus Partners' revenues.

Typically, "the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct."  In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig., 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012).  "The critical consideration for those courts in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions . . . are sufficiently connected to defendants'

---

[1] Further, although not binding on this Court, the SEC found in its November 16, 2015 order that Virtus Advisers "included . . . misleading 'returns' of the back-tested AlphaSector index in appendices to certain Virtus AlphaSector Funds' prospectuses and marketing materials, including detailing the purported performance on a year-by-year basis."  (Lead Plaintiff Ex. 1 ¶ 15.)

existing disclosures to make those public statements misleading." In re Sanofi Sec. Litig., 2016 WL 93866, at *10 (S.D.N.Y. Jan. 6, 2016) (citation omitted). The requisite connection triggering a duty to disclose uncharged wrongdoing arises in three circumstances: (1) "when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices;" (2) "when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring;" and (3) "when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 2016 WL 634079, at *8 (S.D.N.Y. Feb. 17, 2016) (citations omitted); see also In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 358 (S.D.N.Y. 2008) ("[C]ourts have found the requisite connection between improper activity and affirmative statements where defendants made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring."); In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (finding the requisite connection where company discussed sources of revenue while omitting that the "true source" of such revenue was illegal trading).

        For example, in In re Van der Moolen, the plaintiffs alleged that "[d]efendants made numerous statements during the Class Period concerning the sources and significance of the revenue generated by VDM Specialists." 405 F. Supp. 2d at 401. There, the company extolled their revenues and explained that "trading volumes and volatility determine our opportunities to trade," failing to mention that a substantial portion of these revenues came from trading ahead of its clients. In re Van der Moolen, 405 F. Supp. 2d at 394, 401. Ultimately, the district court held that the company's statements put its source of revenue at issue, which gave

rise to Section 10(b) liability because the company failed to disclose the illegal conduct that generated the revenue.

Here, Plaintiff claims that Virtus Partners made multiple statements putting the source of its revenue at issue.  (Complaint 165–71.)  However, only one alleged misstatement is sufficiently connected to trigger a duty to disclose.  In a January 30, 2013 conference call, Aylward stated that "[o]ur portfolio managers continued to deliver strong relative investment performance, and this performance has been a key driver of our high levels of sales and net flows."  (Complaint ¶ 165.)  This statement suggests that investors' decisions to purchase AlphaSector fund shares are driven largely by the portfolio managers' investment performance, not the back-tested performance history of the AlphaSector strategy.  Just as defendants in In re Van der Moolen attributed their financial success to proper sources and omitted the contribution of illegal trades to its revenues, so too Virtus Partners cites proper drivers of "sales and net flows" but omits the misleading performance history.  Such a statement is a half-truth sufficient to state a claim.

Other alleged misstatements discuss the source of Virtus Partners' revenue, but are too tenuously connected to trigger a duty to disclose the alleged wrongdoing.  (See Complaint 167–71.)  For instance, the Complaint alleges that in its 2012 Form 10-K filed on March 1, 2013, the Company stated that revenues increased "primarily as a result of an increase in average assets and an increase in average management fees."  (Complaint ¶ 167; see also Complaint ¶ 168 ("The growth in revenues reflect the cumulative benefit of our growing asset levels from continued strong net flows.").)  However, an "allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F.

Supp. 2d 452, 470 (S.D.N.Y. 2006).  These statements do nothing more than put into words information reflected in the company's financial statements.  They report an increase in fund assets and concomitant fees.  There appears to be nothing misleading about them.  Accordingly, the Complaint fails to adequately allege that these statements concerning Defendants' revenue are misleading.

>        3.   The Selection and Monitoring of Managers and Sub-Advisers

>               The Complaint further alleges that Defendants misled investors by touting Virtus Partners' "disciplined" and "rigorous" oversight of its managers and advisers, while knowing that neither Present nor F-Squared "were in [any]way 'high quality.'"  (Complaint ¶¶ 155–64.) But "expressions of puffery and corporate optimism do not give rise to securities violations." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).  While there is no canonical test for how vague a statement must be to qualify as puffery, courts in this Circuit frequently focus on the imprecision of the statements and whether such statements relate to future expectations.  See, e.g., Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (claims in Form 10-K that "diversification [would] play an important role" and that company would "not compromise its financial integrity" were puffery); San Leandro Medical Grp. Profit Sharing Plan v. Philip Morris, 75 F.3d 801, 810–11 (2d Cir. 1996) (statements that company was "optimistic" about earnings and "expected" good performance were puffery); Kleinman v. Elan Corp., PLC, 706 F.3d 145, 153 (2d Cir. 2013) (headline in press release describing results of findings as "encouraging" was puffery).  Statements are not puffery if they contradict facts that are known to a defendant.  See Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000) (finding that statements describing retailer's inventory as "in good shape" and "under control" were not puffery when defendants "allegedly knew that the contrary was true."); Freudenberg v. E*Trade Fin. Corp.,

712 F.3d 2d 171, 190–91 (S.D.N.Y. 2010) (statements regarding "discipline [and] monitoring" are not puffery when they misrepresent existing facts and would mislead a reasonable investor). While statements about "disciplined" and "rigorous" oversight might be meaningless in the abstract, materiality depends upon the context in which the statement was made.  See, e.g., TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (noting that materiality determinations turn on the "total mix" of information available to a reasonable investor).

Here, Plaintiff points to several statements in which Defendants exalt Virtus Partners' monitoring of its managers and sub-advisers.  (See, e.g., Complaint ¶ 158 ("We also have a disciplined approach to performance oversight . . . ."); Complaint ¶ 160 ("Manager selection, performance oversight and product development are key elements of our approach."); Complaint ¶ 162 ("Disciplined product oversight and development.").)  But these "statements are too general to cause a reasonable investor to rely upon them." City of Westland Police & Fire Ret. Sys. v. MetLife, Inc., 2015 WL 5311196, at *17 (S.D.N.Y. Sept. 11, 2015) (finding defendant's characterizations of its underwriting as "solid" and its approach to risk and expense management as "disciplined" to be inactionable puffery).  None of the statements identified by Plaintiff are anything more than imprecise descriptors of Virtus Partners' approach to oversight and do not amount to a promise or guarantee that its choices would prevent the selection of managers or sub-advisers that were less than "high quality."  See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009) (finding statement that defendant had "highly disciplined" risk managers and risk management processes that "set the standard for integrity" were "puffery" because there could be no guarantee that defendant's risk management practices were flawless).

Similarly, statements that the AlphaSector strategy is "dynamic," "analytic," "quantitative," or "proprietary" are mere puffery and "too general to cause a reasonable investor to rely upon them." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009). Moreover, the allegations pertaining to Virtus Partners' stated opinions concerning the SEC investigation do not include factual allegations showing that the statements were objectively false or disbelieved, Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011), and are, in any event, "a classic example of a forward-looking statement," In re GlaxoSmithkline PLC, 2006 WL 2871968, at *10 (S.D.N.Y. Oct. 6, 2006) ("[Defendants'] optimism that [defendant] would prevail in the litigation is a classic example of a forward-looking statement and is clearly protected as such.").

B.  *Scienter*

Under Rule 9(b), a plaintiff must plead "with particularity facts giving rise to a strong inference that the defendant acted with scienter." In re Am. Express Co. Sec. Litig., 2008 WL 4501928, at *5 (S.D.N.Y. Sept. 26, 2008). To plead a "strong inference" of scienter, plaintiffs must allege "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). In determining whether a plaintiff has adequately pled scienter, a court must determine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007).

A strong inference of scienter may arise when a complaint alleges that defendants "knew facts or had access to information suggesting that their public statements were not

-11-

accurate." ECA, Local 134 IBEW, 553 F.3d at 199.  However, such allegations must

"specifically identify the reports or statements containing this information."  Novak v. Kasaks,

216 F.3d 300, 309 (2d Cir. 2000).

     1.  Scienter Allegations

        The Complaint alleges that Cerutti, Waltman, and Aylward (by telephone) learned

of the bogus performance history of F-Squared's AlphaSector strategy during the Boca Raton

Conference.  (Complaint ¶ 79.)  Knowing that the performance was back tested, Defendants'

subsequent public statements and SEC filings were knowingly false.  See In re Philip Servs.

Corp. Sec. Litig., 383 F. Supp. 2d 463, 472 (S.D.N.Y. 2004) (noting that defendants attended a

board meeting at which the participants discussed improperly recorded earnings, and those

defendants later signed the registration statement that reported the false earnings).  In addition,

the Complaint also alleges that, after learning of the SEC's investigation of F-Squared, Cerutti

and Aylward told employees to "destroy any materials they had" relating to the performance

history of the AlphaSector funds.  (Complaint ¶ 17.)  These allegations are sufficient to plead

scienter for Aylward, Cerutti and Waltman.

        Cerutti and Waltman's scienter is also buttressed by their stock sales.  Scienter

may be established by showing that a defendant "benefitted in a concrete and personal way from

the purported fraud."  ECA, Local 134 IBEW, 553 F.3d at 199.  Here, the Complaint alleges that

on June 1, 2013, Cerutti sold 3,280 shares of Virtus Partners stock and on March 14, 2014, he

sold an additional 8,225 shares—overall, 34% of his stock for proceeds of over $2.2 million

before resigning in April 2014.  (Complaint ¶¶ 107–10.)  Similarly, Waltman sold 28% of his

holdings between March 2013 and March 2014.  (Complaint ¶¶ 107–10.)  Although these

allegations may not independently sustain an inference of scienter, they bolster other allegations

giving rise to an inference of scienter for Cerutti and Waltman.  See Tellabs, 551 U.S. at 326

("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations

holistically.").

   However, the Complaint is bereft of any allegation from which it could be

inferred that Angerthal had the requisite scienter.  As such, the Section 10(b) claims against him

must be dismissed.

   2. Confidential Witness

   Defendants argue that Plaintiff's allegations concerning the Boca Raton meeting

and the conference call instructing employees to destroy documents relating to the AlphaSector

track record should be discounted because they stem from a single confidential witness.  See In

re MRU Holdings Sec. Litig., 769 F. Supp. 2d 500, 517 (S.D.N.Y. 2011) ("[I]t is hard to see how

information from anonymous sources could be deemed 'compelling' or how [the Court] could

take account of plausible opposing inferences.  Perhaps these confidential sources have axes to

grind.  Perhaps they are lying.  Perhaps they don't even exist.") (internal citations omitted).  But

"there is no requirement that [sources] be named, provided they are described in the complaint

with sufficient particularity to support the probability that a person in the position occupied by

the source would possess the information alleged."  Novak, 216 F.3d at 314 ("[W]here plaintiffs

rely on confidential personal sources but also on other facts, they need not name their sources as

long as the latter facts provide an adequate basis for believing [the allegations in the

complaint.]").

   Here, the confidential witness is alleged to be a wholesaler of the AlphaSector

Funds who attended the Boca Raton conference and received instructions to dispose of various

marketing materials.  Unlike the unnamed sources in MRU Holdings, the Complaint here

suggests that the confidential witness is not a phantom: The source sent counsel a copy of the

January 2013 registration statement and knew that Aylward did not attend the meeting in Boca

Raton because of a leg injury.  (Complaint ¶¶ 7, 79.)  "These descriptions are sufficient to allow

the Court to infer that the witness[ is] likely to possess the information contained in [his]

statements."  In re Xethanol Corp. Sec. Litig., 2007 WL 2572088, at *3 (S.D.N.Y. Sept. 7,

2007).

    C.  *Attribution of the Misstatements and Omissions*

        1.  The Attribution of Statements to Virtus Partners and Virtus Trust

        Liability under Section 10(b) only extends to the person or entity "making" the

material misstatement.  Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 141,

(2011).  The Supreme Court explained that:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with
> ultimate authority over the statement, including its content and whether and how to
> communicate it. Without control, a person or entity can merely suggest what to say,
> not "make" a statement in its own right. One who prepares or publishes a statement
> on behalf of another is not its maker.

Janus, 564 U.S. at 142.  In Janus, the Supreme Court rejected primary liability for an investment

adviser based on its part in helping to prepare the public filings of its "legally independent"

client.  Janus, 564 U.S. at 147.  The Court compared the relationship between the investment

advisor and the investment fund to that of a speechwriter and a speaker: "Even when a

speechwriter drafts a speech, the content is entirely within the control of the person who delivers

it. And it is the speaker who takes credit—or blame—for what is ultimately said."  Janus, 564

U.S. at 143.  The Court held that the mutual fund—which alone "bears the statutory obligation to

file the prospectus with the SEC"—was the sole maker of the alleged misstatements.  Janus, 564

U.S. at 147.

In so holding, the Court noted that "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." Janus, 564 U.S. at 142–43.  The Court found relevant that nothing "on the face of the prospectuses indicate[d] that any statements therein came from [the investment adviser] rather than [the investment fund]—a legally independent entity with its own board of trustees." Janus, 564 U.S. at 147.

Here, the parties do not dispute that Virtus Trust, rather than Virtus Partners, issued the registration statements and prospectuses at issue.  However, unlike Janus, the face of the prospectuses themselves and the surrounding circumstances in this case suggest that allegedly misleading statements may emanate from Virtus Partners, not Virtus Trust. Specifically, the Complaint alleges that: Virtus Partners' CEO "signed [Virtus Trust]'s registration statements and prospectuses throughout the class period" (Complaint ¶ 30); Virtus Partners' executives approved the offering documents (Complaint ¶¶ 30, 32, 33, 89); and Virtus Partners' management was responsible for eliminating any reference to AlphaSector's historical track record from SEC filings after learning of the F-Squared investigation (Complaint ¶ 104). These allegations of control, coupled with the fact that the Virtus Partners logo was printed in bold on the first page of the prospectuses, are sufficient to allege that Virtus Partners had authority over the information in the registration statements and prospectuses to make its statements attributable to Virtus Partners.  See In re Puda Coal Sec. Inc., Litig., 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014) (attributing statements in prospectus to underwriter because underwriters "actively participated in creating the Prospectus, drafting it jointly," "[t]he front cover of the prospectus prominently displayed both underwriters' names, thus endorsing the

statements within the prospectus to investors," and underwriters "solicited investors for the offering and distributed the prospectus to investors").

However, this rationale does not apply in reverse.  While Virtus Partners exercised control over Virtus Trust and prominently displayed its logo in Virtus Trust's public filings, the Complaint alleges no facts that would permit attribution of the statements in Virtus Partners' public filings to Virtus Trust.  Accordingly, Virtus Trust's liability is cabined to statements contained in its own public filings. [2]

    2.   The Attribution of Statements to the Executive Defendants

"[I]t is not inconsistent with Janus Capital to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has more than one 'maker.'"  See City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).  What is more, "courts consistently hold that signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b)."  In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 163–64 (S.D.N.Y. 2012); see also City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) ("Individual Defendants who signed the Registration Statements 'made' the statements under Janus.").  Here, the Complaint alleges that Aylward signed many of the Virtus Trust public filings, including the January 2013 Prospectus, which is sufficient to establish that he "made" the statements.  However, the remaining defendants—Angerthal, Cerutti, and Waltman—did not sign the public filings at issue and are not alleged to have had authority over their contents.  Therefore, Aylward is the only Executive

---

[2] The Complaint also points to misstatements concerning the AlphaSector performance history that were made in F-Squared advertising documents.  However, these statements were made by F-Squared and are not attributable to any defendant in this action.

Defendant to whom the misstatements contained in Virtus Trust's public filings may be attributed.

Relatedly, the Complaint does not allege that either Cerutti or Waltman actually "made" any of the remaining misstatements for which a claim of primary liability could be asserted.  "[I]ndividuals who do not 'make' statements cannot be liable solely on account of their close relationship with the 'maker.'"  In re Smith Barney, 884 F. Supp. 2d at 164.  The Complaint is devoid of allegations that either Cerutti or Waltman made any of the alleged misstatements.  Because neither defendant is plausibly alleged to be the maker of any misstatement or omission, the Section 10(b) claims are dismissed against them.[3]

II.    Control Person Liability Under Section 20(a)

To establish a prima facie case of control person liability, a "plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at 108 (internal quotation marks and citation omitted).  Defendants argue that the Complaint fails to establish that the defendants were culpable participants in the fraud or exercised control over Virtus Partners.

"Most courts in this district have held that . . . culpable participation is a scienter requirement for which a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context in order to survive a motion to dismiss."  In re ShengdaTech, Inc. Sec. Litig., 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (citations omitted) (collecting cases).  Under the PSLRA, "a plaintiff must allege 'culpable

_____

[3] The Complaint alleges that Angerthal was the "maker" of some misstatements (see Complaint ¶¶ 167, 175), but not others.  Nevertheless, as explained, all claims against Angerthal must be dismissed for failure to adequately allege scienter.

participation' and plead that element with particularity." In re NQ Mobile, Inc. Sec. Litig., 2015
WL 1501461, at *4 (S.D.N.Y. Mar. 27, 2015).  The Complaint adequately alleges that Aylward,
Cerutti, and Waltman acted with knowledge of AlphaSector's false performance record, thereby
satisfying the culpable participation prong.  However, allegations that Angerthal acted with a
culpable state of mind are completely absent from the Complaint.  Accordingly, the control
person claims must be dismissed with regard to Angerthal.  See In re Livent, Inc. Sec. Litig., 78
F. Supp. 2d 194, 222 (S.D.N.Y. 1999) ("Plaintiffs do not satisfy the third requirement to allege a
20(a) claim for the Outside Directors.").

    "Because fraud is not an essential element of a § 20(a) claim, Plaintiffs need not
plead control in accordance with the particularity required under Rule 9(b)." McIntire v. China
MediaExpress Holdings, Inc., 927 F. Supp. 2d 105, 122 (S.D.N.Y. 2013).  But, the Complaint
must allege that the defendant had "[a]ctual control over the wrongdoer and the transaction in
question." In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005).  This may be
established "by showing that the defendant possessed the power to direct or cause the direction
of the management and policies of a person, whether through the ownership of voting securities,
by contract, or otherwise." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472–73 (2d Cir.
1996) (citations omitted).  However, the mere "exercise of influence . . . is not sufficient to
establish control for purposes of Section 20(a)." H & H Acquisition Corp. v. Fin. Intranet
Holdings, 669 F. Supp. 2d 351, 361 (S.D.N.Y. 2009) (emphasis added) (quoting In re Alstom,
406 F. Supp. 2d at 487).  Nor are boilerplate allegations of control based on one's status as an
officer or director. In re Alstom, 406 F. Supp. 2d at 495, 488 n.51.  Nevertheless, "if that same
officer or director has signed financial statements containing materially false or misleading
statements, courts have held that control as to the financial statements is sufficiently pled." In re

Alstom, 406 F. Supp. 2d at 487.  Ultimately, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."  Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (quoting CompuDyne Corp. v. Shane, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006).

            Here, the Complaint alleges sufficient facts to conclude that Cerutti, Waltman, and Aylward exercised control over Virtus Partners.  According to the Complaint, Cerutti directed the wholesalers to ignore statements by Present in Boca Raton and also directed the destruction of documents relating to AlphaSector's performance history.  (Complaint ¶ 190.) Similarly, the Complaint alleges that Waltman co-signed the sub-advisory agreements with Virtus Advisers and F-Squared, tracked the due diligence, and served as a spokesperson for Virtus Partners.  (Complaint ¶ 192.)  And Plaintiff alleges that Aylward, as CEO of Virtus Partners, spoke frequently on behalf of the Company, attended meetings approving the AlphaSector investments, and signed the relevant public filing.  (Complaint ¶ 188.)  These allegations are sufficient at the pleading stage to state a claim for control person liability.

CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is granted in part and denied in part.  Plaintiff's Section 10(b) claims are dismissed against Angerthal, Cerutti, and Waltman and the Section 20(a) claims are dismissed against Angerthal.  In all other respects, Defendants' motion is denied.

The Clerk of Court is directed to terminate the motion pending at ECF No. 52.

Dated: July 1, 2016
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

-20-