# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | ) |  |
| IN RE VIRTUS INVESTMENT PARTNERS, | ) | No. 15-cv-1249 (WHP) |
| INC. SECURITIES LITIGATION | ) |  |
|  | ) |  |
|  | ) |  |

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

**November 7, 2016**

# Table of Contents

Page

I.     INTRODUCTION ........................................................................................ 3

II.    QUALIFICATIONS .................................................................................... 3

III.   SUMMARY OF OPINIONS ....................................................................... 4

IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS ......................... 5

V.     DISCUSSION OF RELIANCE ELEMENT ................................................ 7

VI.    *CAMMER* FACTORS ................................................................................ 9

VII.   APPLICATION OF EFFICIENCY FACTORS TO VIRTUS COMMON STOCK ....... 11

    A.   OVERVIEW ................................................................................... 11

    B.   *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME ................... 12

    C.   *CAMMER* FACTOR 2: ANALYST COVERAGE ...................................... 14

    D.   *CAMMER* FACTOR 3: MARKET MAKERS ......................................... 16

    E.   *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY ........................... 18

    F.   *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION ............... 19

    G.   ADDITIONAL FACTOR 1: MARKET CAPITALIZATION ................................... 28

    H.   ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ............................................. 30

    I.   ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP ............................... 31

    J.   ADDITIONAL FACTOR 4: AUTOCORRELATION ............................................. 32

VIII.  DAMAGES ................................................................................................ 33

IX.    CONCLUSION ......................................................................................... 34

## I.   INTRODUCTION

1.      My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Lead Plaintiff in this matter to examine and opine on whether the market for Virtus Investment Partners, Inc.'s ("Virtus" or the "Company") common stock ("Virtus Common Stock") was efficient during the Class Period.[1] In addition, I have been asked to opine on whether damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.      The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $600 per hour for my work on this matter, and my compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.   QUALIFICATIONS

3.      I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

---

[1] The putative Class Period identified in the Consolidated Class Action Complaint ("Complaint") is from January 25, 2013 through May 11, 2015 (Complaint, at p. 1).

4.     I, along with several others, founded Global Economics Group in March 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.     My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

### III.   SUMMARY OF OPINIONS

6.     After analyzing Virtus Common Stock throughout the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Virtus Common Stock was efficient throughout the Class Period and that damages can be calculated on a class-wide basis. These opinions are based upon my analysis described below.

7.     The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Virtus's business operations and the allegations in this case. **Section V** discusses the reliance requirement and the "fraud on the market" theory. **Section VI** introduces

---

[2] Global Economics Group was formerly known as Winnemac Consulting, LLC.

the *Cammer* factors and other factors for evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Virtus Common Stock during the putative Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

8.     I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.     OVERVIEW OF THE COMPANY AND ALLEGATIONS

9.     Virtus is a Delaware incorporated company headquartered in Hartford, Connecticut which offers investment services to individuals and institutions using their multi-manager, multi-style approach to investment strategies. The Company describes itself as follows in its Form 10-K for the period ending December 31, 2015:

> [Virtus's] retail products include open-end mutual funds, closed-end funds, variable insurance funds and separately managed accounts…Separately managed accounts are comprised of intermediary programs, sponsored and distributed by unaffiliated brokerage firms, and private client accounts, which are offered to the high net-worth clients of our affiliated managers. [Virtus] also manage[s] institutional accounts for corporations, multi-employer retirement funds, public employee retirement systems, foundations, endowments and as a sub-adviser to unaffiliated mutual funds. [Virtus's] earnings are primarily driven by asset-based fees charged for services relating to these products including investment management, fund administration, distribution and shareholder services. These fees are based on a percentage of assets under management ("AUM") and are calculated using daily or weekly average assets, quarter-end assets or average month-end assets.[3]

---

[3] Virtus Investment Partners 2014 10-K, filed March 2, 2015 ("Virtus 2014 10-K"), p. 1.

10.     As of the end of 2015, the Company operated in two different segments: retail and institutional accounts. As of December 31, 2014, Virtus managed $56.7 billion in assets. The Retail segment accounted for $52 billion in assets managed, and the Institutional segment accounted for $4.7 billion in assets managed.[4] Total revenues for the company were $450.6 million.[5] As of December 31, 2014, Virtus employed 410 full-time employees[6], and its shares traded on the NASDAQ Global Market Exchange ("NASDAQ").[7]

11.     Plaintiffs' Complaint alleges that Virtus issued false and misleading statements and omitted material information during the Class Period, ultimately causing damages to purchasers of Virtus Common Stock who unknowingly bought Virtus Common Stock at artificially inflated prices and were damaged when the stock price ultimately reflected the concealed information.[8]

12.     More specifically, the Complaint alleges that false and misleading statements and material omissions were made with respect to the historical track record of the AlphaSector fund. The Complaint alleges that the Company used "back-tested hypothetical results" for the period from April 2001 to September 2008, which were then presented to investors as actual proven returns based on a "live" strategy since inception in April 2001.[9] As a result, these actions by Defendants led to an "influx of billions of dollars" into the Company, which increased revenues and assets for Virtus.[10] The Complaint alleges there was a sharp increase in Virtus's stock price

---

[4] Virtus 2014 10-K, p. 3.

[5] Virtus 2014 10-K, p. 23.

[6] Virtus 2014 10-K, p. 9.

[7] Virtus 2014 10-K, p. 21.

[8] Complaint ¶177.

[9] Complaint ¶¶ 2, 6, 61.

[10] Complaint ¶3.

between January 2009 and the first half of 2013, as a result of Defendants' actions.[11] The Complaint argues that when the corrective information came to light, Virtus's shares plummeted, causing investor losses as the relevant truth corrected by the misstatements and/or omissions was revealed.[12]

## V.    DISCUSSION OF RELIANCE ELEMENT

13.    Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiffs' Section 10(b) claims. Plaintiffs assert the "fraud on the market" theory of reliance in this matter. The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[13]

14.    The Supreme Court recently reaffirmed this theory in Halliburton II:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be

---

[11] Complaint ¶3.

[12] Complaint ¶3.

[13] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[14]

15.    As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known. Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and lack of disclosure by paying the inflated (or deflated) price.

16.    Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[15] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[16] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[17]

---

[14] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

[15] To recognize the presumption of reliance, the Court explained, was not "'conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.'" *Basic*, 485 U.S. at 248 n.28. The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id* at 247 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency. Indeed, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof.

[16] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).

[17] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

17.    The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[18] While economists have identified multiple forms of market efficiency in the financial academic literature, the Supreme Court effectively adopted the "semi-strong form" efficiency standard. This makes perfect economic sense because it recognizes that insiders often possess non-public information and that security prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.[19]

18.    In the next section, I explain the factors that are regularly considered by courts in determining whether the market for a particular security is efficient.

## VI.    *CAMMER* FACTORS

19.    In *Cammer v. Bloom*, the district court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly

---

[18] *Basic,* 485 U.S. at 241.

[19] Indeed, *Halliburton II* sensibly makes clear that the standard is short of some idealized notion of semi-strong efficiency: "To recognize the presumption of reliance, the Court explained, was not 'conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.' The Court instead based the presumption on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" 134 S. Ct. 2398 at 2410 (internal citations omitted).

trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[20]

20.   The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency.[21] As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency.[22] For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[23]

21.   While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the

---

[20] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[21] *Cammer,* 711 F. Supp. at 1276, n.17.

[22] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

[23] *Cammer,* 711 F. Supp. at 1276, n.17 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)) (emphasis added).

identified efficiency factors as a whole because none of the individual tests or metrics are determinative as to whether a particular market is efficient.[24]

22.     In the subsequent sections, I evaluate each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, and 4) autocorrelation (meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns).

## VII.  APPLICATION OF EFFICIENCY FACTORS TO VIRTUS COMMON STOCK

### A.  OVERVIEW

23.     After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports my opinion that the market for Virtus Common Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that Virtus Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays Virtus Common Stock closing price and trading volume for each day throughout the Class Period.

24.     In summary, and as discussed more fully below, Virtus Common Stock traded in an efficient market. First, the average weekly trading volume of Virtus Common Stock during the Class Period exceeded benchmarks that courts have established. During the Class Period, the average daily trading volume for Virtus Common Stock was 65,159 shares, which represents an average of 3.68% turnover per week, higher than the average common stock traded on the NYSE and NASDAQ exchanges. Second, there were a number of securities analysts following and

---

[24] *See also Haliburton II*, 134 S. Ct. at 2414 ("market efficiency is not a yes-or-no proposition").

reporting on Virtus. Third, Virtus Common Stock was actively traded on the NASDAQ,

fulfilling the Cammer factor regarding market makers. Fourth, Virtus filed Form S-3's before

and during the Class Period, met the important eligibility criteria, and was apparently eligible to

file Form S-3's throughout the Class Period, since the Company had previously provided

sufficiently high levels of public information to the market in its SEC filings. Fifth, there was a

strong cause-and-effect relationship between new Company-specific information and the market

price of Virtus Common Stock during the Class Period. Sixth, Virtus Common Stock had a large

market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Seventh,

Virtus Common Stock had a low bid-ask spread relative to other exchange-traded common

stocks. Eighth, institutions, which are considered generally to be well-informed investors, held,

on average, over 70.58% of the public float. Finally, there was no evidence of autocorrelation

during the Class Period. These factors all support the conclusion that Virtus Common Stock

traded in an open, developed, and efficient market throughout the Class Period.

## B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

25.    The first *Cammer* Factor is the average weekly trading volume of a security.

According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the
> outstanding shares would justify a strong presumption that the market for the
> security is an efficient one; 1% would justify a substantial presumption.[25]

26.    Volume as a fraction of shares outstanding is an important indicator of market

efficiency. First, volume is objectively quantifiable and comparable across securities. Second,

high volume is generally indicative of continuity, liquidity, and market depth – which are highly

---

[25] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

indicative of market efficiency.[26] Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[27]

27.    Virtus Common Stock surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly turnover for Virtus Common Stock was 3.68%, compared to 2.11% for the NYSE and NASDAQ over the Class Period. **Exhibit 3** plots Virtus Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[28] Indeed, the average *daily* trading volume during the Class Period was 65,159 shares.

28.    The volume of trading for Virtus Common Stock supports the conclusion that the market for this security was efficient throughout the Class Period.

29.    Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* Factor expressed in dollar terms.[29] To be more specific, instead of

---

[26] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45. Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) as cited by *Cammer*, 711 F. Supp. at 1276 n.17. Market depth refers to the number of shares that can be traded at quoted prices. A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).

[27] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000).

[28] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days (this may not follow the calendar week).

[29] Turnover velocity is simply the average turnover (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, Virtus Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for Virtus Common Stock was 191.90%, compared with the NYSE and NASDAQ average of 110.05% for the Class Period.[30] Thus, Virtus Common Stock had an average annualized turnover that was higher than the average stock trading on the NASDAQ, further supporting that it traded in an efficient market.

30.     In short, the relatively high trading volume in Virtus Common Stock throughout the Class Period supports the conclusion that the market for Virtus Common Stock was efficient.

### C. *CAMMER* FACTOR 2: ANALYST COVERAGE

31.     The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[31]

32.     Analyst coverage can be important confirmatory evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there

---

[30] Turnover velocity for the NYSE and NASDAQ exchanges is calculated from data provided by the World Federation of Exchanges. *See* http://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[31] *Cammer*, 711 F. Supp. at 1286.

is an active market for information regarding the company and its securities, and that the information is widely distributed.

33.   During the Class Period, there was analyst coverage for Virtus. **Exhibit 4** shows that there were at least 63 reports issued during the Class Period and lists 4 separate firms that had equity analysts issue reports on Virtus, including major firms such as Jefferies and Morgan Stanley.[32] There were also three additional firms with equity analysts who participated in earnings conference calls during the Class Period, and therefore, likely issued reports on Virtus that are not accessible through Investext (i.e. Bank of America Merrill Lynch, Goldman Sachs, and Raymond James & Associates). These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The analyst coverage of Virtus supports the conclusion that Virtus Common Stock traded in an efficient market throughout the Class Period.

34.   Since 1989, when the *Cammer* decision was rendered, there has been a massive increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[33] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and

---

[32] I obtained Virtus analyst reports from Investext. The number of analyst reports I identify is likely understated since many are not available through third party data providers such as Investext.

[33] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (http://www.rss-specifications.com/ and http://www.rss-specifications.com/what-is-rss.htm).

the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

35.     Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the analyst coverage of Virtus, there were many other sources of public information dissemination. For example, there was steady public press regarding Virtus. A search for articles classified as related to Virtus by Factiva over the Class Period results in 722 unique articles.[34] In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Class Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Virtus in the public arena throughout the Class Period.

36.     In summary, the number of analyst reports and the steady public dissemination of news and other information regarding Virtus provides evidence of a robust and active market for public information about Virtus and evidence that its common stock traded in an efficient market during the Class Period.

### D.  *CAMMER* FACTOR 3: MARKET MAKERS

37.     A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[35] The third *Cammer* Factor states:

---

[34] Based on a search for "All Sources" with the company or keyword field "Virtus Investment Partners" for the period "January 25, 2013 – May 11, 2015." The Factiva search yielded 722 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.

[35] *See* http://www.sec.gov/answers/mktmaker.htm.

> For over the counter markets without volume reporting, the number of
> market makers is probably the best single criterion. Ten market makers for a
> security would justify a substantial presumption that the market for the
> security is an efficient one; five market makers would justify a more modest
> presumption.[36]

38.    The basic premise that the number of market makers can serve as an efficiency

criteria relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks'
> supply and demand conditions (i.e., the "order flow"). Therefore, it is
> believed the larger the number of market makers in a given security, the more
> information is available about it and the quicker its dissemination in the
> price.[37]

39.    Virtus Common Stock traded on the NASDAQ with continuous public price and

volume reporting, as opposed to an over-the-counter market without volume reporting, which is

the context in which *Cammer* indicated this was a relevant criteria.[38] On such over-the-counter

markets, there may be reason for concern regarding liquidity and information dissemination.

However, these concerns are generally not applicable to stocks trading on large, modern

exchanges such as the NASDAQ, which are often assumed to be efficient,[39] report volume and

trade details, and tend to have rules that virtually guarantee a liquid market.[40]

40.    The NASDAQ is one of the largest and most liquid security exchanges in the world

with billions of shares traded each day. Unlike an over-the-counter market that relies on

---

[36] *Cammer*, 711 F. Supp. at 1293.

[37] Brad M. Barber, et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285, 291 (1994).

[38] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988): ("We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.").

[39] Roman L. Weil, Daniel G. Lentz & David P. Hoffman, *Litigation Services Handbook, The Role of the Financial Expert* (5th ed. 2012).

[40] https://listingcenter.nasdaqomx.com/assets/initialguide.pdf.

decentralized market makers providing liquidity for trading, the NASDAQ relies on a computerized system to match orders and provide quotes.[41] The minimum requirements to be listed on the NASDAQ and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

41.    In any event, data accessible through Bloomberg's Brokerage Activity Summary (BAS) service, shows that there were more than ten major market makers or brokers facilitating transactions in Virtus Common Stock during the Class Period.[42]  Therefore, Virtus Common Stock easily meets this *Cammer* factor, further supporting the efficiency of the market during the Class Period.

### E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

42.    The fourth *Cammer* Factor is SEC Form S-3 Eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[43]

43.    Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[44] In order to be eligible to issue a Form S-3, among other things, a

---

[41] *See* http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf; http://www.nasdaqomx.com/transactions/trading/equities; http://www.nasdaq.com/reference/market_mechanics.pdf.

[42] Bloomberg BAS function.

[43] *Cammer*, 711 F. Supp. at 1287.

[44] For additional information, see www.sec.gov/about/forms/forms-3.pdf.

company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for

more than one year, 2) must have filed all documents in a timely manner for the past twelve

months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted

on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency,

not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

44.    Virtus was apparently S-3 eligible throughout the Class Period and, in fact, filed

Form S-3's before and during the Class Period (i.e. 4/8/2010 and 6/26/2014). [45] A Form S-3

allows a company to register unspecified amounts of different specified types of securities using

a single form. Therefore, Virtus meets this *Cammer* efficiency factor, which supports the

conclusion that Virtus Common Stock traded in an efficient market.

### F. *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

45.    The fifth *Cammer* Factor relates to how the price of a security reacts to new

information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency
> would be to illustrate, over time, a cause and effect relationship between
> company disclosures and resulting movements in stock price. [46]

46.    Establishing a causal connection between new company-specific news events and

movements in the market price is convincing evidence of market efficiency. A technique often

relied upon, both inside and outside of the context of litigation, to establish such a causal

connection is called the "event study." An event study is a well-accepted statistical method

utilized to isolate the impact of information on market prices. [47] Indeed, academics used event

---

[45] S&P Capital IQ.

[46] *Cammer,* 711 F. Supp. at 1291.

[47] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997), p. 13.

studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[48]

47.   An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

48.   To analyze cause and effect, I performed an event study to determine whether Virtus Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with the least amount of Virtus-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about Virtus and the market price of Virtus Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

49.   A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[49] I have performed

---

[48] John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998), p. 111.

[49] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent" variable). In this case, the daily percentage change in Virtus Common Stock (the Virtus daily "return") is the dependent variable and the contemporaneous daily returns for a market and industry index are the independent variables. For a general discussion of regression analysis, see Chapters 1-3 in Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.

such an analysis in this matter where I evaluate the relationship between Virtus Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return (the "Market Index") and the S&P Composite 1500 Asset Management and Custody Banks Index, hereafter referred to as the "Industry Index."[50,51]

50.    For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[52] By using a "rolling" estimation window, it allows for the relationship between Virtus Common Stock, market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[53]

51.    The model indicates that there is a positive correlation between Virtus Common Stock and the control variables. In other words, the movement of the Market Index and Industry Index helps explain movements in Virtus's stock price. For instance, choosing a day in the Class Period purely as an example, June 4, 2014, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.27 which means that a 1% rise in the S&P 500 predicts a 1.27% increase in returns for Virtus Common Stock. The

---

[50] In unreported robustness checks, I repeated my analyses using an alternate regression specification: a 3-factor model controlling for the S&P 500, a market-capitalization weighted index using the constituents of the S&P Composite 1500 Asset Management and Custody Banks Index (excluding Virtus Investment Partners), and a market capitalization weighted peer index, made up of companies mentioned as peers throughout the Class Period by analysts at Jefferies and Morgan Stanley. This variation of my market model specification did not change the substance of my conclusions.

[51] Virtus was a member of the S&P Composite 1500 Asset Management and Custody Bank Index during the Class Period, and thus its returns were excluded from the Industry Index. The returns of the Industry Index are net of the S&P 500 Total Return Index.

[52] *See*, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13, 15 (1997) ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[53] Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

estimated coefficient for the Industry Index is 0.81, meaning that the expected return for Virtus

Common Stock is about a 0.81% increase for every 1% increase in the Industry Index over and

above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling

regression models for each day during the Class Period and demonstrates that there was a

consistently positive relationship between the general market, the Industry Index, and the price

of Virtus Common Stock.

52.   Another important statistic from the regression is the Standard Deviation of the

Errors, which measures the degree of imprecision in the predictions from the model. Put another

way, this measure provides a metric for how much "randomness" remains in the price movement

of Virtus Common Stock after controlling for the Market Index and Industry Index. For instance,

on the example date, June 4, 2014, the model predicted that absent any new firm-specific

information, the price of Virtus Common Stock would increase by 0.62% because the S&P 500

was up 0.21% and the Industry Index was up 0.52%.[54] Because of the inherent randomness

observed in stock price returns, I do not expect the model to predict returns exactly. In this

example, I observe an actual return of 2.24%. Thus, the "abnormal return" for this day is 1.62%

(the actual return of 2.24% minus the predicted return of 0.62%). I then rely on the Standard

Deviation of the Errors from the regression model to tell if this abnormal return of 1.62% is not

sufficiently large enough that I can reject random movement as the explanation.

53.   The test for whether randomness can be rejected is done by calculating what is

known as a "t-statistic," which represents the number of standard deviations between the actual

observation and the prediction. For the example date, an abnormal return of 1.62% represents

---

[54] The expected return of 0.62% is found as follows: 1.27 * 0.21% (Coefficient on Market Index *times* Market Index return) + 0.81 * 0.52% (Coefficient on Industry Index Return *times* Industry Index Return) + -0.06% (constant term from regression).

1.06 standard deviations or a t-statistic of 1.06 (abnormal return of 1.62% divided by the Standard Deviation of the Errors of 0.0153). Using the standard assumption that, in the absence of new firm-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[55] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of 1.06, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

54.    **Exhibit 6** shows that the Standard Deviation of the Errors varied over the Class Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility.

55.    To analyze cause-and-effect, I examined the price response of Virtus Common Stock to earnings announcements that occurred during the Class Period (see **Exhibit 7**). I review ten earnings releases throughout the Class Period, including the final alleged corrective disclosure on May 11, 2015.

---

[55] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001. The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

56.     There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[56] Also, newly released earnings reports by the company are an objective set of news to identify and test. Considering the fourth earnings report listed in **Exhibit 7** as an example (*i.e.* Q3 2013 earnings release), the Company announced third quarter results for fiscal year 2013, which exceeded expectations and caused certain analysts to increase estimates going forward.[57] In response, the market price of Virtus Common Stock increased 11.31%, compared to the expected return of negative 0.86%.[58] Thus, the abnormal return on October 30, 2013 was *positive* 12.17%. With a t-statistic of 7.70, this abnormal price movement is statistically significant, and I therefore have scientific evidence that Virtus Common Stock reacted rapidly to this new information.

57.     Similar to this example, I analyzed the market reaction to Virtus's other earnings announcements throughout the Class Period. In total, of the ten regular quarterly earnings Virtus issued during the Class Period, three resulted in statistically significant price movements above the 95% confidence level. Specifically, all three announcements were significant at the 99% confidence level.

---

[56] *See, e.g.*, William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968, pp. 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971, pp. 119-163; Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980, pp. 1-12.

[57] "3Q13 First Look: Consistent Flows Powering a Step Up in Earnings Power," *Sandler O'Neill & Partners*, October 29, 2013; "3Q13 First Take: Quality Beat, Organic Growth Continues," *Jefferies,* October 29, 2013.

[58] The expected return of -0.86% is found as follows: 1.17 * -0.48% (Coefficient on Market Index times Market Index return) + 1.16 * -0.05% (Coefficient on Industry Index Return times Industry Index Return) + -0.24% (constant term from regression).

58.     **Exhibit 7** presents a summary of the earnings releases, and **Exhibits 8A–8J** depict the intraday price movements for each of these announcement dates.

59.     I then compared these results against the 246 days during the Class Period where I determined that there was no Virtus-related news, analyst reports, or SEC filings.[59] Of these 246 days, there were 15 statistically significant price movements. Thus, during the Class Period there was a statistically significant price reaction at the 95% confidence level on 30.00% of the earnings announcements; on days with no news, I observed a statistically significant reaction 6.10% of the time.[60] The fact that I observed statistically significant movements on 6.10% of the days with no news is not statistically significantly different than what I would expect to observe by randomness alone.[61]

60.     Furthermore, on the 246 days with no news, the average change in price of Virtus Common Stock was 1.11% after controlling for market and industry factors, while the average change in Virtus Common Stock on earnings was 3.90%. In other words, the average magnitude of stock price movement on announcement days was about 3.51 times higher.[62] Again, these data demonstrate that on days when important firm-specific information is released to the market, Virtus' stock price moves much more than on days where there is no firm-specific news. This

---

[59] Based on a search for "All Sources" with the company or keyword field "Virtus Investment Partners" for the period "January 25, 2013 – May 11, 2015." Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. There may be other news articles and sources that are not part of Factiva's database, however, to the extent there are additional news stories not captured by Factiva, the treatment of those days as "no news days" would tend to bias toward finding a lack of cause and effect.

[60] This difference between 30.00% and 6.10% is itself statistically significant at the 95% confidence level.

[61] When using a 95% confidence interval to test for significance, one would expect to observe a significant price movement on approximately 5% of the dates with no news. That is because the test is designed to have a Type I error rate (i.e. false positive rate) of 5%. So, on average, given the volatility observed in the price, you could expect the stock price to move enough to be significant 5.00% of the time based on normal volatility alone. In this case, 6.10% is not statistically significantly different than 5.00% at the 95% level.

[62] This difference between 3.90% and 1.11% is itself statistically significant.

provides further evidence of a cause-and-effect relationship between Virtus-specific news and changes in the price of Virtus Common Stock, and thus an efficient market.

61.    The bar charts below summarize this analysis while **Exhibit 9** gives more detail. [63]



---

[63] In Exhibit 9, I also conducted an alternative analysis of earnings dates significant at the 90% confidence level. Of the ten regular quarterly earnings releases, four resulted in statistically significant price movements above the 90% confidence level. The additional date, April 30, 2014, has a p-value of 0.05253 and is extremely close to being statistically significant at the 95% confidence level.



62.   Finally, when important Virtus-specific news is released to the market (e.g. earnings), Virtus' daily trading volume also tends to be much higher than on days where there is no Virtus news. For instance, the average daily trading volume of the ten days with earnings releases was 117 thousand shares. Compare this to the average daily trading volume of 58 thousand shares for days where there is no news in the Class Period. The bar chart below summarizes this analysis.



**Average Daily Trading Volume on Earnings Announcements vs. Days with No News**

63.    The bar charts above establish a strong cause-and-effect relationship between new, unexpected news and rapid changes in Virtus Common Stock. Virtus earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no Virtus news.

64.    In conclusion, the event study analysis and intraday charts presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of Virtus Common Stock.

## G. ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

65.    In *Krogman v. Sterritt*, the Court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the

28

*Cammer* factors.[64] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[65] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[66] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

66.    Virtus Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period, thus suggesting this factor is supportive of efficiency. There were between 7.8 million and 9.2 million shares of Virtus Common Stock outstanding throughout the Class Period.[67]

67.    Based on the market price, the market capitalization for Virtus Common Stock averaged $1.6 billion during the Class Period. **Exhibit 10** shows Virtus's market capitalization over the Class Period. **Exhibit 11** shows that during the Class Period, Virtus Common Stock's market capitalization fell between the 53rd and 82nd percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period.[68] In other words, over the Class Period, Virtus Common Stock had a higher market capitalization than at least 53% of the firms on the combined NYSE and NASDAQ. Furthermore, insiders held a small percentage

---

[64] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). The factors identified by the *Krogman* Court are 1) market capitalization, 2) size of float of common stock, and 3) bid-ask spread.

[65] *Krogman*, 202 F.R.D. at 478.

[66] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105, 117 (2000).

[67] S&P Capital IQ.

[68] Thomson Reuters Eikon database.

(between 2.66% and 3.16%) of the public float, therefore the float is high relative to shares outstanding.

68.    Given that the market capitalization for Virtus Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for Virtus Common Stock.

## H.  ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

69.    The *Krogman* Court's last additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[69] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

70.    I analyzed bid-ask spreads for Virtus Common Stock during the Class Period. **Exhibit 12A** shows that during the Class Period, the time-weighted average percentage bid-ask spread for Virtus Common Stock in each month ranged from 0.17% and 0.44%. This is well below the average bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in April 2015 (the full month during the Class Period when Virtus had the

---

[69] *Krogman*, 202 F.R.D. at 478.

largest percentage bid-ask spread).[70,71] **Exhibit 12A** demonstrates that Virtus Common Stock had a monthly average bid-ask spread of 0.37% in April 2015, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.59%.[72] **Exhibit 12B** shows the monthly average bid-ask dollar spread for Virtus Common Stock was no more than $0.68 per share during the Class Period, while my randomly-selected group of 100 common stocks had an average bid-ask spread of $0.79.[73] Accordingly, Virtus's bid-ask spread was low during the Class Period in both dollar and percentage terms, and thus this factor further supports market efficiency for Virtus Common Stock.

## I.  ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

71.   Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 13** shows, 353 institutions reported owning a majority of Virtus Common

---

[70] In the last month of the Class Period, May 2015, the bid-ask spread analysis was limited to the trading days in the Class Period.  Based on the full months contained within the Class Period, April 2015 had the largest bid ask spread percentage and thus is used for comparison. Quote data for Virtus and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[71] Determining the average bid-ask spread for an entire exchange is a very data intensive process. In order to replicate this analysis on a smaller scale, I determined the constituents of the NYSE and NASDAQ throughout the Class Period and then randomly generated a list of 100 of those constituents from both exchanges. After determining that all 100 constituents were common stock securities, I evaluated the time-weighted average monthly bid-ask spread for April 2015.

[72] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

[73] Calculated as the average percentage bid-ask spread for this sample, scaled by $134.45, the average price of Virtus Common Stock in April 2015.

Stock during the Class Period, holding, on average, over 70.58% of public float.[74] This high level

of institutional ownership of Virtus Common Stock during the Class Period coupled with the

high trading volume further supports a conclusion of market efficiency.

### J.   ADDITIONAL FACTOR 4: AUTOCORRELATION

72.    If previous price movements of a security have the ability to predict future price

movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency

because if it is persistent and sufficiently large enough that a trader could profit from taking

advantage of the autocorrelation, it means that past price movements are not fully reflected in the

current price, which would suggest market inefficiency.

73.    Autocorrelation may occur from time to time for random reasons or due to the

pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation

were large enough and persistent enough that a trader could consistently earn riskless profits over

time.[75]

74.    A well-accepted methodology to test for the existence of autocorrelation is to run a

regression analysis that tests whether, on average, the abnormal return from the previous day has

a statistically significant effect on the abnormal return today.[76] If the previous day's abnormal

return has no statistically significant predictive power, then there is no consistent evidence of

autocorrelation. Even if the regression shows a significant result for a certain period, then one

must ask whether the effect is persistently significant and large enough to suggest a predictable

arbitrage opportunity in the next period.

---

[74] By contrast, insider holdings only averaged 2.89% of shares outstanding.

[75] Doron Avramov, et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).

[76] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

75.   **Exhibit 14** displays the autocorrelation coefficient for Virtus Common Stock using the abnormal returns from the event study model described above. The coefficient for the Class Period is not statistically significant meaning there is no consistent evidence of autocorrelation (*i.e.*, throughout the Class Period, the coefficient on the previous day's abnormal return averaged 0.05). This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that Virtus Common Stock traded in an efficient market throughout the Class Period.

## VIII.  DAMAGES

76.   Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[77]

77.   The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures

---

[77] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

## IX.   CONCLUSION

78.   In sum, every factor analyzed supports my opinion that Virtus Common Stock traded in an efficient market. Furthermore, class-wide damages in this matter can be calculated using a common methodology.

79.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, 2016.

Chad Coffman

**Exhibit 1**

# Summary of Efficiency Factors for Virtus Investment Partners

| Factor | Summary of Factor | Virtus |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 3.68%, as a percentage of shares outstanding, well exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 65 thousand shares traded daily on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 7 securities analysts issued at least 63 analyst reports, which implies that important information relevant to trading Virtus Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Virtus shares were exchange-traded on the NASDAQ during the Class Period, not over the counter, this factor is satisfied. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • Virtus met the important eligibility criteria for SEC Form S-3 and was apparently S-3 eligible during the Class Period. Historically, Virtus filed Form S-3 before and during the Class Period (i.e. 4/8/2010 and 6/26/2013); therefore, this factor is satisfied. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Virtus Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 3/31/2013 and 6/30/2015, Virtus' market capitalization was $1.46 billion and $1.18 billion, respectively, which is above the 53rd percentile of NYSE and NASDAQ stocks. Virtus Common Stock therefore easily meets this criteria. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the percentage bid-ask spread for Virtus Common Stock in each full month ranged from 0.17% to 0.37%. Virtus's average percentage bid-ask spread was well below the mean percentage bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in April 2015 (the full month when Virtus had the largest percentage bid-ask spread). This supports a finding of efficiency. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • 353 institutions held 70.6% of the public float throughout the Class Period, on average, which further supports the finding that Virtus Common Stock traded in an efficient market (Note: Institutions held as much as 74.6% of the public float during the Class Period). |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • No consistent evidence of autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Virtus Common Stock based solely on its past price movements. |



**Exhibit 2**
**Virtus Common Stock Price & Volume**
**1/25/2013 - 8/31/2015**

Sources: Complaint and S&P Capital IQ.



**Exhibit 3**
**Virtus Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**1/25/2013 - 5/11/2015**

Average Weekly Volume as Percentage of Shares Outstanding:
Average: 3.68%
Median: 3.31%

"1% average weekly trading volume of the outstanding shares justify a substantial presumption" (*Cammer*)

"2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one" (*Cammer*)

■ Volume as a Percentage of Shares Outstanding

Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on January 25, 2013 through May 11, 2015. The last week consists of only two trading days (i.e., May 8, 2015 and May 11, 2015), and therefore was excluded from this analysis.

# Exhibit 4

# Summary of Analyst Reports Issued for Virtus Investment Partners
# During the Class Period [1]

|  | Analyst Name | Reports Issued During the Class Period: 1/25/2013 - 5/11/2015 |
|---|---|---|
| [1] | SANDLER O'NEILL & PARTNERS | 36 |
| [2] | JEFFERIES | 14 |
| [3] | MORGAN STANLEY | 9 |
| [4] | BUYSELLSIGNALS RESEARCH | 4 |
| [5] | BANK OF AMERICA MERRILL LYNCH [2] | - |
| [6] | GOLDMAN SACHS [2] | - |
| [7] | RAYMOND JAMES & ASSOCIATES [2] | - |
|  | **Total** | **63** |

Source: Investext.

(1) Many analyst reports are not available through third party data providers (e.g. Investext); therefore, this almost certainly understates the total amount of analyst coverage.

(2) Analysts from Bank of America Merrill Lynch, Goldman Sachs, and Raymond James & Associates participated in Virtus conference calls and likely issued reports on Virtus, but these reports were not part of the Investext database, so I am unable to determine the complete number of reports issued on the Company.

**Exhibit 5**
**Coefficients from Virtus Common Stock Event Study**
**1/25/2013 - 5/11/2015**



Note: The coefficients for each day are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is a market capitalization weighted index comprised of the constituents of the S&P Composite 1500 Asset Management & Custody Banks Index (excluding Virtus Investment Partners). The returns of the Industry Index are net of the S&P 500. Earnings announcements and alleged corrective disclosures have been removed from estimation.

**Exhibit 6**
**Standard Deviation of the Errors from Virtus Common Stock Event Study**
**1/25/2013 - 5/11/2015**



Note: The standard deviation of the errors for each day are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is a market capitalization weighted index comprised of the constituents of the S&P Composite 1500 Asset Management & Custody Banks Index (excluding Virtus Investment Partners). The returns of the Industry Index are net of the S&P 500. Earnings announcements and alleged corrective disclosures have been removed from estimation.

**Exhibit 7**
**Event Study Analysis of Virtus Investment Partners Earnings Dates**

| # | Date | Time | Market Date | Event | Headline | Virtus Price | Virtus Raw Return | Abnormal Return | Abnormal Dollar Change | T-Stat | P-Value | Sig Level[2] |
|---|------|------|-------------|-------|----------|-------------|-------------------|-----------------|------------------------|--------|---------|-------------|
| | | | | | | | | Rolling Regression Model (120-day window)[1] | | | | |
| 1 | 1/29/2013 | 5:03 PM | 1/30/2013 | Q4 2012 Earnings Release | Virtus Investment Partners Announces Financial Results For the Fourth Quarter and Full Year of 2012 (PR Newswire) | $145.25 | 0.25% | 0.25% | $0.36 | 0.19 | 0.85 | |
| 2 | 4/30/2013 | 4:27 PM | 5/1/2013 | Q1 2013 Earnings Release | Virtus Investment Partners Announces Financial Results For the First Quarter of 2013 (PR Newswire) | $189.51 | -0.78% | 0.79% | $1.51 | 0.64 | 0.52 | |
| 3 | 7/30/2013 | 4:32 PM | 7/31/2013 | Q2 2013 Earnings Release | Virtus Investment Partners Announces Financial Results For the Second Quarter of 2013 (PR Newswire) | $186.50 | 0.15% | -0.23% | -$0.44 | -0.18 | 0.86 | |
| 4 | 10/29/2013 | 4:31 PM | 10/30/2013 | Q3 2013 Earnings Release | Virtus Investment Partners Announces Financial Results For the Third Quarter of 2013 (PR Newswire) | $206.11 | 11.31% | 12.17% | $22.54 | 7.70 | 0.00 | *** |
| 5 | 1/28/2014 | 4:30 PM | 1/29/2014 | Q4 2013 Earnings Release | Virtus Investment Partners Announces Financial Results for the Fourth Quarter and Full Year of 2013 (PR Newswire) | $182.39 | -5.86% | -4.39% | -$8.50 | -2.70 | 0.01 | *** |
| 6 | 4/29/2014 | 4:30 PM | 4/30/2014 | Q1 2014 Earnings Release | Virtus Investment Partners Announces Financial Results For the First Quarter of 2014 (PR Newswire) | $184.99 | 3.38% | 2.90% | $5.19 | 1.96 | 0.05 | *[3] |
| 7 | 7/28/2014 | 4:15 PM | 7/29/2014 | Q2 2014 Earnings Release | Virtus Investment Partners Announces Financial Results For the Second Quarter of 2014 (PR Newswire) | $210.29 | 0.81% | 1.79% | $3.73 | 1.34 | 0.18 | |
| 8 | 10/28/2014 | 9:03 AM | 10/28/2014 | Q3 2014 Earnings Release | Virtus Investment Partners Announces Financial Results For the Third Quarter of 2014 (PR Newswire) | $170.03 | 2.68% | 1.92% | $3.18 | 1.33 | 0.19 | |
| 9 | 1/29/2015 | 9:00 AM | 1/29/2015 | Q4 2014 Earnings Release | Virtus Investment Partners Announces Financial Results for the Fourth Quarter and Full Year of 2014 (PR Newswire) | $142.50 | 2.38% | 1.75% | $2.44 | 1.12 | 0.27 | |
| 10 | 5/11/2015 | 8:00 AM | 5/11/2015 | Q1 2015 Earnings Release | Virtus Investment Partners Announces Financial Results for the First Quarter 2015 (PR Newswire) | $116.27 | -13.20% | -12.83% | -$17.19 | -6.48 | 0.00 | *** |

Source: S&P Capital IQ.
Notes:
(1) The results are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is a market capitalization weighted index comprised of the constituents of the S&P Composite 1500 Asset Management & Custody Banks Index (excluding Virtus Investment Partners). The returns of the Industry Index are net of the S&P 500. Earnings announcements and alleged corrective disclosures have been removed from estimation.
(2) "***" Denotes statistical significance at the 99% confidence level or greater, "**" denotes statistical significance at the 95% confidence level or greater, and "*" denotes statistical significance at the 90% confidence level or greater.
(3) The abnormal return on April 30, 2014 has a p-value of 0.05253 and is extremely close to being statistically significant at the 95% confidence level.



**Exhibit 8A**
**Virtus Common Stock Intraday Price and Volume**
**1/30/2013**

| | Return | Abn. Return | T-Stat |
|---|---|---|---|
| | 0.25% | 0.25% | 0.19 |

1/29/2013 5:03 PM
VRTS reports Q4 2012
earnings.

1/29/2013
4:00 pm - $144.89
NASDAQ Close

1/30/2013
9:30 am - $144.84
NASDAQ Open

1/30/2013
4:00 pm - $145.25
NASDAQ Close

Source: TICK Data.

**Exhibit 8B**
**Virtus Common Stock Intraday Price and Volume**
**5/1/2013**



Source: TICK Data.

**Exhibit 8C**
**Virtus Common Stock Intraday Price and Volume**
**7/31/2013**



| | Return | Abn. Return | T-Stat |
|---|---|---|---|
| | 0.15% | -0.23% | -0.18 |

7/30/2013 4:32 PM
VRTS reports Q2 2013
earnings.

7/31/2013
9:30 am - $186.02
**NASDAQ Open**

7/30/2013
4:00 pm - $186.22
**NASDAQ Close**

7/31/2013
4:00 pm - $186.50
**NASDAQ Close**

Source: TICK Data.



**Exhibit 8D**
**Virtus Common Stock Intraday Price and Volume**
**10/30/2013**

| | Return | Abn. Return | T-Stat |
|---|---|---|---|
| | 11.31% | 12.17% | 7.70 |

10/29/2013 4:31 PM
VRTS reports Q3 2013
earnings.

10/30/2013
9:30 am - $190.38
**NASDAQ Open**

10/29/2013
4:00 pm - $185.16
**NASDAQ Close**

10/30/2013
4:00 pm - $206.11
**NASDAQ Close**

Source: TICK Data.

**Exhibit 8E**
**Virtus Common Stock Intraday Price and Volume**
**1/29/2014**



Source: TICK Data.

**Exhibit 8F**
**Virtus Common Stock Intraday Price and Volume**
**4/30/2014**



| | Return | Abn. Return | T-Stat |
|---|---|---|---|
| | 3.38% | 2.90% | 1.96 |

4/29/2014 4:30 PM
VRTS reports Q1 2014
earnings.

4/29/2014
4:00 pm - $178.95
**NASDAQ Close**

4/30/2014
4:00 pm - $184.99
**NASDAQ Close**

4/30/2014
9:30 am - $177.20
**NASDAQ Open**

Source: TICK Data.

**Exhibit 8G**
**Virtus Common Stock Intraday Price and Volume**
**7/29/2014**



Source: TICK Data.

**Exhibit 8H**
**Virtus Common Stock Intraday Price and Volume**
**10/28/2014**



Source: TICK Data.

Exhibit 8I
Virtus Common Stock Intraday Price and Volume
1/29/2015



Source: TICK Data.



**Exhibit 8J**
**Virtus Common Stock Intraday Price and Volume**
**5/11/2015**

| | Return | Abn. Return | T-Stat |
|---|---|---|---|
| | -13.20% | -12.83% | -6.48 |

5/11/2015 8:00 AM
VRTS reports Q1 2015 earnings.

5/8/2015
4:00 pm - $133.95
**NASDAQ Close**

5/11/2015
9:30 am - $129.36
**NASDAQ Open**

5/11/2015
4:00 pm - $116.27
**NASDAQ Close**

Source: TICK Data.

**Exhibit 9**
**Comparison of Statistical Significance and Abnormal Returns**
**for Virtus Investment Partners**
**Earnings Announcement Dates vs. Days with No News**

| Statistic | Earnings Announcement Dates | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N | 10[1] | 246[2] |
| Significant Days at 95% Confidence Level or Greater | 3 | 15 |
| % Significant Days at 95% Confidence Level or Greater | 30.00%[3] | 6.10%[4] |
| Significant Days at 90% Confidence Level or Greater | 4 | 25 |
| % Significant Days at 90% Confidence Level or Greater | 40.00%[5] | 10.16%[6] |
| Average Absolute Abnormal Return | 3.90%[7] | 1.11% |

Notes:

(1) The last earnings release included in this analysis window was before market hours on May 11, 2015.

(2) For the purposes of this analysis, I selected the 246 days with no news, no analyst reports, and no SEC filings throughout the Class Period.

(3) 30.00% rate of statistical significance is statistically significantly different than 6.10% at the 95% confidence level on the basis of a Chi-Square Test and a Fisher's Exact Test.

(4) One would expect to observe 5% based on random chance alone. 6.10% is not significantly different from 5.00% based on the results of a t-test at the 95% confidence level.

(5) 40.00% rate of statistical significance is statistically significantly different than 10.16% at the 95% confidence level on the basis of a Chi-Square Test and a Fisher's Exact Test.

(6) 10.16% is not significantly different from 10.00% based on the results of a t-test at the 95% confidence level.

(7) 3.90% absolute return is statistically significantly different than 1.11% based on a t-test for difference of means at the 95% confidence level.



**Exhibit 10**
**Virtus Common Stock Market Capitalization**
**1/25/2013 - 8/31/2015**

Sources: Complaint and S&P Capital IQ.

**Exhibit 11**

**Virtus Common Stock Market Capitalization
Compared to Companies Traded
on the NYSE & NASDAQ**

| Last trading day of: | VRTS Market Capitalization (billions) | Percentile Rank in NYSE & NASDAQ [1] |
|---|---|---|
| Q1 - 2013 | $1.46 | 81.84% |
| Q2 - 2013 | $1.38 | 59.80% |
| Q3 - 2013 | $1.46 | 59.64% |
| Q4 - 2013 | $1.82 | 62.01% |
| Q1 - 2014 | $1.58 | 59.57% |
| Q2 - 2014 | $1.94 | 62.41% |
| Q3 - 2014 | $1.58 | 60.11% |
| Q4 - 2014 | $1.54 | 59.32% |
| Q1 - 2015 | $1.17 | 53.47% |
| Q2 - 2015 | $1.18 | 53.46% |

Source: Thomson Reuters Eikon.

Note:

(1) Constituents of the NYSE are not available prior to 5/20/2013, and therefore the percentile rank in Q1 2013 is only based on constituents of the NASDAQ.

**Exhibit 12A**
**Virtus Common Stock Average Monthly Bid-Ask Percentage Spread**
**1/25/2013 - 5/11/2015**



Source: TICK Data.
Note: January 2013 and May 2015 data are limited to the Class Period.

**Exhibit 12B**
**Virtus Common Stock Average Monthly Bid-Ask Dollar Spread per Share**
**1/25/2013 - 5/11/2015**



Source: TICK Data.
Note: January 2013 and May 2015 data are limited to the Class Period. The average and median dollar bid-ask spread for the randomly-selected sample of 100 common stocks trading on the NYSE and NASDAQ in April 2015 are given by the average and median percentage bid-ask spread for this sample, scaled by $134.45 (the average VRTS trading price in April 2015).

**Exhibit 13**
**Virtus Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float: Shares Outstanding Plus Short Interest (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 12/31/2012 | 7,837 | 156 | 224 | 145 | 7,757 | 2.86% | 4,833 | 61.67% | 62.31% |
| 3/31/2013 | 7,832 | 180 | 248 | 132 | 7,717 | 3.16% | 4,676 | 59.71% | 60.60% |
| 6/30/2013 | 7,821 | 196 | 246 | 156 | 7,730 | 3.15% | 4,828 | 61.74% | 62.46% |
| 9/30/2013 | 8,950 | 194 | 246 | 141 | 8,845 | 2.75% | 6,243 | 69.75% | 70.58% |
| 12/31/2013 | 9,101 | 199 | 242 | 175 | 9,034 | 2.66% | 6,418 | 70.52% | 71.05% |
| 3/31/2014 | 9,106 | 189 | 253 | 391 | 9,244 | 2.77% | 6,843 | 75.15% | 74.02% |
| 6/30/2014 | 9,164 | 183 | 256 | 291 | 9,199 | 2.79% | 6,861 | 74.87% | 74.58% |
| 9/30/2014 | 9,120 | 194 | 263 | 309 | 9,165 | 2.89% | 6,798 | 74.54% | 74.17% |
| 12/31/2014 | 9,060 | 194 | 264 | 336 | 9,132 | 2.91% | 6,656 | 73.46% | 72.88% |
| 3/31/2015 | 8,978 | 173 | 258 | 373 | 9,093 | 2.87% | 6,504 | 72.44% | 71.52% |
| 6/30/2015 | 8,912 | 169 | 264 | 369 | 9,017 | 2.96% | 6,663 | 74.76% | 73.89% |
| 9/30/2015 | 8,819 | 159 | 264 | 626 | 9,181 | 2.99% | 6,837 | 77.53% | 74.47% |

| Total Institutions over Class Period: | 353 | | Average over Class Period: | 2.89% | | 70.69% | 70.58% |
|---|---|---|---|---|---|---|---|

Sources: S&P Capital IQ and SEC filings.
Notes: Jeffrey Thorp's insider holdings of 372,755 shares as of the quarter ended 12/31/2012 and 42,840 shares as of the quarter ended 3/31/2013 have been excluded from estimation because these shares are accounted for in institutional holdings of Sonoma Capital Management, of which Jeffrey Thorp is the managing director. Virtus shares sold short by institutions throughout the Class Period are not reflected in total institional holdings  because these shares are already accounted for in the "Short Interest" column. These institutions include: Meeder Asset Management, Inc., Convergence Investment Partners, LLC, TFS Capital LLC, American Century Investment Management Inc., Campbell & Company, LP, Invesco Advisers, Inc., Horizon Advisers, and Americafirst Capital Management, LLC.

**Exhibit 14**
**Virtus Common Stock**
**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day Abnormal Return[1] | T-statistic |
|---|---|---|
| 2013Q1 | -0.09 | -0.61 |
| 2013Q2 | 0.33 | 2.72 |
| 2013Q3 | 0.07 | 0.57 |
| 2013Q4 | 0.07 | 0.54 |
| 2014Q1 | -0.01 | -0.06 |
| 2014Q2 | 0.26 | 2.05 |
| 2014Q3 | 0.21 | 1.63 |
| 2014Q4 | -0.06 | -0.48 |
| 2015Q1 | 0.27 | 2.22 |
| 2015Q2 | -0.54 | -3.24 |
| **Class Period** | **0.05** | **1.14** |

Source: S&P Capital IQ.
Note: The regression period runs from 1/25/2013 to 5/11/2015.
(1) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements and alleged corrective disclosures have been removed.

# Appendix A
# Documents Considered

## Court Documents

- Consolidated Class Action Complaint, *In Re Virtus Investment Partners, Inc. Securities Litigation*, filed August 21, 2015.
- Opinion & Order, *In Re Virtus Investment Partners, Inc. Securities Litigation*, filed July 1, 2016.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. (1988).
- Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. (2014).
- *Krogman v. Sterritt* 202 F.R.D. (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings/Forms

- Select Virtus 10-K Annual filings submitted to the SEC during the relevant period.
- Select Virtus 10-Q Quarterly filings submitted to the SEC during the relevant period.
- Select Virtus 8-K Current reports submitted to the SEC during the relevant period.
- Select Virtus Def 14A Proxy statements submitted to the SEC during the relevant period.
- Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.

## Security Data

- Historical data for Virtus Common Stock, members of the Industry Index, members of the Peer Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ. Historical constituents of the Industry index were obtained from Thomson Reuters Eikon.
- Trade and quote data for Virtus during the Class Period and one hundred random companies trading on the New York Stock Exchange and NASDAQ for April 2015 were obtained from Tick Data, *see* https://tickapi.tickdata.com/.
- Market capitalization data for firms trading on the New York Stock Exchange and NASDAQ were obtained from the Thomson Reuters Eikon database.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Turnover velocity data for the New York Stock Exchange and NASDAQ was obtained from the World Federation of Exchanges, *see* http://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

- The number of market makers during the Class Period for Virtus Common Stock was obtained from Bloomberg.

## News

- Virtus news headlines and select articles downloaded from Factiva for the Class Period.
  - News was obtained by executing a search via Factiva for "All Sources" with the company and keyword fields "Virtus Investment Partners, Inc." for the period "January 25, 2013 – May 11, 2015." The Factiva search yielded 722 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- Virtus earnings press releases throughout the Class Period.
- Virtus conference call transcripts throughout the Class Period.

## Analyst Reports

- Virtus analyst reports supplied by Investext via Thomson Reuters and from Counsel for the period January 2013 to May 2015.
- Analyst reports including, but not limited to:
  - "Initiating with a Hold: Solid Franchise Facing Near-term Headwinds," *Jefferies*, October 9, 2013.
  - "3Q13 First Look: Consistent Flows Powering a Step Up in Earnings Power," *Sandler O'Neill & Partners*, October 29, 2013.
  - "3Q13 First Take: Quality Beat, Organic Growth Continues," *Jefferies*, October 29, 2013.
  - "Flows More Compelling in 2H14-2015, Initiate at EW," *Morgan Stanley*, January 14, 2014.

## Academic Articles/Texts

- Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Yakov Amihud, et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. (2005).
- Doron Avramov, et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Brad M. Barber, et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. (1994).
- William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.

- John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).
- Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. (1995).
- Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. (1970).
- William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. (1996).
- Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. (1978).
- A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).
- Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995.
- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. (2000).
- Roman L. Weil, Daniel G. Lentz & David P. Hoffman, *Litigation Services Handbook, The Role of the Financial Expert* (5th ed. 2012).

## Other

- http://www.sec.gov/answers/mktmaker.htm
- http://www.sec.gov/edgar/searchedgar/companysearch.html
- http://www.sec.gov/about/forms/form13f.pdf.
- http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf.
- http://www.nasdaqomx.com/transactions/trading/equities.
- http://www.nasdaq.com/reference/market_mechanics.pdf.
- https://listingcenter.nasdaqomx.com/assets/initialguide.pdf.
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.htm

APPENDIX B

CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:        (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com

**EMPLOYMENT:**

**Global Economics Group, LLC**
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

**Market Platform Dynamics, LLC**
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

**EDUCATION:**

**CFA**      Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997

Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**   Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa


## PROFESSIONAL EXPERIENCE:

<u>Securities, Valuation, and Market Manipulation Cases:</u>

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  o In Re: <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation</u>.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>Schering-Plough Corporation/ Enhance Securities Litigation</u>. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>REFCO Inc. Securities Litigation</u>. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>Computer Sciences Corporation Securities Litigation</u>. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

## Testimony:

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2009**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009. Filed rebuttal expert report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report on January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed rebuttal expert report July 8, 2010.  Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20,

2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed rebuttal expert report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed rebuttal expert report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed rebuttal expert report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed rebuttal expert report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed rebuttal expert report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert report May 13, 2016. Deposition June 10, 2016.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed rebuttal expert report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed rebuttal expert report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed rebuttal expert report December 7, 2015.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed rebuttal expert report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed rebuttal expert report February 2, 2016. Filed expert reply report on March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report on October 18, 2016.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report on October 31, 2016.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.


<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.


**TEACHING EXPERIENCE:**

> KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
> KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.